ACCEPTED
04-14-00746-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
1/2/2015 3:53:38 PM
KEITH HOTTLE
CLERK

No. 04-14-00746-CV

In the Court of Appeals
for the Fourth District of Texas

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
01/2/2015 3:53:38 PM
VOID
KEITH E. HOTTLE
Clerk

**ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT**,
Appellant,

v.

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
01/5/2015 8:40:00 AM
KEITH E. HOTTLE
Clerk

**CATHERINE CLARK**,
Appellee.

On Appeal from the 285th Judicial District Court
of Bexar County, Texas

**APPELLANT'S BRIEF**

**ATTORNEYS FOR APPELLANT**

Robert A Schulman
State Bar No. 17834500
Leonard J. Schwartz
State Bar No. 17867000
Bryan P. Dahlberg
State Bar No. 24065113
SCHULMAN, LOPEZ & HOFFER, L.L.P.
517 Soledad Street
San Antonio, Texas 78205
Tel.: (210) 538-5385
Fax: (210) 538-5384

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties, as well as the names and addresses of all counsel:

**Defendant/Appellant:** **Alamo Heights Independent School District**

**Defendant/Appellant's
trial and appellate counsel:**
Robert A. Schulman
State Bar Number 17834500
Leonard J. Schwartz
State Bar Number 17867000
Bryan P. Dahlberg
State Bar Number 24065113
SCHULMAN, LOPEZ & HOFFER, L.L.P.
517 Soledad Street
San Antonio, Texas 78205
Tel.: (210) 538-5385
Fax: (210) 538-5384

**Plaintiff/Appellee:** **Catherine Clark**

**Plaintiff/Appellee's
trial and appellate counsel:**
Matthew R. Pearson
State Bar Number 00788173
GRAVELY & PEARSON, L.L.P.
425 Soledad Street, Suite 600
San Antonio, Texas 78205
Tel.: (210) 472-1111
Fax: (210) 472-1110

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .................................................................. ii

TABLE OF CONTENTS ........................................................................................... iii

INDEX OF AUTHORITIES ....................................................................................... vi

STATEMENT OF THE CASE ..................................................................................... 1

STATEMENT REGARDING ORAL ARGUMENT ..................................................... 2

ISSUES PRESENTED ................................................................................................ 3

STATEMENT OF FACTS ........................................................................................... 6

    I.    AHISD terminated Clark's employment in response to numerous irremediable performance deficiencies ................................................... 6

    II.    Clark's allegations of harassment ......................................................... 9

    III.    AHISD's immediate investigation and effective response ............................... 11

    IV.    Clark's performance deteriorated during the 2008-2009 school year ............... 12

    V.    Clark's EEOC Charge and subsequent reports of bullying ............................... 15

    VI.    Clark provided an untruthful statement during AHISD's investigation into a potential breach of state testing protocols................................................. 19

    VII.    Clark's credibility is destroyed and additional performance failures come to the attention of Kershner.................................................. 20

SUMMARY OF THE ARGUMENT................................................................................ 23

ARGUMENT ................................................................................................................ 28

    I.    The standard of review for jurisdictional challenges to TCHRA claims based on governmental immunity mirrors that of a traditional summary judgment motion, and requires dismissal unless the plaintiff establishes the *prima facie* elements of her claims ........................................................ 28

A. *Mission Consolidated*, the first controlling case disregarded by the trial court ........................................................................28

B. *McDonnell Douglas* is the second source of analysis disregarded by the trial judge..................................................................31

C. The *McDonnell Douglas* burden-shifting framework requires a showing of pretext and must be considered a part of the jurisdictional analysis under *Mission Consolidated*....................................33

D. AHISD had multiple legitimate, non-retaliatory reasons for termination, as well as every other decision made with respect to plaintiff's employment .................................................36

II. Plaintiff cannot show pretext because her allegations are based solely on speculation ........................................................................38

A. The doctrine of collateral estoppel bars plaintiff from re-litigating the Board's reasons for acting on her termination ......................................39

B. Plaintiff cannot rely on subjective beliefs or conclusory allegation to demonstrate pretext .................................................................40

C. Plaintiff cannot rely on the alleged unreasonableness of the Board's determination to show pretext for retaliation ............................................41

D. Plaintiff cannot rely on temporal proximity to show pretext ......................44

E. Plaintiff cannot show pretext through disparate treatment because there is no similarly situated comparator .......................................................46

F. Plaintiff's retaliation claim fails under the *McDonnell Douglas* burden-shifting framework, therefore she cannot establish all of the jurisdictional elements of her claim, and the trial court lacked subject matter jurisdiction ...............................................................................48

III. Plaintiff cannot establish the required elements of her sexual harassment claim.......................................................................................49

A. Plaintiff cannot prove AHISD's negligence in controlling working conditions necessary to establish vicarious liability for the alleged misconduct of plaintiff's co-workers .......................................................49

iv

B. Plaintiff does not complain of discrimination based on her gender ............ 51

C. Courts have repeatedly and consistently rejected the sexual harassment claims of plaintiffs who were subjected to more frequent and egregious conduct than that alleged by plaintiff .................................... 54

D. Plaintiff did not report harassment at or even near the time of the alleged event ................................................................................................. 60

E. Notwithstanding the quality of plaintiff's mostly unsupportable claim, AHISD took immediate remedial actions calculated to insure that the conditions in its workplace were discrimination free ..................... 61

   1. AHISD adopted and enforced sexual harassment policies and had implemented sexual harassment training ................................................. 61

   2. AHISD immediately investigated and took prompt remedial action in response to plaintiff's report. Plaintiff did not contest AHISD's investigative conclusions, made no further reports of similar behavior until she filed an EEOC Charge until several months later based on the same allegations. .......................................... 63

PRAYER ..................................................................................................................... 66

CERTIFICATE OF SERVICE .................................................................................... 67

CERTIFICATE OF COMPLIANCE ........................................................................... 68

APPENDIX .................................................................................................................. 69

# INDEX OF AUTHORITIES

## CASES

*Anderson v. Tupelo Regional Airport Authority*,
No. 13–60666, 2014 WL 1929866 (5th Cir. May 15, 2014)........................ 42

*Arredondo v. Gulf Bend Center*,
No. H-06-1580, 2007 WL 1004051 (S.D. Tex. Mar. 30, 2007).................. 46

*AutoZone, Inc. v. Reyes*,
272 S.W.3d 588 (Tex. 2008) .........................................................28, 46-47

*Barnett v. Boeing Co.*,
306 Fed. App'x 875 (5th Cir. 2009)...................................................... 57-58

*Bland Independent School District v. Blue*,
34 S.W.3d 547 (Tex. 2000) ............................................. 23, 29, 31

*Burlington Industries, Inc. v. Ellerth*,
524 U.S. 742 (1998) ..................................................................... 49

*Burlington Northern and Santa Fe Railway Co. v. White*,
548 U.S. 53 (2006) ....................................................................... 37

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ........................................................ 31

*City of Elsa v. Gonzales*,
325 S.W.3d 622 (Tex. 2010) ....................................................... 30

*City of Houston v. Rushing*,
7 S.W.3d 909 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ............ 29

*Clark County School District v. Breeden*,
532 U.S. 268 (2001) .................................................................... 45

*County of Cameron v. Brown*,
80 S.W.3d 549 (Tex. 2002) ................................................................... 29

*Crutcher v. Dallas Independent School District,*
410 S.W.3d 487 (Tex. App.—Dallas 2013, no pet.) .................................. 43

*Dallas Area Rapid Transit v. Carr,*
309 S.W.3d 174 (Tex. App.—Dallas 2010, pet. denied)........................... 29

*DeHart v. Baker Hughes Oilfield Operations, Inc.,*
214 Fed. App'x 437 (5th Cir. 2007) ..................................................... 44-45

*E.E.O.C. v. Exxon Shipping Co.,*
745 F.2d 967 (5th Cir. 1984)................................................................40-41

*Ellerbrook v. City of Lubbock,*
465 Fed. Appx. 324 (5th Cir. 2012) ........................................................ 38

*English v. Pohanka of Chantilly, Inc.,*
190 F. Supp. 2d 833 (E.D.Va. 2002) ....................................................... 53

*Evans v. City of Houston,*
246 F.3d 344 (5th Cir. 2001) .................................................................. 44

*Faragher v. Boca Raton,*
524 U.S. 775 (1998) ............................................... 50, 54-55, 59-61, 63, 65

*Fort Bend Independent School District v. Williams,*
No. 01-13-00052-CV, 2013 WL 4779693
(Tex. App.—Houston [1st Dist.] September 5, 2013, no pet.).................... 46

*Gearhart v. Eye Care Centers of America,*
888 F. Supp. 814 (S.D. Tex. 1995).................................................. 55-56, 58

*Gilster v. Primebank,*
884 F. Supp. 2d 811 (N.D. Iowa 2012) ...................................................... 3

*Green v. Lowe's Home Centers, Inc.,*
199 S.W.3d 514 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ........ 41

*Grice v. FMC Technologies Inc.*,
216 Fed Appx. 401 (5th Cir. 2007) ............................................................... 37

*Gulf States Toyota, Inc. v. Morgan*,
89 S.W.3d 766 (Tex. App.—Houston [1st. Dist.] 2002, no pet.) ............ 50-51

*Hale v. Napolitano*,
No. SA-08-CV-106-XR, 2009 WL 1507144 (W.D. Tex. May 28, 2009)... 57

*Hancock v. Barron Builders & Management Company, Inc.*,
523 F. Supp. 2d 571 (S.D. Tex. 2007) ...................................................... 57-58

*Hockman v. Westward Communications, L.L.C.*,
407 F.3d 317 (5th Cir. 2004) ..................................................................... 57-58

*Hornsby v. Conoco, Inc*,
777 F.2d 243 (5th Cir. 1985) ......................................................................... 40

*Indest v. Freeman Decorating, Inc.*,
164 F.3d 258 (5th Cir. 1999) ..................................................................... 51, 55

*La Day v. Catalyst Tech., Inc.*,
302 F.3d 474 (5th Cir. 2002) ................................................. 24-25, 49, 52

*Lauderdale v. Texas Department of Criminal Justice*,
512 F.3d 157 (5th Cir. 2007) ......................................................................... 64

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir. 1994) ......................................................................... 37

*Long v. Eastfield College*,
88 F.3d 300 (5th Cir. 1996) ........................................................................... 38

*Love v. Motiva Enterprises LLC*,
349 Fed. App'x 900 (5th Cir. 2009) .......................................................... 51-52

*Mayberry v. Vought Aircraft Co.*,
55 F.3d 1086 (5th Cir. 1995) ......................................................................... 43

*Martinez v. Texas Workforce Commission – Civil Rights Division,*
      No 14-50391 (5th Cir. Dec. 30, 2014)...................................................... 43-44

*McCoy v City of Shreveport,*
      492 F.3d 551 (5th Cir. 2007) ...................................................... 36, 38

*McDonald v. Santa Fe Trail Transportation Co.,*
      427 U.S. 273 (1976) ........................................................................... 47

*McDonnell Douglas Corp. v. Green,*
      411 U.S. 792 (1973) ...................................................................*passim*

*Meritor Savings Bank v. Vinson,*
      477 U.S. 57 (1986) ...................................................................... 54-55

*Mission Consolidated Independent School District v. Garcia,*
      372 S.W.3d 629 (Tex. 2012) ................................................... *passim*

*Montgomery County v. Park,*
      246 S.W.3d 610 (Tex. 2007) ................................................................ 37

*Muniz v. El Paso Marriott,*
      773 F. Supp.2d 674 (W.D. Tex. 2011),
      *affirmed* 477 Fed. Appx. 189 (5th Cir. 2012)...................................... 37

*Nairn v. Killeen Independent School District,*
      366 S.W.3d 229 (Tex. App.—El Paso 2012, no pet.) ........................... 39-40

*Nasti v. CIBA Specialty Chemicals Corp.,*
      492 F.3d 589 (5th Cir. 2007) ....................................................... 42

*Oncale v Sundowner Offshore Services, Inc.,*
      523 U.S. 75 (1998) ......................................................... 51-52, 54-55

*Orquiola v. National City Mortgage Co.,*
      510 F. Supp. 2d 1134 (N.D. Ga. 2007)....................................... 3

*Plumlee v. City of Kennedale,*
      795 F.Supp.2d 556 (N.D. Tex. 2011)....................................... 46

*Prairie View A&M University v. Chatha*,
    381 S.W.3d 500 (Tex. 2012) ............................................................... 28

*Ptomey v. Texas Tech University*,
    277 S.W.3d 487 (Tex. App.—Amarillo 2009, pet. denied) ................. 32, 38

*Quantum Chemical Corp. v. Toennies*,
    47 S.W.3d 473 (Tex. 2001) ............................................................... 2, 34

*Rodriguez v. City of Poteet*,
    No. 04–13–00274–CV, 2014 WL 769286
    (Tex. App.—San Antonio February 26, 2014, no pet. h.) .......................... 46

*Sandstad v. CB Richard Ellis, Inc.*,
    309 F.3d 893, 899 (5th Cir. 2002) ............................................................. 43

*Septimus v. University of Houston*,
    399 F.3d 601 (5th Cir. 2005) ..................................................................... 55

*Shepherd v. Comptroller of Public Accounts of State Texas*,
    168 F.3d 871 (5th Cir. 1999) .......................................... 24-25, 54-55, 57-58

*Smith v. Wal–Mart Stores, Inc*,
    891 F.2d 1177 (5th Cir.1990) ..................................................................... 47

*St. Mary's Honor Center v. Hicks*,
    509 U.S. 502 (1993) ..................................................................................... 3

*State v. Lueck*,
    290 S.W.3d 876 (Tex. 2009) ................................................................. 29-30

*Stewart v. Mississippi Transportation Commission*,
    586 F.3d 321 (5th Cir. 2009) ..................................................................... 37

*Summa v. Hofstra University*,
    708 F.3d 115 (2d Cir. 2013) ......................................................................... 3

*Swanson v. General Services Administration,*
110 F.3d 1180 (5th Cir. 1997) ..................................................... 44-45

*Texas Association of Business v. Texas Air Control Board,*
852 S.W.2d 440 (Tex. 1993) ............................................................. 30

*Texas Dept. of Community Affairs v. Burdine,*
450 U.S. 248 (1981) ..................................................................... 3, 34

*Texas Department of Parks & Wildlife v. Miranda,*
133 S.W.3d 217 (Tex. 2004) ............................................................. 29

*Texas State Office of Administrative Hearings v. Birch,*
No. 04-12-00681-CV, 2013 WL 3874473
(Tex. App.—San Antonio July 24, 2013, pet. denied) ................................ 35

*University of Texas, M.D. Anderson Cancer Center v. Valdizan-Garcia,*
No. 01-12-00386-CV, 2012 WL 5545783
(Tex. App.—Houston [1st Dist.] November 15, 2012, no pet.) .................. 35

*University of Texas Southwestern Medical Center v. Nassar,*
133 S.Ct. 2517 (2013) ............................................................... 38, 48

*Vance v. Ball State University,*
133 S.Ct. 2434 (U.S. 2013) ....................................................... 4, 49-50

*Wal-Mart Stores, Inc. v. Canchola,*
121 S.W.3d 735 (Tex. 2003) ............................................................. 38

*Wang v. University of Texas at Austin,*
No. 04-13-00065-CV, 2013 WL 5570824
(Tex. App.—San Antonio Oct. 9, 2013) ............................................ 23, 31

*Washington v. Occidental Chemicals Corp.,*
24 F. Supp. 2d 713 (S.D. Tex. 199) ..................................................... 32

*Wheeler v. BL Development Corp.,*
415 F.3d 399 (5th Cir. 2005) ............................................................. 46

*Williams v. Barnhill's Buffet, Inc.,*
290 Fed. App'x 759 (5th Cir. 2008) .................................................. 61-62, 65

*Ysleta Independent School District v. Monarrez,*
177 S.W.3d 915 (Tex. 2005) ............................................... 28, 46

## STATUTES AND RULES

Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) ........................................ 1

Tex. Educ. Code § 21.159 ............................................ 9, 39

Tex. Educ. Code § 21.251 *et seq.* ............................................. 9

Tex. Educ. Code § 21.301 *et seq.* ............................................. 9, 39

Tex. Lab. Code § 21.001 ............................................ 2, 28, 51

Tex. Lab. Code § 21.051, .055 ........................................ *passim*

Tex. R. App. P. 28.1 ............................................. 1

Tex. R. Civ. P. 166a(b) ............................................ 35

Title VII of the Civil Rights Act of 1964 ....................................... 2, 28, 34, 51-52

## REGULATIONS

29 C.F.R. § 1604.11 ............................................. 63

## ADMINISTRATIVE PUBLICATIONS

*EEOC Notice: Policy Guidance on Current Issues in Sexual Harassment* ........... 63

## STATEMENT OF THE CASE

*Nature of the Case:*      Plaintiff Catherine Clark ("plaintiff" or "Clark"), a former employee of Alamo Heights Independent School District ("AHISD"), alleges unlawful discrimination on the basis of her gender and retaliation in violation of the Texas Commission on Human Rights Act ("TCHRA") stemming from her two year employment and ultimate termination as a physical education teacher and coach at Alamo Heights Junior School. (CR 24-25).[1] After the EEOC rejected her claims (Supp. CR, Vol. I. 125-127), the plaintiff filed her lawsuit. (CR 1). In response, AHISD filed its Plea to the Jurisdiction on June 19, 2014, demonstrating that plaintiff's allegations did not constitute violations of the TCHRA sufficient to invoke the Act's limited waiver of AHISD's governmental immunity, and, consequently, in line with Texas Supreme Court authority, the trial court was *wholly* without subject matter jurisdiction. (CR 33-92).

*Trial Court and Disposition:*      The Honorable Karen H. Pozza, 285th Judicial District Court, Bexar County, Texas, denied AHISD's Plea to the Jurisdiction on October 9, 2014. (CR 459).

*Interlocutory Appeal:*      Pursuant to Rule 28.1 of the Texas Rules of Appellate Procedure and Section 51.014(a)(8) of the Texas Civil Practice and Remedies Code, AHISD timely appealed the trial court's Order denying its Plea to the Jurisdiction. (CR 460).

---

[1]    The record for this appeal was submitted in three parts, consisting of an initial Clerk's Record (cited as "CR"), and two volumes that were subsequently filed as the Supplemental Clerk's Record (cited as "Supp. CR, Vol. I." and "Supp. CR, Vol. II.").

[2]    *McDonnell Douglas* applies to this case pursuant to the announcements of the Texas Supreme Court: "One of TCHRA's purposes is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments. Tex. Labor Code § 21.001(1).

1

## STATEMENT REGARDING ORAL ARGUMENT

Based on controlling precedent from state and federal courts, the Texas Supreme Court narrowly interpreted the TCHRA's waiver of immunity to raise the bar for plaintiffs bringing claims against governmental entity employers. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629 (Tex. 2012). Under *Mission Consolidated*, the elements of a plaintiff's TCHRA cause of action are jurisdictional, and any deficiencies are grounds for dismissal for lack of subject matter jurisdiction. In *Mission Consolidated* the Texas Supreme Court applied the burden-shifting rubric of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) on a plaintiff attempting to overcome governmental immunity at the initial plea to the jurisdiction stage of a discrimination claim. *Id.* at 635-36. As such, oral argument will assist this Court as it considers the trial court's failure to apply the underlying federal and state discrimination precedent. Oral argument will also assist the Court in resolving several interconnected sub-issues concerning the jurisdictional insufficiencies of plaintiff's allegations, particularly as the Court studies, analyzes, and applies the interplay between *McDonnell Douglas* and the Texas Supreme Court's decision in *Mission Consolidated*.[2]

---

[2] *McDonnell Douglas* applies to this case pursuant to the announcements of the Texas Supreme Court: "One of TCHRA's purposes is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments. Tex. Labor Code § 21.001(1). Thus, analogous federal statutes and the cases interpreting them guide our Texas courts' in their reading and application of the TCHRA." *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).

## ISSUES PRESENTED

1.     The trial court erred in failing to follow *McDonnell Douglas*'s shifting burdens of "proof"[3] to the jurisdictional requirements established in *Mission Consolidated*.

2.     Plaintiff's allegations and submissions in response to AHISD's plea to the jurisdiction were insufficient to overcome AHISD's governmental immunity. With the decision in *Mission Consolidated*, it is now black letter law that when a defendant files a plea to the jurisdiction, the burden is upon the plaintiff to provide sufficient evidence that the trial court has jurisdiction. This plaintiff failed to provide the facts necessary to proffer a *prima facie* case under *McDonnell Douglas* or to show that the District's reasons for terminating plaintiff's contract were a pretext for retaliation, a necessary ingredient to confer subject matter jurisdiction on the trial court for plaintiff's claim of retaliation. Given plaintiff's failure to offer evidence of pretext and pursuant to *Mission Consolidated* and *McDonnell Douglas*, the trial court's failure to grant the Plea to the Jurisdiction was reversible error.

Since plaintiff is required to establish the required jurisdictional elements of each of her claims, this issue is accompanied by sub-issues regarding the

---

[3]     AHISD articulated legitimate, nondiscriminatory reasons for its termination of the plaintiff. Once it did so, the ultimate burden of establishing a violation of the TCHRA shifted back to the plaintiff, requiring plaintiff to prove that *each and every one* of the articulated reasons was, in fact, a pretext for the discharge. *See, e.g., Summa v. Hofstra University*, 708 F.3d 115 (2d Cir. 2013); *Gilster v. Primebank*, 884 F. Supp. 2d 811 (N.D. Iowa 2012); *Orquiola v. National City Mortg. Co.*, 510 F. Supp. 2d 1134 (N.D. Ga. 2007); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, (1981*)*.

identification of those jurisdictional elements and plaintiff's requirement to meet

her jurisdictional burden is addressing each of the following:

3. **<u>With respect to plaintiff's retaliation claim:</u>**

   A. The trial court erred in denying AHISD's Plea to the Jurisdiction given plaintiff's failure to establish all of the required elements of her *prima facie* case of retaliation.

   B. Because plaintiff lacked direct evidence of causation and brought her retaliation claim under the *McDonnell Douglas* burden-shifting framework, the trial court erred in failing to treat each step of the burden-shifting framework as jurisdictional.

   C. The trial court erred in not following the Texas and United States Supreme Court's precedent requiring 'but for' causation to find that a plaintiff's subjective beliefs and conclusory allegations were legally insufficient as allegations necessary to establish that AHISD's numerous legitimate, non-discriminatory, and non-retaliatory reasons for terminating plaintiff's employment were pretextual so as to demonstrate retaliation sufficient to overcome AHISD's Plea to the Jurisdiction.

4. **<u>With respect to plaintiff's gender discrimination claim:</u>**

   A. Given that plaintiff's alleged harassers were co-workers and not supervisors, the trial court erred in failing to follow applicable precedent to find that plaintiff must, but did not, allege that AHISD failed to take reasonable action to control or prevent employee-upon-employee discrimination under the United States Supreme Court's test in *Vance v. Ball State University*, 133 S.Ct. 2434 (U.S. 2013) sufficient to withstand the AHISD Plea to the Jurisdiction.

   B. The trial court erred in failing to find that plaintiff's allegations were insufficient to establish a *prima facie* case of same-sex hostile work environment and withstand AHISD's Plea to the

4

Jurisdiction where the alleged harassment was not based on plaintiff's gender.

C.      The trial court erred in not concluding that plaintiff, in alleging neither severe nor pervasive inappropriate teasing and off-hand comments failed to show an actionable hostile work environment sufficient to withstand AHISD's Plea to the Jurisdiction.

D.      The trial court erred in determining that plaintiff established a *prima facie* case of discrimination sufficient to withstand AHISD's Plea to the Jurisdiction, notwithstanding AHISD's jurisdictional evidence conclusively establishing that plaintiff failed to timely report the alleged inappropriate conduct, and, that once reported, AHISD took prompt remedial action calculated to prevent further harassment.

E.      The trial court erred in denying AHISD's Plea to the Jurisdiction given plaintiff's failure to establish the essential elements of her hostile work environment claim based on alleged harassment by her same-sex co-workers.

## I.    AHISD terminated Clark's employment in response to numerous irremediable performance deficiencies.

AHISD terminated Clark's employment after the 2008-2009 school year as an ultimate response to her numerous irremediable performance deficiencies. (Supp. CR, Vol. I. 103-105) It was Clark's principal, Stephanie Kershner who recommended her termination to the AHISD Superintendent, Dr. Kevin Brown (Superintendent or Brown). (Supp. CR, Vol. I. 103) Principal Kershner's recommendation was the aftermath of an extensive Department of Human Resource (HR) investigation and report reviewing complaints made by Clark and complaints against her, which concluded that despite AHISD's significant and repeated efforts to remediate and improve Clark's performance, her performance remained severely substandard.[5] *See* Appendix, Tab 3, Kershner's Letter to the Superintendent) Kershner also concluded that Clark had been the cause of extreme disruptions among faculty at the Junior School campus (AHJS), for which she was

---

[4]   Clark's employment history included multiple occurrences of disobedience and misconduct that ultimately led to her termination. Since the *Mission Consolidated* jurisdictional analysis and the *McDonnell Douglas* burden-shifting framework require the court to analyze pertinent facts, some relevant facts regarding Clark's misconduct are not addressed here but are later contained in the Argument section of this Brief.

[5]   For the Court's convenience, two documents of primary importance have been included in the Appendix to this Brief, in addition to being found within the voluminous Clerk's record for this appeal. Appendix Tab 3 is Kershner's Letter to Superintendent Kevin Brown supporting her recommendation that plaintiff be terminated. Appendix Tab 4 is AHISD's Notice of Proposed Termination sent to plaintiff detailing the several non-retaliatory reasons for AHISD's proposed action, as well as plaintiff's right to challenge said action by requesting a due process hearing. These two letters are also found as exhibits to the affidavits of Stephanie Kershner and Kevin Brown at Supp. CR, Vol. I. 129-136 and 138-174, respectively).

responsible that thwarted her campus's accomplishment of its educational goals. *Id.* at p. 8. Indeed, relying on the HR investigation and her own experience with Clark, she determined that Clark had not been truthful during the course of her investigation. *Id.* Kershner's conclusions were based on specific factual findings detailed in a letter to Brown, including, but not limited to findings (i) that Clark had made a number of demeaning and derogatory statements to other teachers about two of her co-workers in the Girls' Athletic Department, Ann Monterrubio and Michele Boyer, calling them "lesbian dike *[sic]* coaches who get drunk and share men"; (ii) that Clark made false reports about her actions in a District investigation of a potential violation of state assessment testing protocols, actions that she at first denied and later admitted to having committed; (iii) that Clark had repeatedly made unsubstantiated claims to others, including students, that Monterrubio and Boyer were engaging in criminal wrongdoing, having vandalized her car, stolen her keys and stolen her cell phone; (iv) that Clark had, on at least two separate occasions, disobeyed Kershner's express and clear directive to not bring her daughter to her campus during work hours, and that an examination of Clark's teaching records and interviews with and reports from her own students revealed that Clark was responsible for serious special program and reporting deficiencies under federal and state law requirements that adversely impacted the

educational well-being of her students. *Id.* at pp. 6-8; *see also* Supp. CR Vol. I. 330.

Based on these reasons (and multiple others), Superintendent Brown recommended Clark's termination to the Board of Trustees at a meeting held on June 25, 2009, at which time the Board, having considered the recommendations and supporting reasons, along with Clark's previous and most recent performance evaluations, proposed her termination of employment for cause. (Supp. CR, Vol. I. 105, 137, 178) Thus, the record submitted to the trial court considering AHISD's Plea to the Jurisdiction was replete with overwhelming evidence supporting each of the eleven stated reasons for Brown's recommendation. Most significantly, there is nothing in the record submitted to and considered by the trial court considering jurisdiction, demonstrating that the reasons for Brown's recommendation to the Board and the Board's termination decision were a pretext for discrimination, or even that Brown or the Board had any animosity toward plaintiff whatsoever.

On July 14, 2009, AHISD issued Clark written notice of the Board's proposed action, setting out eleven specific reasons for the recommendation and citing nineteen documented descriptions of plaintiff's misconduct in support thereof. (Appendix, Tab 4, pp. 1-3, *also at* Supp. CR, Vol. I. 138-140).

Having received notice of termination for cause, plaintiff was entitled to contest the Board decision in a hearing to be conducted by an independent hearing

officer appointed by the Commissioner of Education. (Supp. CR, Vol. I. 105) This was Clark's opportunity for a full due process transcribed hearing, applying Texas rules of evidence and procedure, where AHISD would be required to continue Clark in employment pending the results of the hearing, where the full hearing transcript and court reporting costs would have gone to AHISD, and where the "free" transcript would then be forwarded to the Commissioner of Education in a further two-step appeal process as Clark may have required. *See* Tex. Educ. Code §§ 21.159, .251-260, .301-307. But, despite these rights, Clark did not request an independent hearing examiner nor, in any way, contest the Board's proposal. (Supp. CR, Vol. I. 105)

Because Clark did not challenge her proposed termination, on August 14, 2009 the Board of Trustees again voted, and Clark's employment was terminated. (Supp. CR, Vol. I. 178) Subsequently, on December 11, 2009, Clark filed this lawsuit. (CR 1-5)

## II. Clark's allegations of harassment.

Clark began her employment with AHISD in August 2007. (CR 24) Her lawsuit claims that she had been harassed by Monterrubio and Boyer since the beginning of her employment, but that she did not make a formal complaint to Kershner until May 15, 2008, at the very end of the 2007-2008 school year. (CR 24) In fact, during her annual review in March, two months prior to her initial

9

complaints to Kershner, Clark assured Kershner that her relationship with Monterrubio was "fine." (Supp. CR, Vol. I. 181-182) Then, on May 15, 2008, plaintiff produced for Kershner a thirteen-page litany of complaints against multiple employees that reached back eight months and included allegations against Monterrubio, that she was offended by Monterrubio's conversations about atheism, abortion, and Monterrubio's use of weight loss pills; that on one occasion, when coaching the girls' basketball team, that Monterrubio called plays and yelled louder than she yelled; and that Monterrubio had once left a note on plaintiff's desk advising her to use a different printer. (Supp. CR, Vol. I. 211-224, Letter dated May 14, 2008) Additionally, Clark complained that Monterrubio had asked the students "who they liked more." *Id.* Clark's complaint also included allegations suggesting sexual conduct involving Monterrubio: that Monterrubio had discussed her personal sex life with the female coaching staff; that she had commented about plaintiff's breasts and body; that she had suggested that plaintiff purchase an "indecent tree ornament" for the office Christmas party; that she had, on two occasions, displayed pictures of male private parts; and that Monterrubio had emailed "dirty" cartoons to plaintiff using her private email account. (Supp. CR, Vol. I. 211-213) Clark also reported that she had laughed and joked with her co-workers when viewing one of the photos. (Supp. CR, Vol. I. 219) Ironically,

10

Clark's complaint letter sexually disparaged Monterrubio and Boyer, describing them as "dressed like working girls." (Supp. CR, Vol. I. 220)

## III.  AHISD's immediate investigation and effective response.

Kershner immediately and thoroughly investigated each of Clark's allegations. (Supp. CR, Vol. I. 183) Kershner interviewed every employee identified in Clark's written complaint, meeting with each coach named, including Monterrubio. *Id.* When meeting with Monterrubio, Kershner reminded Monterrubio of the District's sexual harassment policies, directing compliance. *Id.* Kershner concluded her investigation of Clark's claims, providing Clark with a written response on May 23, 2008 and meeting with Clark on May 27, 2008 to discuss the results of her investigation and her finding of insufficient evidence to support Clark's allegations of sexual harassment. (Supp. CR, Vol. I. 183, 225-226) At that meeting, Kershner directed Clark to be proactive and to more immediately report concerns should future complaints arise. *Id.* Kershner reminded Clark of the District's grievance policies and opportunities for resolving and addressing workplace complaints, handing her a copy of the District's policy that included an outline of her right to appeal Kershner's resolution of her complaint, and again directing Clark to bring any future complaint in a timely fashion. (Supp. CR, Vol. I. 183, 225-226)

From the time of this May 27, 2008 meeting, until Clark filed her EEOC Charge on October 7, 2008, Clark was silent, not renewing her prior allegations, nor asserting further allegations,[6] nor availing herself of any of the multiple avenues of redress or appeal that were offered to her under the very Board Policy that was provided to her by Kershner. (Supp. CR, Vol. I. 183). If Clark had subsequent sexual harassment concerns, Kershner remained uninformed. As such, Kershner (and her employer, AHISD) had every reason to believe that Kershner's swift actions addressing Clark's complaints and her conference with and directives to Monterrubio had successfully resolved Clark's concerns. (Supp. CR, Vol. I. 102, 183)

## IV.  Clark's performance deteriorated during the 2008-2009 school year.

Clark's complaints in May 2008 that closed out the 2007-2008 school year had Kershner sensitive to the potential for continued discord between Clark and Monterrubio in the next school year. As such, Kershner closely monitored the Girls' Athletic Department from the beginning of that year. (Supp. CR, Vol. I. 184) Nonetheless, in the 2008-2009 school year, the AHJS campus female coaching staff was plagued by numerous complaints emanating from Clark, as well as

---

[6]  As discussed below, at a meeting with Kershner on September 29, 2008, Clark vaguely alluded to inappropriate conduct alleging that she had knowledge of three incidents, which she described as "sexual harassment," and several other instances she described as "unprofessional behavior." (Supp. CR, Vol. I. 183-184, 230) However, Clark refused Kershner's request to provide specific details regarding these general allegations, and never told Kershner who or what she was referring to. *Id.*

complaints about Clark by Monterrubio and other co-workers. *Id.* Kershner's response was to again be proactive meeting these complaints with attempts to remediate the discord. (Supp. CR, Vol. I. 184, 227-231) Throughout August, September, and October of 2008, Kershner and Gene Phillips, the AHISD Athletic Director, met on multiple occasions with all of the Girls' Athletic Department coaches in an attempt to encourage and facilitate open communications and to remediate their specific concerns. *Id.*

On one occasion in March of 2008 Kershner corrected Clark, directing her to not have her children at her workplace during working hours. *Id.* On August 26, 2008, Kershner and Phillips met with Clark to discuss complaints by co-workers that she was not performing her coaching duties; that she was continuing to bring her children to her workplace; and that she was leaving work early during team tryouts to transport her children to their respective schools. *Id.* Again, on September 11, 2008, Kershner met with Clark regarding complaints by another coach that Clark had been surreptitiously recording conversations in the coaches' office. (Supp. CR, Vol. I. 229-231) Once more, on October 14, 2008, Kershner met with Clark regarding Clark's complaint that the volume of Monterrubio's radio was too high. *Id.*

Notwithstanding these reports by and against her, Clark described her perception of improved workplace relationships in several communications and

13

meetings with Phillips as "…everything is fine," and even described the workplace improvements as "great." (Supp. CR, Vol. I. 184).

Then, on September 29, 2008, Clark met with Kershner to complain of three incidents that she described as sexual harassment, and other incidents that she described as "unprofessional behavior." (Supp. CR, Vol. I. 183-184, 230) But, when asked to provide specifics about her allegations, such as the identity of her alleged harassers and perpetrators, Clark refused. *Id.* Thus, Kershner once again directed Clark to follow the District's Policies and procedures. *Id.*

On October 29, 2008, Kernsher's annual performance evaluation of Clark documented her recent performance deficiencies, that is, her constant fighting and bickering with multiple co-workers (including, but not limited to Monterrubio), and her failure to follow Kershner's repeated directives to utilize the District policy to address her complaints. As a result, Kershner placed Clark on a growth plan, formally known in the parlance of Texas public school educators as an "Intervention Plan for Teacher in Need of Assistance (TINA)." (Supp. CR, Vol. I. 184-185, 236-237) Clark's TINA was one of two issued by Kershner to teachers on her campus that year. (Supp. CR, Vol. I. 184-185) Clark's TINA cited two "domains" or areas of concern, in which Clark's performance needed improving: her professional communications with co-workers and supervisors, and her compliance with AHISD's policies and procedures (in the reporting workplace

14

concerns). (Supp. CR, Vol. I. 236-237) Accompanying the TINA, Kershner issued a memorandum to Clark citing specific examples of her deficiencies. (Supp. CR, Vol. I. 229-231) Under her TINA, Clark was required to utilize the District's policies to bring complaints, and to "work with all colleagues in a supportive and cooperative manner." *Id.* Kershner also placed Monterrubio on a TINA, requiring her to comply with the District's policies on appropriate workplace conduct. (Supp. CR, Vol. I. 238-247)

## V.    Clark's EEOC Charge and subsequent reports of bullying.

In October 2008, Clark filed a Charge of Discrimination with the EEOC alleging sexual harassment and retaliation. (Supp. CR, Vol. I. 232-235) Her charge mirrored the allegations of her May 15, 2008 letter to Kershner, six months prior. *Id*. AHISD responded to Clark's Charge, and on September 28, 2009, the EEOC dismissed the Charge, finding no substance to any of Clark's claims. (Supp. CR, Vol. I. 102, 125-127)

Three months later, in January of 2009, Clark submitted three more letters to Kershner, complaining this time that she had been "bullied" and ostracized by Monterrubio and Boyer since November of 2008. (Supp. CR, Vol. I. 185-187, 250-253) Despite Clark's TINA, directing her to follow AHISD's grievance policies (policies that require, among other things, that an employee grieve within fifteen days of the event spawning the complaint) Clark filed the first of her three "new"

15

letter complaints on January 23, 2009, more than two months after much of the conduct she was grieving. *Id.*

Clark's letter complained that Monterrubio and Boyer had hidden her keys and had taken and hidden her cell phone. (Supp. CR, Vol. I. 250-253) She also complained that Kershner had "blindsided" her by asking her to attend a meeting without previously informing her of the meeting agenda. *Id.* She claimed that "all the coaches" were "snapping" at her, and that she was being "bullied." *Id.* She complained that Boyer had purchased breakfast tacos for other coaches, but not for her. *Id.* She also alleged that her print jobs had been removed from the Department printer, wadded up and thrown away. *Id.* In her next January 30, 2009 letter, she complained that another female coach had failed to inform her that a manager had quit; that Kershner was "blindsiding" her in meetings; that the radio in the Athletic Office was too loud, and that when other coaches purchased lunch they had "overlooked the professional courtesy of including [her] when providing food for everyone else in the workplace." (Supp. CR, Vol. I. 254-256) On February 6, 2009, plaintiff submitted a third letter to Kershner complaining that the other coaches would not speak to her; that Boyer had asked her to gather and store "balls and Frisbees" that were not hers (Clark's); that another coach, Christi Gonzalez, had twice "interrupted" her (Clark) while she was trying to coach players; that "someone had gone through [her] things on [her] desk" and that "many papers

16

were out of order and [she] had two clipboards missing"; and that coaches were talking about student activity monies that were missing in front of her. (Supp. CR, Vol. I. 257-258) Again, despite the requirements of her TINA, and despite Kershner's specific directives on at least three prior occasions (Supp. CR, Vol. I. 185, 227-231, 248-249), none of these most recent complaints were brought under applicable grievance policies and procedures. (Supp. CR, Vol. I. 185)

On February 11, 2009, Clark applied for FMLA leave, claiming on her leave application that she was suffering from "persistent episodic diarrhea" and "cognitive difficulty" brought about by "severe situational disturbance" and "reactive depression with anxiety." (Supp. CR, Vol. I. 259) Clark's leave request was immediately granted. *Id.*

Clark's latest complaints were certainly not of sexual harassment. Indeed she complained incessantly of minor workplace slights. But Clark's complaining and the complaining about her revealed obviously dysfunctional staff relations to Kershner who took advantage of the relative peace brought about by Clark's leave of absence to more fully investigate each of her claims. (Supp. CR, Vol. I. 187-188) The result of the investigation was that Clark's claims of petty annoyances and personal slights were not supported, leaving Kershner to conclude that Clark's inability to relate positively with co-workers had been the cause of extreme disruption in the workplace. (Supp. CR, Vol. I. 187-188, 260)

Kershner issued investigation findings to Clark on April 8, 2009, the day Clark returned from leave, informing Clark that her complaints about her co-workers were unsupported, that Kershner believed Clark continued "[…] to experience difficulties in [her] work relationships with [her] colleagues," and reminding Clark of her TINA requirement to maintain good working relationships with her colleagues. (Supp. CR, Vol. I. 187-188, 236-237, 260)

Then, on April 15, 2009 Clark filed a grievance, this time under the AHISD grievance policy. The grievance was against Monterrubio, alleging that Monterrubio had pushed her from behind during a student exercise run. (Supp. CR, Vol. I. 261-263) Clark claimed no injury as a result, and her grievance acknowledged Monterrubio's immediate apology. *Id.* Still, she asserted that the "shove" was intentional and done in retaliation for her previous complaints about Monterrubio. (Supp. CR, Vol. I. 188) During the investigation of this formal grievance, Clark submitted 29 more complaints of "bullying" against Monterrubio and Boyer as "additions" to her grievance. (Supp. CR, Vol. I. 264-267) Clark's additional grievances included allegations that either Monterrubio or Boyer had ripped the antenna from her car and that, on an unspecified date, Monterrubio (in her car) had "chased" Clark in her car. *Id.* With regard to Clark's complaint that Monterrubio had assaulted her, Kershner interviewed students involved to determine that Monterrubio's contact with Clark had not been intentional.

18

(Supp. CR, Vol. I. 189) Nonetheless, AHISD honored Clark's requested remedy, in the last week of April 2009, Monterrubio was transferred to another campus in the hopes that this move would eliminate, or at least reduce the considerable tension among the female coaching staff at the AHJS. (Supp. CR, Vol. I. 189, 316-320)

**VI.** **Clark provided an untruthful statement during AHISD's investigation into a potential breach of state testing protocols.**

On April 29, 2009, Clark and other teachers were monitoring the school's yearly TAKS testing administration when a ringing cell phone disrupted the test. (Supp. CR, Vol. I. 188) Since the Texas Education Agency prohibits students from having cell phones during testing (Supp. CR, Vol. I. 270-280), and none of the test monitors stepped forward to claim the ringing cell phone, the incident was treated as a potential violation of testing protocols and a diligent search was made to determine the source of the ringing phone. (Supp. CR, Vol. I. 188) But, the phone was heard to ring at least two more times during the testing, and one of the teacher/monitors present identified Clark's phone as the source. *Id.* Clark was questioned and asked to provide a written statement. *Id.* Clark's statement was that she did not remember a phone ringing during testing, and that her phone was in her pocket and "on vibrate" the entire day. (Supp. CR, Vol. I. 268) Later that day, Clark admitted and then provided a second statement that it was in fact her cell phone that rang during the testing period. (Supp. CR, Vol. I. 269)

**VII.** **Clark's credibility is destroyed and additional performance failures come to the attention of Kershner.**

Monterrubio's transfer did nothing to abate Clark's continued conflicts with other coaches, including Boyer and Christi Gonzalez, each of whom were the subject of new complaints such as her claim that Boyer snubbed Clark by turning her back to her. (Supp. CR, Vol. I. 189) Clark also complained that at an April 28, 2009 meeting among the Girls' Athletic Department faculty, that was attended by Kershner, Boyer had falsely accused her of "lying" when Clark was questioned about her missing keys, and about her contention that she was the first person to arrive at work each morning. *Id.* Clark had also asserted that at this meeting she had answered each of Kershner's questions in a polite and professional manner. *Id.* But Kershner, having been present at the meeting and an eyewitness to the conduct of the individuals described in Clark's complaint, knew first hand that Clark's account of the meeting events differed significantly from what had actually happened. *Id.* As such, Kershner was able to positively conclude that Clark's report was not credible. (Supp. CR, Vol. I. 189, 312-313)

On May 1, 2009, Clark was placed on administrative leave with pay and Dr. Dana Bashara, AHISD's Human Resources Director, was directed to conduct a comprehensive review of Clarks 29 grievances. (Supp. CR, Vol. I. 96-97, 102-103, 128)

Beginning on May 12, 2009 and ending on May 28, 2009, Dr. Bashara interviewed coaches, teachers, students, and the grievant, Clark. In the end, Dr. Bashara found not a shred of evidence supporting any of Clark's allegations. (Supp. CR, Vol. I. 96-97, 102-103)

Meanwhile, Janet Briggs, a long-standing and respected AHJS teacher, reported to Kershner that Clark had engaged her, Briggs, in an unsolicited conversation on April 23, 2009, to inform her that Monterrubio and Boyer were "lesbian dikes" *[sic]* who "get drunk and share men." (Supp. CR, Vol. I. 189-190, 321-322) Additionally, Debbie Cathey, a substitute teacher who had been assigned to teach Clark's classes while she was on FMLA leave, and was again assigned to her classes when Clark was placed on paid administrative leave, brought numerous concerns regarding Clark's classroom performance to the attention of Bashara. (Supp. CR, Vol. I. 96-97, 327-335) Specifically, Ms. Cathey offered disturbing reports of significant deficiencies in Clark's grading practices and reports, Clark's failure to have prepared lesson plans, as well as major deficiencies in Clark's classroom organization and management. *Id.* Subsequent interviews with Clark's students revealed additional previously unreported and undiscovered concerns, including Clark having complained about her co-workers to her students and Clark's continued disregard of Kershner's prior admonishments and directives to

not bring her daughter to the coaching office during working hours. (Supp. CR, Vol. I. 96-97, 189-190)

Bashara concluded her investigation and Kershner reviewed her report to conclude and to recommend to her Superintendent that Clark be terminated from employment. (Appendix, Tab 3, p. 8; *also at* Supp. CR, Vol. I. 315) Superintendent Brown accepted her recommendation and passed it along with his concurring recommendation to the AHISD Board of Trustees. (Supp. CR, Vol. I. 103-105) The AHISD Board of Trustees accepted and approved the Superintendent's recommendation of eleven termination-for-cause reasons and nineteen specifically cited supporting examples of behavior, proposing Clark's termination. (Appendix, Tab 4, p. 1-3; *also at* Supp. CR, Vol. I. 138-140) Clark did not contest the Board's proposal, and on August 14, 2009, the AHISD Board acted to terminate Clark's employment. (Supp. CR, Vol. I. 105, 178)

The workplace conduct of this plaintiff exhibited a level of unprofessionalism that no employer, let alone a public school employer, should be required to tolerate. Were it not for the lower court's failure to follow the precedent of this Court,[7] the United States Supreme Court,[8] and the Supreme Court of Texas,[9] this would be a straightforward case. Had the trial court simply tracked the framework established by these governing courts on how to determine a plea to the jurisdiction in a discrimination case, the uncontroverted facts and reasons for the school district's employment action would have been the trial court's focus and AHISD would not be an appellant.

The plaintiff here asserts claims of gender discrimination and retaliation under the TCHRA. Although she now claims that she was "harassed" from the

---

[7]  *Wang v. Univ. of Texas at Austin*, No. 04-13-00065-CV, 2013 WL 5570824, at *3 (Tex. App.—San Antonio Oct. 9, 2013). This Court recognized, as the lower tribunal failed to do, that a plea to the jurisdiction challenges the existence of the plaintiff's alleged jurisdictional facts and requires the plaintiff to affirmatively demonstrate the court's jurisdiction to hear the case, citing *Mission Consolidated*. "When deciding a plea to the jurisdiction," the Court writes, "we review not only the pleadings, 'but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.' *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)."

[8]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (setting forth the procedure for assessing a disparate-treatment claim when direct evidence of discrimination is lacking).

[9]  *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 632 (Tex. 2012). The framework to be applied is set out in the opening paragraph of this Court's binding precedent where this Court asked, "Can a plaintiff establish a *prima facie* case of age discrimination when undisputed evidence shows she was replaced by someone older?" answering, "The specific issue today is whether, under the Texas Commission on Human Rights Act (TCHRA), such a claimant is ever entitled to a presumption of age discrimination under the *McDonnell Douglas* burden-shifting framework. We answer no." With such pronouncement, *Mission* became the structure for all TCHRA employment discrimination and pleas to the jurisdiction determinations to follow.

start of her employment in August 2007, she waited until the end of her first probationary year in May 2008 to bring this alleged harassment to the attention of her principal, Stephanie Kershner. Once having come forward, she became a prolific grumbler, complaining of over 100 instances of purported "incidents" in the year to follow, that upon investigation, proved to be mostly imaginary or utterly trivial. Three of these over 100 complaints involved sexual matters. The rest were indicative of plaintiff's failure to co-exist with her female co-workers, and even though her alleged harassers were women, plaintiff claims that all the conduct she complains of was the result of gender discrimination, creating a sexually hostile work environment.

Because plaintiff was unable to establish each of the required elements of a *prima facie* sexual harassment-hostile work environment case, the lower court erred when it found jurisdiction for that claim under the TCHRA. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635-36 (Tex. 2012). Specifically, with respect to plaintiff's sexual harassment-hostile work environment claim, plaintiff was required to plead and demonstrate that the behavior of which she complained was both based on her sex, and, that it was so severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *See La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002); *Shepherd v. Comptroller of Public Accounts of State Texas*,

168 F.3d 871, 874 (5th Cir. 1999). But, plaintiff neither argued, let alone demonstrated, either *prima facie* element. *See* Argument, Part III, B. and C. Nor did plaintiff even attempt to show that AHISD was negligent in controlling working conditions, another *prima facie* element. Rather, the uncontroverted evidence at the jurisdictional hearing on appeal conclusively established that AHISD had met its requirements for defending sexual harassment claims, having promulgated appropriate anti-harassment policies, and when plaintiff finally reported alleged harassing conduct after several months, AHISD followed its policies to immediately investigate plaintiff's claims, issue a report and take prompt remedial actions. *See* Argument, Part III, D. and E.

In spite of the overwhelming evidence to the contrary, plaintiff also claims that she was terminated in retaliation for having engaged in a protected activity. However, instead of sweeping plaintiff's complaints under the rug or punishing her, AHISD welcomed, and on several occasions literally begged plaintiff to bring her complaints in a timely manner under proscribed policies and procedures. And, notwithstanding plaintiff's circumvention of those processes, each and every one of her allegations was fully investigated, no matter how trivial they appeared to be. (Supp. CR, Vol. I. 185-187)

Plaintiff's eventual termination from employment was based on numerous, significant, legitimate, non-retaliatory reasons, and her termination was proposed

only after AHISD had exhausted every effort to improve and remediate a myriad of well-documented performance deficiencies. (Appendix, Tab 4, pp. 1-3, *also at* Supp. CR, Vol. I. 138-140) Among the multiple reasons for her termination was plaintiff's failure to perform local, state and federally required teaching responsibilities, to follow clear and repeated administrative directives, for her having lodged unsupported and salacious comments about and descriptions of co-workers to other teachers and students, accusing those co-workers of criminal conduct and ribald and indiscriminate sexual conduct, and describing them as homosexuals, and for her having provided a knowingly false statement to protect her own interests in an investigation into potential state standardized student testing procedures. *Id.* Plaintiff has no evidence that any of these documented reasons proffered for her termination were a pretext for retaliation. Rather, the evidence at the jurisdictional hearing under review clearly demonstrated that plaintiff was terminated solely due to the reasons offered to the AHISD Board of Trustees that issued the termination notice. As such, the trial court again erred by not dismissing plaintiff's TCHRA retaliation claim because plaintiff could not, and did not establish the *prima facie* elements for a retaliation claim, most notably, she was missing the third required *prima facie* element – causation.

Pursuant to the Texas Supreme Court's holding *in Mission Consolidated Independent School District v. Garcia*, 372 S.W.3d 629 (Tex. 2012), plaintiff's

inability to establish the necessary elements of her *prima facie* case should have meant that AHISD's governmental immunity was not waived for either of her claims. Accordingly, the trial court erred when it denied AHISD's Plea to the Jurisdiction, and as will be clearly demonstrated below, this Court must reverse the trial court's order and dismiss plaintiff's claims for want of subject matter jurisdiction.

# ARGUMENT

**I.** **THE STANDARD OF REVIEW FOR JURISDICTIONAL CHALLENGES TO TCHRA CLAIMS BASED ON GOVERNMENTAL IMMUNITY MIRRORS THAT OF A TRADITIONAL SUMMARY JUDGMENT MOTION, AND REQUIRES DISMISSAL UNLESS THE PLAINTIFF ESTABLISHES THE *PRIMA FACIE* ELEMENTS OF HER CLAIMS.**

**A.** ***Mission Consolidated*, the First Controlling Case Disregarded by the Trial Court.**

Deciding a plea to the jurisdiction in an employment discrimination or retaliation case brought against any state agency that has governmental immunity, such as this public school district, requires the application of two convergent principles of jurisprudence; in the first, the Texas rules on how to judge a jurisdictional plea under the TCHRA are grounded in *Mission Consolidated*, both its ancestry and its progeny (*see Mission Consolidated*, 372 S.W.3d 629, 635-36 (Tex. 2012); the second set of canons are the *McDonnell Douglas* federal guidelines established by the United States Supreme Court, guiding both federal and state courts in the resolution of employment discrimination and retaliation claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[10]

---

[10] The TCHRA was enacted with the express purpose of providing for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments. *See* Tex. Lab. Code § 21.001(1). The Texas Supreme Court has observed that the purpose behind the TCHRA is "to correlate state law with federal law in employment discrimination cases." *Autozone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (citing *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). Because the TCHRA seeks to promote federal civil rights policy, courts look to federal law for guidance when the provisions of the TCHRA and Title VII are analogous. *See Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500 (Tex. 2012).

Unless a public school district's governmental immunity has been clearly and unambiguously waived by statute, its immunity deprives a trial court of subject matter jurisdiction over claims filed against the district, and an assertion of immunity is an appropriate grounds for filing a plea to the jurisdiction. *See State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009). When a lawsuit is barred by governmental immunity, "dismissal with prejudice for want of jurisdiction is proper." *See City of Houston v. Rushing*, 7 S.W.3d 909, 914 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

To preserve this immunity, a governmental defendant challenges the trial court's right to hear a case by filing a plea to the jurisdiction on any ground for which it claims the trial court lacks subject matter jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004); *Dallas Area Rapid Transit v. Carr*, 309 S.W.3d 174, 176 (Tex. App.—Dallas 2010, pet. denied). The trial court must then determine "at its earliest opportunity whether it has the constitutional or statutory authority to decide the case." *Miranda*, 133 S.W.3d at 226. To make this determination, the court must "consider the plaintiff's pleadings ***and any evidence*** necessary to resolve the issue of jurisdiction." *See County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002); *see also Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). We emphasize the phrase "*any evidence*."

Once a defendant files a plea to the jurisdiction, it becomes incumbent upon the plaintiff to allege sufficient facts to affirmatively show that the trial court has subject matter jurisdiction. *See City of Elsa v. Gonzales*, 325 S.W.3d 622, 625 (Tex. 2010); *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). It was not up to AHISD to show a lack of jurisdiction, but was rather the burden of the plaintiff to raise a fact question on each of the jurisdictional elements of her claims (*see Mission Consol.*, 372 S.W.3d at 635). Because the plaintiff here failed to meet her burden, the trial court was duty-bound to dismiss her claims for lack of subject matter jurisdiction. *Id.*

With this in mind, we turn our attention to the seminal case of *Mission Consolidated*, which, while disregarded by the lower court, directs the outcome of this appeal. The *Mission* Court held that a TCHRA claim waives governmental immunity only where a plaintiff "actually alleges a violation of the TCHRA *by pleading facts that state a claim thereunder*." *Mission Consol.*, 372 S.W.3d at 635-36 (emphasis added). Thus, a conclusory allegation in a TCHRA petition, such as a statement that a school district's conduct violated the TCHRA, is wholly insufficient to raise a fact question on the jurisdictional elements such claim as to implicate the statute's waiver of immunity. *See Lueck*, 290 S.W.3d at 884. Rather, a plaintiff's ability to establish each of the elements of a *prima facie* TCHRA case "*by pleading facts that state a claim thereunder*" is

fundamental to a showing that the trial court has subject matter jurisdiction. *Mission Consol.*, 372 S.W.3d at 636.

Because the elements required to establish liability under the TCHRA are also the elements required to invoke the statute's waiver of immunity and establish the court's subject matter jurisdiction, the trial court considering TCHRA jurisdiction must "consider evidence as necessary to resolve any dispute over those facts, even if that evidence implicates both the subject matter jurisdiction of the court and the merits of the case." *Id.* at 635 (internal quotations omitted). Thus, when as here, a governmental entity defendant challenges the trial court's subject matter jurisdiction over TCHRA claims brought against it, "the trial court's review of a plea to the jurisdiction **mirrors that of a traditional summary judgment motion.**" *Id.* (emphasis added). On appeal of the trial court's failure to grant AHISD's Plea to the Jurisdiction, the Court must conduct this same analysis under a *de novo* standard of review. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009).

## B. *McDonnell Douglas* is the Second Source of Analysis Disregarded by the Trial Judge.

Had the trial judge adhered to her obligation under *Mission Consolidated*, *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547 (Tex. 2000) and *Wang v. Univ. of Texas at Austin*, No. 04-13-00065-CV, 2013 WL 5570824 (Tex. App.—San Antonio Oct. 9, 2013, no pet.), she would have dissected the facts to analyze

31

plaintiff's claims under the burden-shifting analytical edifice established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Thus, once AHISD offered legitimate, nondiscriminatory reasons for its action, (as it did in its submissions and exhibits offered to the trial court) any presumption of discrimination that had been established by plaintiff's *prima facie* case— presuming that she had even constructed a *prima facie* case, which as shown *infra,* she had not—dissolved and plaintiff's burden of persuasion once again arose, requiring plaintiff to *produce sufficient evidence to raise a fact issue* that defendant's proffered reasons were mere pretext, and that the real reason for her termination was based on an impermissible retaliatory motive. *See Washington v. Occidental Chem. Corp.*, 24 F. Supp. 2d 713, 721 (S.D. Tex. 1998).

Thus, there are two independent reasons as to why AHISD's Plea to the Jurisdiction should have been granted by the lower court, and why this Court must reverse:

First, plaintiff fails to make even a *prima facie* case of retaliation by showing that: (1) she engaged in a protected activity, (2) AHISD took an adverse employment action against her, and (3) a causal connection exists between the protected activity and the adverse employment action. *See Ptomey v. Texas Tech Univ.*, 277 S.W.3d 487, 495 (Tex. App.—Amarillo 2009, pet. denied). AHISD concedes that plaintiff engaged in a protected activity when she filed her Charge

with the EEOC on October 7, 2008. AHISD also concedes that plaintiff suffered an adverse employment action when the Board of Trustees voted to terminate her employment. However, plaintiff did not, because she cannot establish beyond mere allegation that a causal connection existed between the two.

Second, even assuming *arguendo* that plaintiff had pled a marginal *prima facie* case, defendant articulated multiple legitimate reasons for its actions and plaintiff did not rebut a single one nor did plaintiff even attempt to demonstrate that the reasons given by AHISD for its actions were a pretext for discrimination.

We now address these failures in reverse order, confronting first plaintiff's failures to rebut the reasons for her termination to show them to be pretext.

## C. The *McDonnell Douglas* Burden-Shifting Framework Requires a Showing of Pretext and Must be Considered a Part of the Jurisdictional Analysis Under *Mission Consolidated*.

Under *Mission Consolidated*, this Court must review the sufficiency of plaintiff's claims as it would a traditional motion for summary judgment. *See Mission Consol.*, 372 S.W.3d at 635. We initially examine plaintiff's retaliation claim. Since plaintiff brings this claim as mere conclusion, absent any direct evidence of causation, she proceeds under the familiar *McDonnell Douglas* burden-shifting framework, for analyzing discrimination and retaliation claims at the summary judgment stage when a plaintiff lacks direct evidence of causation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Despite the lack of

direct evidence of retaliation, a plaintiff bringing a retaliation claim under Title VII or the TCHRA may proceed under the *McDonnell Douglas* burden-shifting analysis as a substitute method of proof, relying initially on a rebuttable presumption of retaliation that vanishes when the defendant articulates a legitimate, non-retaliatory rationale for its employment action. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981)) (explaining that the employer's provision of a legitimate reason eliminates the presumption initially relied on by the plaintiff). Once an employer makes this showing, the plaintiff can no longer rely on this presumption, and in order to avoid dismissal, must produce sufficient circumstantial evidence of pretext to create a fact question on each of the employer's legitimate, non-retaliatory reasons. *Id.* Therefore, the rebuttable presumption alone is insufficient to carry a plaintiff's burden of establishing the jurisdictional elements of a retaliation claim under the TCHRA, otherwise a plaintiff would be able to continue to rely solely on this presumption, even after it has vanished, to establish the court's subject matter jurisdiction. This is the logical extension of the Texas Supreme Court's rationale in *Mission Consolidated*, and it compels the trial court and this Court to consider the entire burden-shifting framework, including pretext, in its jurisdictional analysis.

Yet, the trial court failed to conduct this complete pretext analysis, obviously disregarding precedent from this Court and the First Court of Appeals, analyzing retaliation claims since *Mission Consolidated*. *See Tex. SOAH v. Birch*, No. 04-12-00681-CV, 2013 WL 3874473 at *19 (Tex. App.—San Antonio July 24, 2013, pet. denied) (holding that trial court lacked subject matter jurisdiction over retaliation claim because plaintiff could not rebut employer's legitimate, non-retaliatory reasons for termination); *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. Valdizan-Garcia*, No. 01-12-00386-CV, 2012 WL 5545783 at *7-8 (Tex. App.—Houston [1st Dist.] November 15, 2012, no pet.) (addressing causation in a retaliation claim by analyzing pretext evidence as jurisdictional).

Moreover, applying the burden-shifting framework, including the showing of pretext, as part of the jurisdictional analysis under *Mission Consolidated* does not impose a significant burden on a plaintiff. To avoid dismissal under the same analysis that would be used in a traditional motion for summary judgment, a plaintiff need only to proffer competent summary judgment evidence that if viewed favorably for the plaintiff would produce a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(b) and *Mission Consol.*, 372 S.W.3d at 635-36.

**D. AHISD Had Multiple Legitimate, Non-Retaliatory Reasons for Termination, as well as Every Other Decision Made With Respect to Plaintiff's Employment.**

AHISD's burden to articulate such reasons is "only one of production, not persuasion, and involves no credibility assessment." *See McCoy v City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Here, AHISD clearly met its burden. AHISD's reasons for proposing plaintiff's termination were not about her internal reports to Kershner or her filing a Charge with the EEOC, but were rather based on the eleven (11) independent performance deficiencies supported by nineteen (19) described examples of conduct that were identified in the Notice of Proposed Termination. (Supp. CR, Vol. I. 103-105; *see also* Appendix, Tab 4, pp. 1-3, AHISD's Notice of Proposed Termination) Except for plaintiff's weak attempts through bare argument and conclusory allegations (discussed below), it remains undisputed that these stated reasons and identified descriptions of plaintiff's multiple and significant performance deficiencies constituted legitimate, non-retaliatory reasons for her termination.

Additionally, we point out that AHISD has also articulated legitimate, non-retaliatory reasons for each of its prior actions and decisions made with respect to plaintiff's employment. (Appendix, Tab 3, pp. 6-8; *also at* Supp. CR, Vol. I. 134-136, 190-192) AHISD demonstrated that it took every conceivable action to remediate plaintiff's substandard performance and unprofessional conduct, further

supporting its legitimate, non-retaliatory reasons for each of the professional development assignments, performance evaluations, reprimands, and other employment actions, each of which was thoroughly and exhaustively detailed in writings to plaintiff. (Supp. CR, Vol. I. 191, 391-416) As such, AHISD demonstrated that it had considered and articulated legitimate, non-retaliatory reasons for every action taken with respect to plaintiff's employment, even with regard to employment decisions that would not constitute adverse employment actions[11] under the TCHRA. *Id.* Other than her base contentions that she was the victim of retaliation, plaintiff can produce no competent summary judgment evidence that any of these actions, and particularly the decision to terminate her employment, were not fully justified by the circumstances, much less that they were retaliatory in nature. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (holding that unsubstantiated assertions and conclusory allegations are not competent summary judgment evidence).

---

[11] The TCHRA's anti-retaliation provision only protects materially adverse employment decisions that "would dissuade a reasonable worker from making or supporting a charge of discrimination." *See Montgomery Cty. v. Park*, 246 S.W.3d 610, 612 (Tex. 2007) citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Although Plaintiff points to the "bullying" and "ostracism" visited upon her by her co-workers, they were not materially adverse employment actions under the TCHRA. *See Muniz v. El Paso Marriott*, 773 F.Supp.2d 674, 682 (W.D. Tex. 2011), affirmed 477 Fed. Appx. 189 (5th Cir. May 14, 2012) (citing *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009)). Similarly, Plaintiff's claim that she was placed under increased scrutiny by Kershner, even if true, was not an adverse employment action. *See id.* (citing *Grice v. FMC Techs. Inc.*, 216 Fed Appx. 401, 404 (5th Cir. 2007) (holding that an adverse employment action had not occurred where the employer (1) watched the plaintiff closely, (2) accused the plaintiff of forgery, and (3) falsified an incident report to place blame on the plaintiff)).

## II. PLAINTIFF CANNOT SHOW PRETEXT BECAUSE HER ALLEGATIONS ARE BASED SOLELY ON SPECULATION.

Plaintiff must either demonstrate that all eleven reasons and nineteen examples are mere pretext for retaliation or her claim must be dismissed as a matter of law. *See Ellerbrook v. City of Lubbock*, 465 Fed. Appx. 324, 330 (5th Cir. 2012); *see also McCoy*, 492 F.3d at 557. To establish pretext, a plaintiff must show that the defendant's explanation for the employment action is false, and that discrimination was the real reason. *See Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 493 (Tex. App.—Amarillo 2009, pet. denied); *see also Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003) (an employee's proof that the investigation leading to her termination was imperfect, incomplete, and arrived at an incorrect conclusion is insufficient to prove pretext). Such a showing can only be accomplished by evidence that AHISD would not have taken its adverse employment action 'but for' plaintiff's protected activity. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).[12] Plaintiff offers no such evidence. (Supp. CR, Vol. II. 68-80, Plaintiff's Deposition)

---

[12] "[E]ven if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *See Long v. Eastfield College*, 88 F.3d 300, 305 n. 4 (5th Cir. 1996).

### A. The Doctrine of Collateral Estoppel Bars Plaintiff from Re-Litigating the Board's Reasons for Acting on Her Termination.

The Texas Education Code establishes a robust framework that provided plaintiff with ample opportunity to litigate the Board's proposed termination of her contract. (Appendix, Tab 4, pp. 1-3. Notice of Proposed Termination) Had plaintiff merely challenged this action, she would have been provided a full evidentiary hearing before an independent hearing examiner where plaintiff may have presented her case that the reasons offered in support of the proposed termination were retaliatory.[13] *See* Tex. Educ. Code § 21.159(b). But, plaintiff did not challenge her proposed termination or the purported "good cause" reasons supporting it. (Supp. CR, Vol. I. 105; Supp. CR, Vol. II 80) As such, the only evidence before the Board in its determination of "good cause" were the reasons given to plaintiff supporting the administration's recommendation to terminate. (Supp. CR, Vol. I. 103-15) The Board's findings that the proffered reasons constituted "good cause" resulted from plaintiff's failure to challenge the proposed termination through the process established by the Texas Education Code, and she is barred by the doctrine of collateral estoppel from re-litigating those reasons in a lawsuit brought under the TCHRA. *See Nairn v. Killeen Indep. Sch. Dist.*, 366 S.W.3d 229, 246-47 (Tex. App.—El Paso 2012, no pet.) (affirming summary

---

[13]   Under Chapter 21 of the Texas Education Code, plaintiff would have further been entitled to appeal the Board's determination of good cause to the Commissioner of Education. *See* Tex. Educ. Code § 21.301 *et seq.*

judgment on sexual harassment and retaliation claims under the TCHRA because the factual determinations reached in support of teacher's termination under the Education Code had preclusive effect). Plaintiff also gave deposition testimony that she has no evidence that any Board member acted in retaliation when the members voted unanimously to terminate her employment. (Supp. CR, Vol. II. 68-80) Plaintiff cannot and did not show to the trial court that the Board's decision to terminate her employment was pretext for retaliation, or that it was based on any reason other than her failure to request a hearing to challenge the proposed action.

**B.    Plaintiff Cannot Rely on Subjective Beliefs or Conclusory Allegations to Demonstrate Pretext.**

Even were plaintiff not barred from challenging the reasons supporting the Board's action by the doctrine of collateral estoppel, plaintiff's claim fails because she cannot show that any of the reasons offered for her termination were pretextual. This is because plaintiff has no evidence of retaliation, offering only her unsubstantiated and subjective belief in its place. (Supp. CR, Vol. II. 68-80) These unsubstantiated assertions and subjective beliefs are not sufficient to prove pretext or to meet a plaintiff's *prima facie* burden under the *McDonnell Douglas* framework. *See Liquid Air Corp.*, 37 F.3d at 1075; s*ee also Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246 (5th Cir. 1985) (holding that an employee's subjective beliefs about the reasons for her termination are not sufficient to provide judicial relief when the employer has presented legitimate, non-retaliatory reasons for its

40

adverse employment action); *E.E.O.C. v. Exxon Shipping Co.*, 745 F.2d 967, 976 (5th Cir. 1984) (holding that pretext cannot be supported by conclusory statements). As plaintiff clearly reveals in her deposition testimony she has no evidence, outside of her unsupported belief, of any retaliatory motive held by Kershner, Bashara, Brown, or any member of the AHISD Board of Trustees–those who had decided the fate of her employment. (Supp. CR, Vol. II. 68-80)

Further, AHISD has remained consistent and has never offered shifting or inconsistent reasons for its actions toward plaintiff, who argues only that she was the victim of retaliation, but cannot show that any of the reasons proffered for her termination were false or not credible, or that AHISD failed to follow its usual policies and procedures in carrying out this adverse employment action. *See Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514, 519 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (discussing factors in context of termination of employment).

C. **Plaintiff Cannot Rely on the Alleged Unreasonableness of the Board's Determination to Show Pretext for Retaliation.**

In her deposition, plaintiff testified that the only "evidence" she has that AHISD retaliated against her is the inference drawn from her averment that she never engaged in the conduct that AHISD cited to support its termination decision. (Supp. CR, Vol. II. 68-70) While plaintiff denies that she actually engaged in the terminable conduct cited by the Board (Supp. CR, Vol. II. 86), whether or not those allegations are true is of no legal consequence; rather, the appropriate inquiry

41

for a *McDonnell Douglas* analysis and the review of AHISD's jurisdictional challenge was whether AHISD reasonably believed that plaintiff had engaged in such conduct. *See Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 595 (5th Cir. 2007) (holding that no genuine issue of material fact existed where an employer's stated reason for termination was its reasonable belief that the aggrieved employee submitted a false report to the employer). The evidence conclusively demonstrates that the Board's belief was genuine. (Supp. CR, Vol. I. 103-106) At the time of its decision, Superintendent Brown had presented the Board with the AHISD Administration's conclusions regarding the need to terminate plaintiff's employment, which were supported by specific examples of alleged conduct and a voluminous investigatory record developed by Stephanie Kershner and Dana Bashara. (Appendix, Tab 3, pp. 6-8, Kershner's Letter to Superintendent Brown) Plaintiff did not challenge the proposed termination, nor did she dispute any of the specific allegations of conduct attributed to her. (Supp. CR, Vol. I. 105) Thus, the AHISD Board of Trustees' conclusion that good cause existed for her termination, based on the Administration's uncontroverted version of events regarding plaintiff's conduct, was entirely reasonable. *Id.*; *see also Anderson v. Tupelo Regional Airport Auth.*, No. 13–60666, 2014 WL 1929866 at \*5 (5th Cir. May 15, 2014).

Moreover, plaintiff's unsupported testimony or assertion that AHISD had acted unreasonably in terminating her employment, cannot, by itself, meet her burden to show pretext, as a demonstration of unreasonableness must be accompanied by further demonstration of discriminatory or retaliatory animus. *See Crutcher v. Dallas Indep. Sch. Dist.*, 410 S.W.3d 487, 497 (Tex. App.—Dallas 2013, no pet.) ("The issue at the pretext stage is not whether the employer made an erroneous decision; it is whether the decision, even if incorrect, was the real reason for the employment determination. The employer is entitled to be unreasonable so long as it does not act with discriminatory animus.") (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002); *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)). Plaintiff has not offered any evidence of discriminatory or retaliatory animus motivating the decision to terminate her employment, and she cannot show that the Board's stated reasons were pretext. (Supp. CR, Vol. II. 74-80)

Additionally, Kershner's negative assessment of plaintiff's credibility may serve as the basis of its legitimate, non-retaliatory reason, even though plaintiff complains that such reason is a subjective opinion, because AHISD has offered evidence demonstrating how Kershner arrived at this determination, namely, plaintiff's misrepresentations of Boyer's conduct at the meeting attended by Kershner, and plaintiff's untruthful written statement given during the TAKS cell

phone incident. *See* Appendix Tab 5, pp. 4-5, *Martinez v. Texas Workforce Comm'n – Civil Rights. Div.*, No 14-50391 (5th Cir. Dec. 30, 2014) (per curiam) (holding that employer's subjective opinions may serve as the basis for a legitimate reason supporting an employment action, and that such subjectivity is not evidence of pretext).

**D.    Plaintiff Cannot Rely on Temporal Proximity to Show Pretext.**

Temporal proximity can only be considered as evidence of causation if the timing between the two events is very close, and even then, the Fifth Circuit has held such consideration cannot stand alone as determinative of retaliation. *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. App'x 437, 442 (5th Cir. 2007) (Close temporal proximity "is not itself determinative of retaliation."); *see also Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 n. 3 (5th Cir. 1997) ("the mere fact that some adverse action is taken after […] some protected activity will not always be enough for a *prima facie* case."). In the present case, plaintiff's reliance on temporal proximity is inappropriate because the time period between plaintiff's EEOC Charge and her termination was seven months, a larger gap than any previously recognized as circumstantial evidence of retaliation by the Fifth Circuit. *See Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting up to a four month time lapse may establish a causal connection). Moreover, in *Swanson*, the Fifth Circuit reasoned that temporal

proximity is a particularly poor indicator of retaliation when, as is the case here, the plaintiff made several complaints over an extended period of time while also suffering from numerous performance deficiencies over that same time period. *See Swanson*, 110 F.3d at 1188 n.3. The Fifth Circuit also noted the undesirable result if temporal proximity to anything that happened in a prior extended time period could support a link between that prior event and the adverse employment action. *Id.*

Finally, although plaintiff argues that she was given a TINA/growth plan in the days following her EEOC Charge, such is not indicative of a retaliatory motive because AHISD had identified and been working to correct each of the performance deficiencies identified in her growth plan. (Supp. CR, Vol. I. 184-185, 227-228) Thus, the TINA was not a reaction to plaintiff's EEOC Charge, but the natural consequence of plaintiff's failure to conduct herself as Kershner had previously directed. (Supp. CR, Vol. I. 229-231) The United States Supreme Court held in *Clark County School District v. Breeden*, 532 U.S. 268 (2001) that an employer's knowledge of an employee's intervening protected activity will not require the employer to suspend a previously considered, but as yet untaken employment action.[14] *Id.* at 272.

---

[14] Plaintiff's report and subsequent EEOC filing cannot stand in the way of AHISD's legitimate business decisions concerning her employment. *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. App'x 437, 442-44 (5th Cir. 2007). The mere fact that plaintiff

45

### E. Plaintiff Cannot Show Pretext Through Disparate Treatment Because There is No Similarly Situated Comparator.

Nor did plaintiff demonstrate that the reasons AHISD proffered for her termination were pretext through a showing that she was treated more harshly than other similarly situated employees. In order to establish pretext for retaliation through a showing of disparate treatment, a plaintiff must demonstrate a distinction between treatment of that plaintiff and another "similarly situated," but more favorably treated employee, under "nearly identical circumstances." *See Rodriguez v. City of Poteet*, No. 04–13–00274–CV, 2014 WL 769286 *7 (Tex. App.— San Antonio February 26, 2014, no pet. h.) (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005). The comparator employee must be similarly situated "in all material respects, including similar standards, supervisors, ***and conduct***." *Id.* (citing *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005)) (emphasis added). Circumstances are not "nearly identical" if they involve employees with different work rule violations or disciplinary records. *See*

engaged in a protected activity does not render her immune from discipline or confer a privileged status upon her, and it does not tie the District's hands in responding when it reasonably believes her performance was deficient. *See Arredondo v. Gulf Bend Ctr.*, No. H-06-1580, 2007 WL 1004051, at *6 (S.D. Tex. Mar. 30, 2007); *see also Fort Bend Indep. Sch. Dist. v. Williams*, No. 01-13-00052-CV, 2013 WL 4779693, *8 (Tex. App.—Houston [1st Dist.] September 5, 2013, no pet.) (holding that the plaintiff's placement on paid administrative leave pending an investigation into her misconduct was not an adverse employment action for purposes of her retaliation claim). Nor can Plaintiff argue that she should be immune from the consequences of her misconduct merely because the District learned of that misconduct, at least in part, during its investigation into her reports of harassment. *See Plumlee v. City of Kennedale*, 795 F.Supp.2d 556, 564 (N.D. Tex. 2011) (employer was "not required to disregard what it believed to be evidence of plaintiff's misconduct because of the circumstances under which that evidence came to light").

46

*id.* (citing *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 594 (Tex. 2008)). Although "precise equivalence" is not required, a plaintiff must show "that the misconduct for which [the plaintiff] was discharged was nearly identical to that engaged in by an employee whom [the employer] retained." *Id.* at 917-18 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n. 11 (1976) and *Smith v. Wal–Mart Stores, Inc.*, 891 F.2d 1177, 1180 (5th Cir.1990)).

In fact, plaintiff cannot prove disparate treatment at any level because she was not "similarly situated" with any other AHISD employees. (Supp. CR, Vol. I. 105-106, 191-192) Here, plaintiff was the only employee proposed for termination by the Superintendent who then failed to contest the Board of Trustees' approval of that proposed action. (Supp. CR, Vol. I. 106) Here, plaintiff was the only AHISD employee who wholly failed to challenge the allegations of conduct and myriad performance deficiencies demonstrated by the Superintendent, and relied upon by the Board in reaching their decision. *Id.* Thus, plaintiff cannot compare herself to any other AHISD employees recommended for termination. *Id.* Nor did any other employees not recommended for termination have comparable work rule violations or disciplinary records. *Id.* In fact, no other AHISD employee in the recent history of the District could be associated with such an astounding variety of consistent and severe performance deficiencies, which included multiple instances of inappropriate, disruptive, unprofessional and insubordinate conduct. *Id.* And had

any other employees conducted themselves similarly to plaintiff, they too would have been recommended for termination. *Id.*

## F. Plaintiff's Retaliation Claim Fails Under the *McDonnell Douglas* Burden-Shifting Framework, Therefore She Cannot Establish All of the Jurisdictional Elements of her Claim, and the Trial Court Lacked Subject Matter Jurisdiction.

AHISD has articulated the legitimate, non-retaliatory reasons for plaintiff's termination, as well as for every other decision made with respect to plaintiff's employment. (Appendix, Tab 4, pp. 1-3; *see also* Supp. CR Vol. I. 103-105, 190-191) Plaintiff has not, because she cannot, show that such reasons were pretext (Supp. CR Vol. II, pp. 74-80), and thus, she did not meet her *McDonnell Douglas* required demonstration of 'but for' causation. *See Nassar*, 133 S.Ct. at 2533; *see also McDonnell Douglas*, 411 U.S. 792, 807. Additionally, plaintiff has failed to establish even the *prima facie* elements of a claim under the TCHRA so that AHISD's immunity has not been waived, and the trial court lacked subject matter jurisdiction over plaintiff's retaliation claim. *See Mission Consol.*, 372 S.W.3d at 637.

Therefore, plaintiff cannot carry her ultimate burden under the *McDonnell Douglas* analysis. On this final point, independent of all others, plaintiff's retaliation claim, that she was terminated for unlawfully retaliatory reasons, fails and, as a matter of law, it must be dismissed for lack of subject matter jurisdiction. *Id*.

## III. PLAINTIFF CANNOT ESTABLISH THE REQUIRED ELEMENTS OF HER SEXUAL HARASSMENT CLAIM.

### A. Plaintiff Cannot Prove AHISD's Negligence in Controlling Working Conditions Necessary to Establish Vicarious Liability for the Alleged Misconduct of Plaintiff's Co-workers.

Nor did plaintiff allege facts as necessary to demonstrate that AHISD was vicariously liable for sexual harassment in negligently failing to control a hostile work environment. Plaintiff's hostile work environment[15] claim is not about her supervisor. It is rather about the alleged behavior of her co-workers. (CR 24-25) As the United States Supreme Court recently held in *Vance v. Ball State University*, 133 S.Ct. 2434 (U.S. 2013), an employer's vicarious liability for a hostile work environment hinges on the status of the alleged harasser; essentially, whether the alleged harasser was a co-worker or a supervisor. *Id.* at 2439. Distinguishing from a co-worker with merely the ability to direct a claimant's day-to-day activities and duties, the *Vance* Court further held that the "supervisor" of a sexual harassment claimant must be the employee who is "empowered by the employer to *take tangible employment actions* against the victim." *Id.* (emphasis added).

---

[15] Courts have recognized two distinct types of prohibited sexual harassment; *quid pro quo* claims, and hostile work environment claims. *Quid pro quo* sexual harassment occurs when a tangible employment action results from the employee's refusal to submit to a supervisor's sexual demands. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752-54 (1998); *see also La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002); *see also Wal–Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 470 (Tex. App.—Austin 2000, pet. denied). In the instant case, plaintiff asserts only a hostile work environment claim, and she does not claim that any of her supervisor's made sexual advances towards her.

In the instant case, plaintiff complains of the behavior of Ann Monterrubio and Michelle Boyer, fellow female physical education teachers and girls' athletic coaches at AHJS. *See* Plaintiff's Second Amended Petition, p. 3. Boyer was the girls' athletic coordinator. (CR 25; Supp. CR, Vol. I. 181) While Boyer was colloquially referred to on campus and in documentation, including letters written by Kershner, as plaintiff's supervisor, such characterization is of no moment (*see Vance*, 133 S.Ct. at 2439), as Boyer acted only in a coordinating role having had no authority to hire, fire, promote, reassign, or alter the benefits of plaintiff's employment. (Supp. CR, Vol. I. 181) Boyer then, as *Vance* explains, was not plaintiff's "supervisor." *See Vance*, 133 S.Ct. at 2442; *see also* Supp. CR, Vol. I. 35-36. Thus, even the alleged sexual harassment of plaintiff by her co-workers, Boyer and Monterrubio, is insufficient, by itself, to assert a vicarious liability claim against AHISD. *See Vance*, 133 S.Ct. at 2441, citing *Faragher v. Boca Raton*, 524 U.S. 775, 789 (1998). Accordingly, AHISD can only be held vicariously liable if it was negligent in controlling working conditions. *See id*.

Moreover, to even demonstrate a *prima facie* case that AHISD was negligent in controlling working conditions, plaintiff was required to demonstrate: (1) that she is a member of a protected category (*i.e.*, female); (2) who was subjected to unwelcome harassment; (3) that was based on gender; (4) and which affected a term, condition, or privilege of her employment; and (5) that her employer,

50

AHISD, knew, or should have known, of the harassment and did not take prompt remedial action. *See Gulf States Toyota, Inc. v. Morgan*, 89 S.W.3d 766, 770 (Tex. App.—Houston [1st. Dist.] 2002, no pet.). But, plaintiff cannot and did not attempt to establish the third, fourth, or fifth elements of her *prima facie* case. Because plaintiff cannot make out the required *prima facie* case, the trial court lacked subject matter jurisdiction over her claims and erred when it failed to grant AHISD's Plea to the Jurisdiction.

**B.    Plaintiff Does Not Complain of Discrimination Based on her Gender.**

Anti-discrimination laws like Title VII and the TCHRA are "not a general civility code for the American workplace." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999). Rather, the purpose of the TCHRA's ban on sexual harassment is to eliminate employment discrimination and establish equal employment conditions and opportunities for both sexes in the workplace. *See* Tex. Lab. Code § 21.001. With respect to this same purpose, the United States Supreme Court has held:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex. We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one's sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.

*See Oncale v Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (internal quotations and ellipses omitted). While Title VII and the TCHRA clearly allow same-sex hostile work environment claims, the Supreme Court has specifically rejected the proposition that workplace harassment is actionable merely because it involves sexual content. *See id.* at 79. Rather, a plaintiff pursuing a same-sex sexual harassment claim "must first demonstrate that the sexual harassment was discrimination because of sex." *See La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002) (*citing Oncale*). The *Oncale* court suggested three potential routes for a plaintiff alleging same-sex sexual harassment to carry this burden. A plaintiff must either: (1) establish that the alleged harasser made explicit or implicit proposals of sexual activity and provide credible evidence that the alleged harasser was homosexual; (2) demonstrate that the alleged harasser was motivated by general hostility to the presence of members of the same sex in the workplace; or (3) offer direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. *Id.*

Prior to her Response to AHISD's Plea to the Jurisdiction, plaintiff had not previously claimed that her alleged harassers were homosexuals making sexual advances. Although she now claims precisely that (CR 175-176), such allegations, based solely on plaintiff's subjective belief that Monterrubio and Boyer were homosexual, are insufficient under the first "evidentiary route" to proving the

purported discrimination was based on gender. *See Love v. Motiva Enterprises LLC*, 349 Fed. App'x 900, 902-03 (5th Cir. 2009) (holding that allegations of inappropriate comments, gestures, and physical contact by same-sex co-worker were more indicative of humiliating or bullying behavior, ***and did not support an inference of sexual attraction and proposals for sex***); *see also English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 846 (E.D. Va. 2002) (holding that plaintiff's subjective belief that his harasser was homosexual was insufficient as sole proof to avoid summary judgment on same-sex sexual harassment claim). Plaintiff also did not show, and she did not even attempt to demonstrate, that her alleged harassers were motivated by general hostility to women in the workplace, or that they treated male co-workers differently. In fact, plaintiff asserted that her alleged harasser, Monterrubio, acted inappropriately to virtually every person she came into contact with, regardless of gender. (Supp. CR, Vol. I. 264) And in a report on May 15, 2008, plaintiff asserted that Monterrubio and Boyer's alleged sexually explicit and unprofessional conduct was also directed towards male employees, specifically alleging that they showed inappropriate photographs to a male coach, John Muñoz, and generally alleging that:

> [Monterrubio] constantly complained about Coach Moore, Coach Gonzalez, Coach McAllister, ***and all the male coaches. She made fun of their professional and private lives. She griped about the way they worked and made digs about their character on a daily basis. So I knew she was doing the same thing to me.***

53

(Supp. CR, Vol. I. 219) In an email to Kershner, plaintiff again asserted:

> **[Monterrubio] makes fun of not just me, but students, parents, and teachers on a daily basis. She badmouths others and has no concern for discretion. […] She is known to snap at me, other coaches, students, and parents. She enjoys teasing students and staff and causing trouble. Ann shouts at students and fellow coaches, including me.**

(Supp. CR, Vol. I. 264)

For such reasons, and upon such admissions, plaintiff was, and is, unable to show same-sex sexual harassment under any one of the three permitted routes and did not, therefore, prove that her sexual harassment claim was gender based, as was required to establish the *prima facie* case necessary to invoke the trial court's subject matter jurisdiction. *See Oncale*, 523 U.S. at 79-80; *Mission Consolidated*, 372 S.W.3d at 637.

## C. Courts Have Repeatedly and Consistently Rejected the Sexual Harassment Claims of Plaintiffs Who Were Subjected to More Frequent and Egregious Conduct than that Alleged by Plaintiff.

"Not all harassment will affect a term, condition, or privilege of employment." *Shepherd v. Comptroller of Public Accounts of State Texas*, 168 F.3d 871, 874 (5th Cir. 1999). "Conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive

working environment.'" *Shepherd*, 168 F.3d at 874, citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

The United States Supreme Court has elaborated on the standard: "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that a victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. "Whether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005).

In *Faragher*, the court reiterated that "[…] teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, (1998)). Likewise, "incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability." *Indest*, 164 F.3d at 263.

Courts have repeatedly and consistently rejected the sexual harassment claims of plaintiffs who were subjected to more frequent and egregious conduct

than that alleged by plaintiff For example, in *Gearhart v. Eye Care Centers of America*, 888 F. Supp. 814 (S.D. Tex. 1995), the plaintiff complained of conduct from multiple co-workers that included several inappropriate sexual comments in addition to multiple instances of offensive and unwanted physical contact. *Id.* at 824. The plaintiff claimed that on one occasion her co-worker told her that she could be promoted and earn vacation time by "sleeping with the boss." *Id.* at 820. The co-worker made several lewd remarks referencing masturbation, complementing the plaintiff's legs, telling her she was beautiful while touching her hair, talking to her about his neighbor's large breasts, and asking her to go into a dark office. *Id.* at 820-22. On another occasion, one of her co-workers touched the plaintiff's breasts and told her that he would do anything for her. *Id.* at 820-21. After considering these allegations and other instances of inappropriate sexual remarks to the plaintiff, the court concluded that the behavior did not rise to the level of an actionable claim for hostile work environment sexual harassment. *Id.* at 825. The court granted the employer's motion for summary judgment, reasoning that such "allegations [were] nothing more than some evidence of flirting, some casual touching, and sexual innuendos or jokes," and that "Gearhart was not propositioned, forced to respond [to her supervisors], or placed in any threatening situations." *Id.* at 825 (internal quotations omitted).

In *Shepherd*, the plaintiff was subjected to a co-worker's sexually offensive behavior including comments, several instances of unwelcome physical touching, and attempts to look up her dress and down her shirt. *See Shepherd*, 168 F.3d at 872. The plaintiff complained of behavior that included comments such as "your elbows are the same color as your nipples," "you have big thighs," and "here's your seat" while patting the lap. *Id.* at 872-74. In *Hockman v. Westward Communications, L.L.C.*, 407 F.3d 317 (5th Cir. 2004), a co-worker slapped the plaintiff on the buttocks with a newspaper, repeatedly grabbed her breasts and buttocks, held her cheeks and attempted to kiss her, requested opportunities to be alone with her, and made numerous sexually suggestive comments. *See id.* at 321. The plaintiff in *Hockman* testified that she was inappropriately touched so often she could not recall the number of times it happened. *Id.* at 328. In *Barnett v. Boeing Co.*, 306 Fed. App'x 875 (5th Cir. 2009), the plaintiff alleged that her supervisor leered at her, touched her in sexually inappropriate and unwelcome ways, and actively intimidated her after she made a complaint by frequenting her workspace to glare at her, and other acts of psychological intimidation. *Id.* at 879. In *Hale v. Napolitano*, No. SA-08-CV-106-XR, 2009 WL 1507144 (W.D. Tex. May 28, 2009), the plaintiff was subjected to continuous, repeated "filthy, sexist and obscene language and jokes in the workplace." *Id.* at *6. In *Hancock v. Barron Builders & Mgmt. Co., Inc.*, 523 F. Supp. 2d 571 (S.D. Tex. 2007), the alleged

harasser made over 100 sexually graphic, vulgar and offensive statements during a nine-month period and frequently discussed his personal sex life with the plaintiff. *See id.*, 523 F. Supp. at 576.

In each of these cases, the courts rejected the plaintiffs' sexual harassment claims. In the instant case, plaintiff made numerous allegations concerning the behavior of her female co-workers, Monterrubio and Boyer, the overwhelming majority of which were utterly trivial. Only a small fraction of the allegations (three out of over 100) concern these two women and involve sexual content or even have sexual undertones.[16] (Supp. CR, Vol. I. 211-224) Plaintiff's allegations fall well short of the threshold for actionable conduct established in *Gearhart*, *Shepherd*, *Hockman*, and *Barnett. See, e.g., Gearhart*, 888 F. Supp. at 825 (holding as a matter of law that alleged conduct, even if true, was not actionable sexual harassment); *Shepherd*, 168 F.3d at 875 (same); *Hockman*, 407 F.3d at 329 (same); and *Barnett*, 306 Fed. App'x 880 (same).

These alleged events, even if they had occurred as plaintiff claims, describe isolated, discreet instances of questionable behavior, behavior that, as described, is perhaps workplace inappropriate, but none, even analyzed under the totality of the

---

[16] Specifically, in her May 15, 2008 report Plaintiff alleged that Monterrubio made comments about plaintiff's body, including her breasts, critiqued plaintiff's clothing, discussed her own [Monterrubio's] sex life in front of others, including plaintiff, purchased "indecent" ornaments for an office Christmas party, and on two occasions showed plaintiff graphic pictures of male genitalia. (Supp. CR, Vol. I. 211-224) Plaintiff also claims that her buttocks were grabbed by an unknown person during a group picture at the faculty Christmas party. *Id.*

circumstances, that would be deemed sexual harassment under the law to create liability for AHISD. *Id.* Moreover, AHISD, in investigating plaintiff's claims, found correctable behaviors but no corroborating evidence of actionable sexual harassment, particularly among the numerous female and male staff members who, according to plaintiff were at times present and witnessed these alleged conduct. (Supp. CR, Vol. I. 183) Beyond bare assertions, plaintiff provided the court below and this Court no evidence to substantiate her claims of actionable sexual harassment or of a sexually hostile workplace environment. (Supp. CR, Vol. II, 68-80) Instead, plaintiff argues that the conduct she alleges establishes a violation of the TCHRA because Kershner admitted that, if her assertions were true, such would violate AHISD's policy, a policy that clearly establishes a public school district workplace threshold of prohibited inappropriate conduct far less tolerant than that which our courts have recognized as actionable. *See infra*, discussion of AHISD Board Policy DIA (Local), at Footnote 17.

In light of the threshold established through the above-cited authorities, plaintiff is unable to establish the essential element of a *prima facie* sexual harassment claim, that the alleged sexually oriented conduct she alleges was so "extreme [as] to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. And thus, plaintiff cannot establish but another of the

elements of a *prima facie* sexual harassment claim required to establish the trial court's subject matter jurisdiction. *See Mission Consol.*, 372 S.W.3d at 637.

### D. Plaintiff Did Not Report Harassment at or Even Near the Time of the Alleged Event.

AHISD's anti-harassment policy asks for prompt reporting of sexually harassing conduct to a principal or the District's EEO coordinator. (Supp. CR, Vol. I. 94, 101, 107-11) Here, the first instance of alleged sexually inappropriate behavior toward plaintiff, she contends, occurred on September 20, 2007, approximately one month after she had begun her employment at AHISD. (Supp. CR, Vol. I. 211) Further, plaintiff asserts that Monterrubio had bullied and harassed her from then on. *Id.* It was not until May 15, 2008, near the end of that school year, nearly eight months after the first alleged incident of harassment, that plaintiff made her first report to Kershner, the campus principal. (CR 121) Plaintiff unreasonably failed to utilize AHISD's policy on sexual harassment or to otherwise avoid conduct she considered harmful. *See Faragher*, 524 U.S. at 807. As such, plaintiff's conduct literally prevented AHISD from taking earlier remedial action to eliminate purported discrimination. (Supp. CR, Vol. I. 183) "If the plaintiff unreasonably failed to avail herself of the employer's preventative or remedial apparatus, she should not recover damages that could have been avoided had she done so […]" such that an employee's failure to utilize the complaint

procedure set forth in an employer's anti-harassment policy will normally preclude recovery on a sexual harassment claim. *Faragher*, 524 U.S. at 806-808.

**E.   Notwithstanding the Quality of Plaintiff's Mostly Unsupportable Claim, AHISD Took Immediate Remedial Actions Calculated to Insure that the Conditions in Its Workplace Were Discrimination Free.**

Finally, plaintiff's claims and uncontroverted summary judgment evidence conclusively negates the required element of a *prima facie* case that AHISD failed to take prompt remedial action when notified by plaintiff of her sexual harassment complaint. In fact, the summary judgment evidence demonstrates only that in each instance plaintiff alleged exposure to sexual harassment, AHISD responded, immediately investigating and taking corrective action reasonably calculated to prevent discrimination. (Supp. CR, Vol. I. 183-188)

**1.   *AHISD adopted and enforced sexual harassment policies and had implemented sexual harassment training.***

While unnecessary as a matter of law, proof that an employer had promulgated an anti-harassment policy with a complaint procedure is indicative of an employer who *has* exercised reasonable care to prevent and promptly correct alleged or even actual sexual harassment. *See Faragher*, 524 U.S. at 806. Additionally, an employer who conducts routine, periodic training of employees on its anti-harassment policies has typically exercised reasonable care to prevent harassment. *See Williams v. Barnhill's Buffet, Inc.*, 290 Fed. App'x 759, 763

(5th Cir. 2008) (holding that employer that conducted yearly training regarding anti-harassment policy and handling of sexual harassment complaints had exercised reasonable care).

AHISD's Board Policies prohibit unlawful sexual harassment. (Supp. CR, Vol. I. 101, 107-11) The District considers any allegation of sexual harassment a serious matter and is committed upon notice to taking immediate and appropriate action. *Id.* This AHISD policy (1) describes the type of conduct that constitutes sexual harassment and prohibited conduct,[17] (2) identifies to whom employees should make a report if they are subjected to sexual harassment, (3) describes the investigative procedures that may be used once a report is made, (4) describes the potential disciplinary procedures that may be used in a case of sexual harassment, and (5) provides a statement that retaliation against an employee making a report will not be tolerated. *Id.*

AHISD's policy is distributed annually to all District employees, is posted at each campus and administrative office, and is readily available to all employees online at the District's website. (Supp. CR, Vol. I. 94-95, 101) Teachers also receive yearly training on the District's anti-harassment policy, including the appropriate

---

[17]    AHISD's Board Policy DIA (Local) is a prophylactic anti-harassment effort on the part of the District that is designed to both prohibit and enable an appropriate disciplinary response to conduct that lies well below the legal threshold that would give rise to an actionable claim of discrimination against the District under a theory of *respondeat superior*. (Supp. CR, Vol. I. 101) The policy specifically prohibits conduct "even if the behavior does not rise to the level of unlawful conduct." (Supp. CR, Vol. I. 107-111)

reporting procedures. *Id.* AHISD's policy and practices are consistent with federal and state law, as well as EEOC guidelines. *See* 29 C.F.R. § 1604.11; *see also EEOC Notice: Policy Guidance on Current Issues in Sexual Harassment.* Unquestionably, AHISD took reasonable care to prevent sexual harassment in its workplace. *See Faragher*, 524 U.S. at 805.

**2. AHISD immediately investigated and took prompt remedial action in response to plaintiff's report. Plaintiff did not contest AHISD's investigative conclusions, made no further reports of similar behavior until she filed an EEOC Charge until several months later based on the same allegations.**

As soon as plaintiff made her initial report, AHISD conducted a comprehensive, exhaustive investigation. (Supp. CR, Vol. I. 183) While AHISD concluded that plaintiff's allegations were not sustained by the investigation, AHISD took swift remedial action calculated to eliminate any possible, future discrimination as a safeguard. (Supp. CR, Vol. I. 183, 225-226) AHISD counseled Monterrubio, addressing with her the District's anti-harassment policies and the potential adverse result for violations of same. *Id.* AHISD also met with plaintiff to discuss her claims, Kershner's investigation findings, and her rights under AHISD Board Policy to appeal those findings if she was dissatisfied with the investigation results. (Supp. CR, Vol. I. 183, 193-197)[18] Plaintiff was directed at such time to

---

[18]   AHISD's anti-harassment policy establishes that "[a] complainant who is dissatisfied with the outcome of the investigation may appeal through DGBA (Local), beginning at the appropriate level." (Supp. CR, Vol. I. 193-197) Had plaintiff been unsatisfied with the response of Stephanie Kershner, her campus principal, she should have requested a conference with the

promptly report future incidents. *Id.* But, plaintiff did not avail herself of any such opportunities to contest the findings or to further report. Rather, it is uncontroverted that plaintiff claimed to be satisfied with AHISD's response. *Id.* Plaintiff thanked Kershner for conducting a thorough investigation, and told her that she trusted her judgment with respect to these conclusions, and so AHISD reasonably believed that its actions had successfully resolved her concerns, which were not raised again until plaintiff filed an EEOC Charge months later. *Id.* As the Fifth Circuit held in *Lauderdale v. Texas Department of Criminal Justice*, 512 F.3d 157 (5th Cir. 2007), when an employee believes that an initial complaint was ineffective, it is unreasonable to not utilize other avenues provided under the employer's policy, such as the clear method of appeal contained in AHISD's Board Policy DIA (Local). *See id.*, 512 F.3d at 164.

In subsequent reports to Kershner on January 23, 30, and February 6, 2009, plaintiff alleged that Monterrubio and Boyer had been "ostracizing" and "bullying" her. (Supp. CR, Vol. I. 185-187) By this time, plaintiff had lodged more than 100 specific allegations, most of which were completely outlandish, including the complaint that Monterrubio called plays and cheered louder than her at a girls' basketball game, that Boyer did not bring her breakfast tacos one morning, and that she was offended by Monterrubio's conversations involving atheism, abortion, and

---

superintendent or his designee under Level Two of the procedure established under DGBA (Local). (Supp. CR, Vol. I. 198-203)

weight loss pills. *Id.* Nevertheless, as it had before, AHISD immediately investigated but could not find support for these assertions. *Id.* When plaintiff filed a grievance alleging that Monterrubio had assaulted her, insisting that Monterrubio be transferred from her assigned campus, the District could not agree with plaintiff's description of the alleged assault upon her, but nonetheless, granted plaintiff's requested remedy and transferred Monterrubio to another campus. (Supp. CR, Vol. I. 316-320)

Clearly, AHISD had reasonable policies in place to prevent sexual harassment and took prompt corrective action reasonably calculated to prevent future incidents once plaintiff reported harassment. (Supp. CR, Vol. I. 101, 107-111) The undisputed evidence conclusively establishes that AHISD acted swiftly, prudently, and appropriately, and as such, cannot be considered negligent in controlling the working conditions. *See Faragher*, 524 U.S. at 806; *Williams*, 290 Fed. App'x at 763. Accordingly, plaintiff's sexual harassment claim must be dismissed as a matter of law because she cannot establish the fifth required element of her *prima facie* case. *See Mission Consol.*, 372 S.W.3d at 637.

## PRAYER

For the foregoing reasons, AHISD prays that this Court reverse the trial court's order denying its Plea to the Jurisdiction, and dismiss plaintiff's claims for want of subject matter jurisdiction.

Respectfully submitted,

**SCHULMAN, LOPEZ & HOFFER, LLP**

/s/ Robert A. Schulman
Robert A. Schulman
State Bar Number 17834500
Email: rschulman@slh-law.com
Leonard J. Schwartz
State Bar Number 17867000
Email: lschwartz@slh-law.com
Bryan P. Dahlberg
State Bar Number 24065113
Email: bdahlberg@slh-law.com
517 Soledad Street
San Antonio, Texas 78205
Tel.: (210) 538-5385
Fax: (210) 538-5384

**ATTORNEYS FOR APPELLANT
ALAMO HEIGHTS ISD**

## CERTIFICATE OF SERVICE

This is to certify that on this 2nd day of January 2015, a true and correct copy of the foregoing document has been delivered by facsimile to counsel of record for Appellee in this proceeding as follows:

Mr. Mr. Matthew R. Pearson, GRAVELY & PEARSON, L.L.P., 425 Soledad St., Suite 600, San Antonio, Texas 78205, Facsimile: (210) 472-1110.

/s/ Robert A. Schulman
Robert A. Schulman,
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this Appellant's Brief contains 14,477 words (excluding the caption, identity of parties and counsel, table of contents, index of authorities, statement of the case, statement regarding oral argument, statement of issues presented, signature, certificate of service, certificate of compliance, and appendix).

I further certify that this is a computer-generated document created in Word for Mac, using 13-point typeface for all text, except for footnotes, which are in 10-point typeface. In making this certificate of compliance I am relying on the word count provided by the software used to prepare this document.

I understand that a copy of this document may be posted on the Court's website and that the electronically filed copy of the document becomes part of the Court's record.

Copies have been sent to all parties associated with this case.

/s/ Robert A. Schulman
Robert A. Schulman,
Attorney for Appellant

# APPENDIX

**Tab   Document**

1       Order Denying Plea to the Jurisdiction, dated October 9, 2014

2       Texas Labor Code, Chapter 21, the Texas Commission on Human Rights Act

3       Principal Stephanie Kershner's Letter to Superintendent Kevin Brown, dated June 23, 2009

4       AHISD's Notice of Proposed Termination, dated July 14, 2009

5       *Martinez v. Texas Workforce Commission – Civil Rights. Division*, No 14-50391 (5th Cir. Dec. 30, 2014) (per curiam)

**Appendix**

**Tab 1**



2009CI19821 -D285

CAUSE NO. 2009-CI-19821

| | | |
|---|---|---|
| CATHERINE CLARK | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | 285TH JUDICIAL DISTRICT |
| | § | |
| ALAMO HEIGHTS ISD | § | |
| Defendant | § | BEXAR COUNTY, TEXAS |

## ORDER ON DEFENDANT ALAMO HEIGHTS ISD'S
## PLEA TO THE JURISDICTION

On this day, came to be heard Defendant Alamo Heights ISD's Plea to the Jurisdiction.

The Court having considered the motion, response and supporting evidence is of the opinion that

said motion does not have merit and should be in all things DENIED. It is accordingly,

ORDERED that Defendant Alamo Heights ISD's Plea to the Jurisdiction is DENIED.

Signed this _9_ day of __Oct.___ , 2014.

_____
JUDGE PRESIDING

459

**Appendix**

**Tab 2**

LABOR CODE

TITLE 2. PROTECTION OF LABORERS

SUBTITLE A. EMPLOYMENT DISCRIMINATION

CHAPTER 21. EMPLOYMENT DISCRIMINATION

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 21.001.  PURPOSES.  The general purposes of this chapter are to:

(1)  provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section 2000e et seq.);

(2)  identify and create an authority that meets the criteria under 42 U.S.C. Section 2000e-5(c) and 29 U.S.C. Section 633;

(3)  provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments (42 U.S.C. Section 12101 et seq.);

(4)  secure for persons in this state, including persons with disabilities, freedom from discrimination in certain employment transactions, in order to protect their personal dignity;

(5)  make available to the state the full productive capacities of persons in this state;

(6)  avoid domestic strife and unrest in this state;

(7)  preserve the public safety, health, and general welfare;  and

(8)  promote the interests, rights, and privileges of persons in this state.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 9.01(a), eff. Sept. 1, 1995.


Sec. 21.0015.  TEXAS WORKFORCE COMMISSION CIVIL RIGHTS DIVISION.  The powers and duties exercised by the Commission on

Human Rights under this chapter are transferred to the Texas Workforce Commission civil rights division.  A reference in this chapter to the "commission" means the Texas Workforce Commission civil rights division.

Added by Acts 2003, 78th Leg., ch. 302, Sec. 1.


    Sec. 21.002.  DEFINITIONS.  In this chapter:
        (1)  "Auxiliary aids and services" includes:
            (A)  qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
            (B)  qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;
            (C)  acquisition or modification of equipment or devices; and
            (D)  services and actions similar to those described by Paragraphs (A)-(C).
        (2)  "Bona fide occupational qualification" means a qualification:
            (A)  reasonably related to the satisfactory performance of the duties of a job; and
            (B)  for which a factual basis exists for the belief that no person of an excluded group would be able to satisfactorily perform the duties of the job with safety or efficiency.
        (3)  Repealed by Acts 2003, 78th Leg., ch. 302, Sec. 4(2).
        (4)  "Complainant" means an individual who brings an action or proceeding under this chapter.
        (5)  "Demonstrates" means meets the burdens of production and persuasion.
        (6)  "Disability" means, with respect to an individual, a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment.  The term does not include:

(A)  a current condition of addiction to the use of alcohol, a drug, an illegal substance, or a federally controlled substance;  or

(B)  a currently communicable disease or infection as defined in Section 81.003, Health and Safety Code, or required to be reported under Section 81.041, Health and Safety Code, that constitutes a direct threat to the health or safety of other persons or that makes the affected person unable to perform the duties of the person's employment.

(7)  "Employee" means an individual employed by an employer, including an individual subject to the civil service laws of this state or a political subdivision of this state, except that the term does not include an individual elected to public office in this state or a political subdivision of this state.

(8)  "Employer" means:

(A)  a person who is engaged in an industry affecting commerce and who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year;

(B)  an agent of a person described by Paragraph (A);

(C)  an individual elected to public office in this state or a political subdivision of this state;  or

(D)  a county, municipality, state agency, or state instrumentality, regardless of the number of individuals employed.

(9)  "Employment agency" means a person or an agent of the person who regularly undertakes, with or without compensation, to procure:

(A)  employees for an employer;  or

(B)  the opportunity for employees to work for an employer.

(10)  "Labor organization" means a labor organization engaged in an industry affecting commerce.  The term includes:

(A)  an organization, an agency, or an employee representation committee, group, association, or plan engaged in an industry affecting commerce in which employees participate and that exists for the purpose, in whole or in part, of dealing with

employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment;

        (B)  a conference, general committee, joint or system board, or joint council that is subordinate to a national or international labor organization;  and

        (C)  an agent of a labor organization.

      (11)  "Local commission" means a commission on human relations created by one or more political subdivisions.

      (11-a)  "Major life activity" includes, but is not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.  The term also includes the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

      (12)  "Political subdivision" means a county or municipality.

      (12-a)  "Regarded as having such an impairment" means subjected to an action prohibited under Subchapter B or C because of an actual or perceived physical or mental impairment, other than an impairment that is minor and is expected to last or actually lasts less than six months, regardless of whether the impairment limits or is perceived to limit a major life activity.

      (13)  "Respondent" means the person charged in a complaint filed under this chapter and may include an employer, employment agency, labor organization, or joint labor-management committee that controls an apprenticeship or other training or retraining program, including an on-the-job training program.

      (14)  "State agency" means:

        (A)  a board, commission, committee, council, department, institution, office, or agency in the executive branch of state government having statewide jurisdiction;

        (B)  the supreme court, the court of criminal appeals, a court of appeals, or the State Bar of Texas or another

judicial agency having statewide jurisdiction;  or

   (C)  an institution of higher education as defined by Section 61.003, Education Code.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 9.02(a), eff. Sept. 1, 1995;  Acts 1997, 75th Leg., ch. 834, Sec. 1, eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 872, Sec. 10, eff. Sept. 1, 1999;  Acts 2003, 78th Leg., ch. 302, Sec. 4(a).
Amended by:
 Acts 2009, 81st Leg., R.S., Ch. 337 (H.B. 978), Sec. 1, eff. September 1, 2009.


 Sec. 21.0021.  CONSTRUCTION OF CERTAIN DEFINITIONS.  (a)  The term "disability":

  (1)  shall be construed in favor of broad coverage of individuals under Subchapters B and C, to the maximum extent allowed under those subchapters; and

  (2)  includes an impairment that is episodic or in remission that substantially limits a major life activity when active.

 (b)  The determination of whether an impairment substantially limits a major life activity must be made without regard to the ameliorative effects of mitigating measures, including:

  (1)  medication, medical supplies, medical equipment, medical appliances, prosthetic limbs and devices, hearing aids, cochlear implants and other implantable hearing devices, mobility devices, and oxygen therapy equipment;

  (2)  devices that magnify, enhance, or otherwise augment a visual image, other than eyeglasses and contact lenses that are intended to fully correct visual acuity or eliminate refractive error;

  (3)  the use of assistive technology;

  (4)  reasonable accommodations and auxiliary aids or services; and

  (5)  learned behavioral or adaptive neurological

modifications.

Added by Acts 2009, 81st Leg., R.S., Ch. 337 (H.B. 978), Sec. 2, eff. September 1, 2009.


Sec. 21.003.  GENERAL POWERS AND DUTIES OF COMMISSION.  (a) The commission may:
(1)  promote the creation of local commissions on human rights by cooperating or contracting with individuals or state, local, or other agencies, public or private, including agencies of the federal government and of other states;
(2)  receive, investigate, seek to conciliate, and pass on complaints alleging violations of this chapter;
(3)  file civil actions to effectuate the purposes of this chapter;
(4)  request and, if necessary, compel by subpoena:
(A)  the attendance of necessary witnesses for examination under oath;  and
(B)  the production, for inspection and copying, of records, documents, and other evidence relevant to the investigation of alleged violations of this chapter;
(5)  furnish technical assistance requested by a person subject to this chapter to further compliance with this chapter or with a rule or order issued under this chapter;
(6)  recommend in its annual report legislation or other action to carry out the purposes and policies of this chapter;
(7)  adopt procedural rules to carry out the purposes and policies of this chapter;  and
(8)  provide educational and outreach activities to individuals who have historically been victims of employment discrimination.
(b)  The commission by rule may authorize a commissioner or one of its staff to exercise the powers stated in Subsection (a)(4) on behalf of the commission.
(c)  The commission biennially shall develop an inventory of equal employment opportunity policies and programs adopted and

implemented by the various state agencies.

    (d)  The commission at least annually shall make a comprehensive written report on the commission's activities to the governor and to the legislature.

    (e)  The commission shall conduct a study of the policies and programs of a selected state agency if the commission is directed to conduct the study by legislative resolution or by executive order of the governor.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 9.03(a), eff. Sept. 1, 1995; Acts 1999, 76th Leg., ch. 872, Sec. 11, eff. Sept. 1, 1999. Amended by:

    Acts 2013, 83rd Leg., R.S., Ch. 1312 (S.B. 59), Sec. 77, eff. September 1, 2013.


    Sec. 21.0035.  CIVILIAN WORKFORCE COMPOSITION.  (a)  The commission by rule shall biennially determine:

        (1)  the percentage of the statewide civilian workforce composed of:

            (A)  Caucasian Americans;

            (B)  African Americans;

            (C)  Hispanic Americans;

            (D)  females;  and

            (E)  males;  and

        (2)  the percentage of the statewide civilian workforce of the groups listed in Subdivision (1) according to the following job categories:

            (A)  state agency administration;

            (B)  professional;

            (C)  technical;

            (D)  protective services;

            (E)  paraprofessional;

            (F)  administrative support;

            (G)  skilled craft;  and

            (H)  service and maintenance.

(b)  The commission shall report the percentages of the statewide civilian workforce as determined under this section to the governor and the legislature not later than the fifth day of each regular session of the legislature.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 12, eff. Sept. 1, 1999.


Sec. 21.004.  CRIMINAL OFFENSE OF INTERFERENCE;  PENALTY. (a)  A person commits an offense if the person wilfully resists, prevents, impedes, or interferes with the performance of a duty under or the exercise of a power provided by this chapter.
(b)  An offense under this section is a Class B misdemeanor.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.005.  CONSTRUCTION WITH OTHER LAWS.  (a)  This chapter does not relieve a government agency or official of the responsibility to ensure nondiscrimination in employment as required under another provision of the state or federal constitutions or laws.
(b)  This chapter does not affect the standards for determining eligibility for benefits under Title 5 or under a state or federal disability benefit program.
(c)  Nothing in this chapter may be construed as the basis for a claim by an individual without a disability that the individual was subject to discrimination because of the individual's lack of a disability.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993. Amended by:
Acts 2009, 81st Leg., R.S., Ch. 337 (H.B. 978), Sec. 3, eff. September 1, 2009.


Sec. 21.006.  CONFORMITY WITH FEDERAL STATUTES.  If a provision of this chapter is held by the Equal Employment Opportunity Commission to disqualify the commission as a deferral agency or for the receipt of federal funds, the commission shall

administer this chapter to qualify for deferral status or the receipt of those funds until the legislature meets in its next session and has an opportunity to amend this chapter.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.007.  PRIVILEGED COMMUNICATION;  IMMUNITY.  An oral or written statement made to a commissioner or an employee of the commission in connection with the discharge of the commissioner's or employee's duties under this chapter may not be the basis for an action for defamation of character.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.08(a), eff. Sept. 1, 1995.


Sec. 21.008.  LIMITED SEVERABILITY.  (a)  If any clause, sentence, subsection, section, or other provision of this chapter or the application of such a provision to any person or circumstances is held invalid or unconstitutional, that invalidity shall not affect the other clauses, sentences, subsections, sections, or provisions or applications of this chapter that may be given effect without the invalid clause, sentence, subsection, section, or provision or application and shall not affect, invalidate, impair, or nullify the remainder of this chapter.  The effect of the determination of invalidity shall be confined to the clause, sentence, subsection, section, or provision or application so adjudicated to be invalid or unconstitutional, and to that end the provisions of this chapter are declared to be severable.
     (b)  If any limit on damages prescribed by Section 21.2585 is invalidated by a method other than by legislative means, the amount of civil liability for all past and future noneconomic losses, including past and future pain and suffering, mental anguish and suffering, and any other nonpecuniary damage, is limited to an amount not to exceed $150,000.
     (c)  If a limit on damages prescribed by Section 21.2585 is invalidated by a method other than by legislative means and if the alternative civil liability limits contained in Subsection (b) are

also invalidated by a method other than by legislative means, Section 21.2585 is void.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.08(a), eff. Sept. 1, 1995.


Sec. 21.009.  JOINDER OF COMMISSION.  (a)  In any civil action in which the validity of a provision of this chapter or Chapter 461, Government Code, a rule adopted under this chapter or Chapter 461, Government Code, or the application of the provision or rule is challenged as void, unconstitutional, or unenforceable, the commission shall be made a party to the proceedings, and, on the motion of the commission, venue of the cause may be transferred to the district courts of Travis County.

(b)  An order restraining the commission or invalidating a provision of this chapter or Chapter 461, Government Code, or a commission rule adopted under this chapter or Chapter 461, Government Code, may not be enforced and may not take effect until the commission has answered and appeared in the action and has exhausted all avenues of appeal and any judgment is final and enforceable.

(c)  Notwithstanding any other provision of state law, including this chapter, only the commission, if a prevailing party, may recover costs and attorney's fees in such a declaratory proceeding under this section.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.08(a), eff. Sept. 1, 1995.


Sec. 21.010.  EMPLOYMENT DISCRIMINATION TRAINING FOR STATE EMPLOYEES.  (a)  Each state agency shall provide to employees of the agency an employment discrimination training program that complies with this section.

(b)  The training program must provide the employee with information regarding the agency's policies and procedures relating to employment discrimination, including employment discrimination involving sexual harassment.

(c)   Each employee of a state agency shall attend the training program required by this section not later than the 30th day after the date the employee is hired by the agency and shall attend supplemental training every two years.

(d)   The commission shall develop materials for use by state agencies in providing employment discrimination training as required by this section.

(e)   Each state agency shall require an employee of the agency who attends a training program required by this section to sign a statement verifying the employee's attendance at the training program.  The agency shall file the statement in the employee's personnel file.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 14, eff. Sept. 1, 1999.


SUBCHAPTER B.  UNLAWFUL EMPLOYMENT PRACTICES

Sec. 21.051.  DISCRIMINATION BY EMPLOYER.  An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1)   fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment;  or

(2)   limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.052.  DISCRIMINATION BY EMPLOYMENT AGENCY.  An employment agency commits an unlawful employment practice if the employment agency:

(1)   fails or refuses to refer for employment or discriminates in any other manner against an individual because of race, color, disability, religion, sex, national origin, or age;  or

(2)   classifies or refers an individual for employment on the basis of race, color, disability, religion, sex, national origin, or age.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.053.   DISCRIMINATION BY LABOR ORGANIZATION.   A labor organization commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the labor organization:
(1)   excludes or expels from membership or discriminates in any other manner against an individual;  or
(2)   limits, segregates, or classifies a member or an applicant for membership or classifies or fails or refuses to refer for employment an individual in a manner that would:
(A)   deprive or tend to deprive an individual of any employment opportunity;
(B)   limit an employment opportunity or adversely affect in any other manner the status of an employee or of an applicant for employment;  or
(C)   cause or attempt to cause an employer to violate this subchapter.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.054.   ADMISSION OR PARTICIPATION IN TRAINING PROGRAM. (a)   Unless a training or retraining opportunity or program is provided under an affirmative action plan approved under a federal law, rule, or order, an employer, labor organization, or joint labor-management committee controlling an apprenticeship, on-the-job training, or other training or retraining program commits an unlawful employment practice if the employer, labor organization, or committee discriminates against an individual because of race, color, disability, religion, sex, national origin, or age in admission to or participation in the program.
(b)   The prohibition against discrimination because of age in this section applies only to discrimination because of age against

an individual who is at least 40 years of age but younger than 56 years of age.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.055.  RETALIATION.  An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:
        (1)  opposes a discriminatory practice;
        (2)  makes or files a charge;
        (3)  files a complaint;  or
        (4)  testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.056.  AIDING OR ABETTING DISCRIMINATION.  An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency aids, abets, incites, or coerces a person to engage in a discriminatory practice.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.057.  INTERFERENCE WITH COMMISSION.  An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency wilfully interferes with the performance of a duty or the exercise of a power under this chapter or Chapter 461, Government Code, by the commission, the commission's staff, or the commission's representative.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.058.  PREVENTION OF COMPLIANCE.  An employer, labor union, or employment agency commits an unlawful employment practice

if the employer, labor union, or employment agency wilfully obstructs or prevents a person from complying with this chapter or a rule adopted or order issued under this chapter.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.059.  DISCRIMINATORY NOTICE OR ADVERTISEMENT.  (a)  An employer, labor organization, employment agency, or joint labor-management committee controlling an apprenticeship, on-the-job training, or other training or retraining program commits an unlawful employment practice if the employer, labor organization, employment agency, or committee prints or publishes or causes to be printed or published a notice or advertisement relating to employment that:
        (1)  indicates a preference, limitation, specification, or discrimination based on race, color, disability, religion, sex, national origin, or age;  and
        (2)  concerns an employee's status, employment, or admission to or membership or participation in a labor union or training or retraining program.
    (b)  This section does not apply if disability, religion, sex, national origin, or age is a bona fide occupational qualification.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.060.  VIOLATION OF CONCILIATION AGREEMENT.  A party to a conciliation agreement made under this chapter commits an unlawful employment practice if the party violates the terms of the conciliation agreement.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.061.  INSUFFICIENT EVIDENCE OF UNLAWFUL PRACTICE.  In the absence of other evidence of an unlawful employment practice, evidence of the employment of one person in place of another is not sufficient to establish an unlawful employment practice.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


SUBCHAPTER C. APPLICATION;  EXCEPTIONS

Sec. 21.101.  AGE DISCRIMINATION LIMITED TO INDIVIDUALS OF
CERTAIN AGE.  Except as provided by Section 21.054, the provisions
of this chapter referring to discrimination because of age or on
the basis of age apply only to discrimination against an individual
40 years of age or older.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.102.  BONA FIDE EMPLOYEE BENEFIT PLAN;  PRODUCTION
MEASUREMENT SYSTEM.  (a)  Except as provided by Subsections (b) and
(c), an employer does not commit an unlawful employment practice by
applying different standards of compensation or different terms,
conditions, or privileges of employment under:
        (1)  a bona fide seniority system, merit system, or an
employee benefit plan, such as a retirement, pension, or insurance
plan, that is not a subterfuge to evade this chapter;  or
        (2)  a system that measures earnings by quantity or
quality of production.
    (b)  An employee benefit plan may not excuse a failure to hire
on the basis of age.  A seniority system or employee benefit plan
may not require or permit involuntary retirement on the basis of
age except as permitted by Section 21.103.
    (c)  This section does not apply to standards of compensation
or terms, conditions, or privileges of employment that are
discriminatory on the basis of race, color, disability, religion,
sex, national origin, or age.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.103.  COMPULSORY RETIREMENT PERMITTED FOR CERTAIN
EMPLOYEES.  This chapter does not prohibit the compulsory
retirement of an employee who is:
        (1)  at least 65 years of age;

(2)   employed in a bona fide executive or high policy-making position for the two years preceding retirement;  and

(3)   entitled to an immediate, nonforfeitable annual retirement benefit from a pension, profit-sharing, savings, or deferred compensation plan or a combination of plans of the employee's employer that equals, in the aggregate, at least $27,000.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.104.  AGE REQUIREMENT FOR PEACE OFFICERS OR FIRE FIGHTERS.  An employer does not commit an unlawful employment practice by imposing a minimum or maximum age requirement for peace officers or fire fighters.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.105.  DISCRIMINATION BASED ON DISABILITY.  A provision in this subchapter or Subchapter B  referring to discrimination because of disability or on the basis of disability applies only to discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.106.  SEX DISCRIMINATION.  (a)  A provision in this chapter referring to discrimination because of sex or on the basis of sex includes discrimination because of or on the basis of pregnancy, childbirth, or a related medical condition.

(b)  A woman affected by pregnancy, childbirth, or a related medical condition shall be treated for all purposes related to employment, including receipt of a benefit under a fringe benefit program, in the same manner as another individual not affected but similar in the individual's ability or inability to work.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.

Sec. 21.107.  EFFECT ON ABORTION BENEFITS.  This chapter does not:

(1)  require an employer to pay for health insurance benefits for abortion unless the life of the mother would be endangered if the fetus were carried to term;

(2)  preclude an employer from providing abortion benefits;  or

(3)  affect a bargaining agreement relating to abortion.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.108.  DISCRIMINATION BASED ON RELIGION.  A provision in this chapter referring to discrimination because of religion or on the basis of religion applies to discrimination because of or on the basis of any aspect of religious observance, practice, or belief, unless an employer demonstrates that the employer is unable reasonably to accommodate the religious observance or practice of an employee or applicant without undue hardship to the conduct of the employer's business.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.109.  EMPLOYMENT BY RELIGIOUS ORGANIZATION.  (a)  A religious corporation, association, society, or educational institution or an educational organization operated, supervised, or controlled in whole or in substantial part by a religious corporation, association, or society does not commit an unlawful employment practice by limiting employment or giving a preference to members of the same religion.

(b)  Subchapter B  does not apply to the employment of an individual of a particular religion by a religious corporation, association, or society to perform work connected with the performance of religious activities by the corporation, association, or society.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.

Sec. 21.110.  DISCRIMINATION BASED ON NATIONAL ORIGIN.  A provision in this chapter referring to discrimination because of national origin or on the basis of national origin includes discrimination because of or on the basis of the national origin of an ancestor.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.111.  PERSON EMPLOYED OUT OF STATE.  This chapter does not apply to an employer with respect to the employment of a person outside this state.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.112.  EMPLOYEES AT DIFFERENT LOCATIONS.  An employer does not commit an unlawful employment practice by applying to employees who work in different locations different standards of compensation or different terms, conditions, or privileges of employment that are not discriminatory on the basis of race, color, disability, religion, sex, national origin, or age.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.113.  IMBALANCE PLAN NOT REQUIRED.  This chapter does not require a person subject to this chapter to grant preferential treatment to an individual or a group on the basis of race, color, disability, religion, sex, national origin, or age because of an imbalance between:
        (1)  the total number or percentage of persons of that individual's or group's race, color, disability, religion, sex, national origin, or age:
                (A)  employed by an employer;
                (B)  referred or classified for employment by an employment agency or labor organization;
                (C)  admitted to membership or classified by a labor organization;  or
                (D)  admitted to or employed in an apprenticeship,

on-the-job training, or other training or retraining program;  and

   (2)  the total number or percentage of persons of that race, color, disability, religion, sex, national origin, or age in:

    (A)  a community, this state, a region, or other area;  or

    (B)  the available work force in a community, this state, a region, or other area.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


  Sec. 21.114.  PLAN TO END DISCRIMINATORY SCHOOL PRACTICES.  A public school official does not commit an unlawful employment practice by adopting or implementing a plan reasonably designed to end discriminatory school practices.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


  Sec. 21.115.  BUSINESS NECESSITY.  (a)  Subject to Subsection (b), an employer does not commit an unlawful employment practice by engaging in a practice that has a discriminatory effect and that would otherwise be prohibited by this chapter if the employer establishes that the practice:

   (1)  is not intentionally devised or operated to contravene the prohibitions of this chapter; and

   (2)  is justified by business necessity.

  (b)  An employer may not use a qualification standard, employment test, or other selection criterion based on an individual's uncorrected vision unless the standard, test, or criterion is consistent with business necessity and job-related for the position to which the standard, test, or criterion applies.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993. Amended by:

  Acts 2009, 81st Leg., R.S., Ch. 337 (H.B. 978), Sec. 4, eff. September 1, 2009.


  Sec. 21.116.  RELIANCE ON COMMISSION INTERPRETATION OR

OPINION.  (a)  A person is not liable for an unlawful employment practice performed in good faith and in conformity with and in reliance on a written interpretation or opinion of the commission.

(b)  In a proceeding alleging an unlawful employment practice, the respondent has the burden of pleading and proving the defense provided by this section.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.117.  EMPLOYMENT OF FAMILY MEMBER.  Subchapter B  does not apply to the employment of an individual by the individual's parent, spouse, or child.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.118.  STATEWIDE HOMETOWN PLAN.  Subchapter B  does not apply to a labor union, firm, association, or individual participating on September 23, 1983, in a statewide hometown plan approved by the United States Department of Labor.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.119.  BONA FIDE OCCUPATIONAL QUALIFICATION.  If disability, religion, sex, national origin, or age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business or enterprise, performing any of the following practices on the basis of disability, religion, sex, national origin, or age of an employee, member, or other individual is not an unlawful employment practice:

(1)  an employer hiring and employing an employee;

(2)  an employment agency classifying or referring an individual for employment;

(3)  a labor organization classifying its members or classifying or referring an individual for employment;  or

(4)  an employer, labor organization, or joint labor-management committee controlling an apprenticeship, on-the-job training, or other training or retraining program admitting or

employing an individual in its program.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.120.  USE OR POSSESSION OF CONTROLLED SUBSTANCE.  (a) An employer does not commit an unlawful employment practice by adopting a policy prohibiting the employment of an individual who currently uses or possesses a controlled substance as defined in Schedules I and II of Section 202, Controlled Substances Act, and their subsequent amendments (21 U.S.C. Section 801 et seq.), other than the use or possession of a drug taken under the supervision of a licensed health care professional or any other use or possession authorized by the Controlled Substances Act or any other federal or state law.

(b)  Subsection (a) does not apply to a policy adopted or applied with the intent to discriminate because of race, color, sex, national origin, religion, age, or disability.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.04(a), eff. Sept. 1, 1995.


Sec. 21.121.  WORK FORCE DIVERSITY PROGRAMS.  An employer does not commit an unlawful employment practice by developing and implementing personnel policies that incorporate work force diversity programs.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.04(a), eff. Sept. 1, 1995.


Sec. 21.122.  BURDEN OF PROOF IN DISPARATE IMPACT CASES.  (a) An unlawful employment practice based on disparate impact is established under this chapter only if:

(1)  a complainant demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, sex, national origin, religion, or disability and the respondent fails to demonstrate that the challenged practice is job-related for the position in question and

consistent with business necessity;  or

        (2)  the complainant makes the demonstration in accordance with federal law as that law existed June 4, 1989, with respect to the concept of alternative employment practices, and the respondent refuses to adopt such an alternative employment practice.

        (b)  To determine the availability of and burden of proof applicable to a disparate impact case involving age discrimination, the court shall apply the judicial interpretation of the Age Discrimination in Employment Act of 1967 and its subsequent amendments (29 U.S.C. Section 621 et seq.).

        (c)  To demonstrate that a particular employment practice causes a disparate impact, the complainant must demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complainant demonstrates to the satisfaction of the court that the elements of a respondent's decision-making process are not capable of separation for analysis, that decision-making process may be analyzed as one employment practice.

        (d)  If the respondent demonstrates that a specific practice does not cause a disparate impact, the respondent may not be required to demonstrate that the practice is consistent with business necessity.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.


        Sec. 21.123.  SCOPE OF DEFENSE.  A demonstration that an employment practice is consistent with business necessity may not be used as a defense under this chapter against a complaint of intentional discrimination.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.


        Sec. 21.124.  PROHIBITION AGAINST DISCRIMINATORY USE OF TEST SCORES.  It is an unlawful employment practice for a respondent, in connection with the selection or referral of applicants for

employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of employment-related tests on the basis of race, color, sex, national origin, religion, age, or disability.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.


Sec. 21.125.  CLARIFYING PROHIBITION AGAINST IMPERMISSIBLE CONSIDERATION OF RACE, COLOR, SEX, NATIONAL ORIGIN, RELIGION, AGE, OR DISABILITY IN EMPLOYMENT PRACTICES.  (a)  Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was a motivating factor for an employment practice, even if other factors also motivated the practice, unless race, color, sex, national origin, religion, age, or disability is combined with objective job-related factors to attain diversity in the employer's work force.

(b)  In a complaint in which a complainant proves a violation under Subsection (a) and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court may grant declaratory relief, injunctive relief except as otherwise provided by this subsection, and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a complaint under Subsection (a), but may not award damages or issue an order requiring an admission, reinstatement, hiring, promotion, or back pay.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.  Amended by Acts 1997, 75th Leg., ch. 1126, Sec. 1, eff. Sept. 1, 1997.


Sec. 21.126.  COVERAGE OF PREVIOUSLY EXEMPT EMPLOYEES OF THE STATE OR POLITICAL SUBDIVISION OF THE STATE.  It is an unlawful employment practice for a person elected to public office in this state or a political subdivision of this state to discriminate

because of race, color, sex, national origin, religion, age, or disability against an individual who is an employee or applicant for employment to:

       (1)  serve on the elected official's personal staff;

       (2)  serve the elected official on a policy-making level; or

       (3)  serve the elected official as an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.


     Sec. 21.127.  EXPANSION OF RIGHTS TO CHALLENGE DISCRIMINATORY SENIORITY SYSTEMS.  With respect to a seniority system adopted for an intentionally discriminatory purpose in violation of this chapter, whether that discriminatory purpose is apparent on the face of the seniority provision, an unlawful employment practice occurs when:

       (1)  the seniority system is adopted;

       (2)  an individual becomes subject to the system;  or

       (3)  an individual is injured by the application of the system or a provision of the system.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.


     Sec. 21.128.  REASONABLE ACCOMMODATION;  GOOD FAITH EFFORT. (a)  It is an unlawful employment practice for a respondent covered under this chapter to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability who is an employee or applicant for employment, unless the respondent demonstrates that the accommodation would impose an undue hardship on the operation of the business of the respondent.

     (b)  A showing of undue hardship by the respondent is a defense to a complaint of discrimination made by an otherwise

qualified individual with a disability.  In considering a complaint based on a disability, the commission shall consider the reasonableness of the cost of any necessary workplace accommodation and the availability of alternatives or other appropriate relief.

(c)  In a complaint in which a discriminatory employment practice involves the provision of a reasonable workplace accommodation under this chapter, damages may not be awarded under Subchapter F  if the respondent demonstrates good faith efforts, in consultation with the otherwise qualified individual with a disability who has informed the respondent that accommodation is needed, to identify and make a reasonable workplace accommodation that would provide the individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

(d)  A respondent is not obligated to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual under Subsection (a) if the individual's disability is based solely on being regarded as having an impairment that substantially limits at least one major life activity.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.
Amended by:
Acts 2009, 81st Leg., R.S., Ch. 337 (H.B. 978), Sec. 5, eff. September 1, 2009.


Sec. 21.129.  COURT-ORDERED REMEDIES, AFFIRMATIVE ACTION AGREEMENTS, AND CONCILIATION AGREEMENTS NOT AFFECTED.  This chapter does not affect a court-ordered remedy, affirmative action agreement, or conciliation agreement made in accordance with law.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.05(a), eff. Sept. 1, 1995.


SUBCHAPTER D.  LOCAL ENFORCEMENT

Sec. 21.151.  ENFORCEMENT BY ORDINANCE.  A political subdivision may adopt and enforce an order or ordinance that prohibits a practice that is unlawful under this chapter, another state law, or federal law.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.152.  CREATION OF LOCAL COMMISSION.  (a)  A political subdivision or two or more political subdivisions acting jointly may create a local commission to:
        (1)  promote the purposes of this chapter;  and
        (2)  secure for all individuals in the jurisdiction of each political subdivision freedom from discrimination because of race, color, disability, religion, sex, national origin, or age.
     (b)  The political subdivision creating a local commission may appropriate funds for the expenses of the local commission.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.153.  GENERAL POWERS AND DUTIES OF LOCAL COMMISSION. (a)  A local commission may:
        (1)  employ an executive director and other employees and agents and set their compensation;
        (2)  cooperate or contract with a person, including an agency of the federal government or of another state or municipality;  and
        (3)  accept a public grant or private gift, bequest, or other payment.
     (b)  A local commission shall prepare at least annually a report and furnish a copy of the report to the Commission on Human Rights.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.154.  INVESTIGATORY AND CONCILIATORY POWERS OF LOCAL COMMISSION.  (a)  If the federal government or the Commission on Human Rights refers a complaint alleging a violation of this

chapter to a local commission or defers jurisdiction over the subject matter of the complaint to a local commission, the local commission may receive, investigate, conciliate, or rule on the complaint and may file a civil action to carry out the purposes of this chapter.

(b)  The local commission may request, and as necessary, compel by subpoena:

(1)  the attendance of a witness for examination under oath;  or

(2)  the production for inspection or copying of a record, document, or other evidence relevant to the investigation of an alleged violation of this chapter.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.155.  REFERRAL TO LOCAL COMMISSION AND ACTION ON COMPLAINTS.  (a)  The Commission on Human Rights shall refer a complaint concerning discrimination in employment because of race, color, disability, religion, sex, national origin, or age that is filed with that commission to a local commission with the necessary investigatory and conciliatory powers if:

(1)  the complaint has been referred to the Commission on Human Rights by the federal government;  or

(2)  jurisdiction over the subject matter of the complaint has been deferred to the Commission on Human Rights by the federal government.

(b)  The local commission shall take appropriate action to remedy the practice alleged as discriminatory in the referred complaint.

(c)  If the local commission does not act on the complaint within 60 days or a longer time that is reasonable, the Commission on Human Rights shall reassume responsibility for the complaint and take appropriate action on the complaint.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.156.  REFERRAL BY LOCAL COMMISSION TO STATE

COMMISSION.  A local commission may refer a matter under its jurisdiction to the Commission on Human Rights.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


SUBCHAPTER E. ADMINISTRATIVE REVIEW

Sec. 21.201.  FILING OF COMPLAINT;  FORM AND CONTENT; SERVICE.  (a)  A person claiming to be aggrieved by an unlawful employment practice or the person's agent may file a complaint with the commission.

(b)  The complaint must be in writing and made under oath.

(c)  The complaint must state:

(1)  that an unlawful employment practice has been committed;

(2)  the facts on which the complaint is based, including the date, place, and circumstances of the alleged unlawful employment practice;  and

(3)  facts sufficient to enable the commission to identify the respondent.

(d)  The executive director or the executive director's designee shall serve the respondent with a copy of the perfected complaint not later than the 10th day after the date the complaint is filed.

(e)  A complaint may be amended to cure technical defects or omissions, including a failure to verify the complaint or to clarify and amplify an allegation made in the complaint.

(f)  An amendment to a complaint alleging additional facts that constitute unlawful employment practices relating to or arising from the subject matter of the original complaint relates back to the date the complaint was first received by the commission.

(g)  If a perfected complaint is not received by the commission within 180 days of the alleged unlawful employment practice, the commission shall notify the respondent that a complaint has been filed and that the process of perfecting the complaint is in progress.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 9.06(a), eff. Sept. 1, 1995.


    Sec. 21.202.  STATUTE OF LIMITATIONS.  (a)  A complaint under this subchapter must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred.
    (b)  The commission shall dismiss an untimely complaint.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1993.


    Sec. 21.203.  ALTERNATIVE DISPUTE RESOLUTION;  OFFICE.  (a) The use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, fact-finding, minitrials, and arbitration, is encouraged to resolve disputes arising under this chapter.  The settlement of a disputed claim under this chapter that results from the use of traditional or alternative means of dispute resolution is binding on the parties to the claim.
    (b)  The commission shall establish an office of alternative dispute resolution.  At any time after a complaint is received under Section 21.201, at the request of a party or at the direction of the commission the matter may be referred to the office of alternative dispute resolution.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 9.06(b), eff. Sept. 1, 1995.


    Sec. 21.204.  INVESTIGATION BY COMMISSION.  (a)  The executive director or a staff member of the commission designated by the executive director shall investigate a complaint and determine if there is reasonable cause to believe that the respondent engaged in an unlawful employment practice as alleged in the complaint.
    (b)  If the federal government has referred the complaint to the commission or has deferred jurisdiction over the subject matter of the complaint to the commission, the executive director or the executive director's designee shall promptly investigate the

allegations stated in the complaint.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.205.  LACK OF REASONABLE CAUSE;  DISMISSAL OF COMPLAINT.  (a)  If after investigation the executive director or the executive director's designee determines that reasonable cause does not exist to believe that the respondent engaged in an unlawful employment practice as alleged in a complaint, the executive director or the executive director's designee shall issue a written determination, incorporating the finding that the evidence does not support the complaint and dismissing the complaint.

(b)  The executive director or the executive director's designee shall serve a copy of the determination on the complainant, the respondent, and other agencies as required by law.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.206.  DETERMINATION OF REASONABLE CAUSE;  REVIEW BY PANEL.  (a)  If after investigation the executive director or the executive director's designee determines that there is reasonable cause to believe that the respondent engaged in an unlawful employment practice as alleged in a complaint, the executive director or the executive director's designee shall review with a panel of three commissioners the evidence in the record.

(b)  If after the review at least two of the three commissioners determine that there is reasonable cause to believe that the respondent engaged in an unlawful employment practice, the executive director shall:

(1)  issue a written determination incorporating the executive director's finding that the evidence supports the complaint;  and

(2)  serve a copy of the determination on the complainant, the respondent, and other agencies as required by law.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.

Sec. 21.207.  RESOLUTION BY INFORMAL METHODS.  (a)  If a determination of reasonable cause is made under Section 21.206, the commission shall endeavor to eliminate the alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.

(b)  Without the written consent of the complainant and respondent, the commission, its executive director, or its other officers or employees may not disclose to the public information about the efforts in a particular case to resolve an alleged discriminatory practice by conference, conciliation, or persuasion, regardless of whether there is a determination of reasonable cause.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.208.  NOTICE OF DISMISSAL OR UNRESOLVED COMPLAINT.  If the commission dismisses a complaint filed under Section 21.201 or does not resolve the complaint before the 181st day after the date the complaint was filed, the commission shall inform the complainant of the dismissal or failure to resolve the complaint in writing by certified mail.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.210.  TEMPORARY INJUNCTIVE RELIEF.  (a)  If the commission concludes from a preliminary investigation of an unlawful employment practice alleged in a complaint that prompt judicial action is necessary to carry out the purpose of this chapter, the commission shall file a petition seeking appropriate temporary relief against the respondent pending final determination of a proceeding under this chapter.

(b)  The petition shall be filed in a district court in a county in which:

(1)  the alleged unlawful employment practice that is the subject of the complaint occurred;  or

(2)  the respondent resides.

(c)   A court may not issue temporary injunctive relief unless the commission shows:

        (1)   a substantial likelihood of success on the merits; and

        (2)   irreparable harm to the complainant in the absence of the preliminary relief pending final determination on the merits.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


        Sec. 21.211.   ELECTION OF REMEDIES.   A person who has initiated an action in a court of competent jurisdiction or who has an action pending before an administrative agency under other law or an order or ordinance of a political subdivision of this state based on an act that would be an unlawful employment practice under this chapter may not file a complaint under this subchapter for the same grievance.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


SUBCHAPTER F. JUDICIAL ENFORCEMENT

    Sec. 21.251.   CIVIL ACTION BY COMMISSION.   (a)   The commission may bring a civil action against a respondent if:

        (1)   the commission determines that there is reasonable cause to believe that the respondent engaged in an unlawful employment practice;

        (2)   the commission's efforts to resolve the discriminatory practice to the satisfaction of the complainant and respondent through conciliation have been unsuccessful;  and

        (3)   a majority of the commissioners determines that the civil action may achieve the purposes of this chapter.

    (b)   The complainant may intervene in a civil action brought by the commission.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


    Sec. 21.252.   NOTICE OF COMPLAINANT'S RIGHT TO FILE CIVIL

ACTION.   (a)   A complainant who receives notice under Section 21.208 that the complaint is not dismissed or resolved is entitled to request from the commission a written notice of the complainant's right to file a civil action.

　　(b)   The complainant must request the notice in writing.

　　(c)   The executive director may issue the notice.

　　(d)   Failure to issue the notice of a complainant's right to file a civil action does not affect the complainant's right under this subchapter to bring a civil action against the respondent.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


　　Sec. 21.253.   EXPEDITED NOTICE OF COMPLAINANT'S RIGHT TO FILE CIVIL ACTION.   (a)   On receipt of a written request by a complainant, the commission shall issue before the 181st day after the date the complaint was filed a notice of the right to file a civil action if:

　　　　(1)   the complainant alleges an unlawful employment practice based on the complainant's status as an individual with a life-threatening illness, as confirmed in writing by a physician licensed to practice medicine in this state;  or

　　　　(2)   the executive director certifies that administrative processing of the complaint cannot be completed before the 181st day after the date the complaint was filed.

　　(b)   The commission shall issue the expedited notice by certified mail not later than the fifth business day after the date the commission receives the written request.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


　　Sec. 21.254.   CIVIL ACTION BY COMPLAINANT.   Within 60 days after the date a notice of the right to file a civil action is received, the complainant may bring a civil action against the respondent.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.

Sec. 21.255.  COMMISSION'S INTERVENTION IN CIVIL ACTION BY COMPLAINANT.  After receipt of a timely application, a court may permit the commission to intervene in a civil action filed under Section 21.254 if:

     (1)  the commission certifies that the case is of general public importance;  and

     (2)  before commencement of the action the commission issued a determination of reasonable cause to believe that this chapter was violated.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.256.  STATUTE OF LIMITATIONS.  A civil action may not be brought under this subchapter later than the second anniversary of the date the complaint relating to the action is filed.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 9.07(a), eff. Sept. 1, 1995.


Sec. 21.257.  ASSIGNMENT TO EARLY HEARING.  The court shall set an action brought under this subchapter for hearing at the earliest practicable date to expedite the action.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.258.  INJUNCTION;  EQUITABLE RELIEF.  (a)  On finding that a respondent engaged in an unlawful employment practice as alleged in a complaint, a court may:

     (1)  prohibit by injunction the respondent from engaging in an unlawful employment practice;  and

     (2)  order additional equitable relief as may be appropriate.

    (b)  Additional equitable relief may include:

     (1)  hiring or reinstating with or without back pay;

     (2)  upgrading an employee with or without pay;

     (3)  admitting to or restoring union membership;

     (4)  admitting to or participating in a guidance program,

apprenticeship, or on-the-job training or other training or
retraining program, using objective job-related criteria in
admitting an individual to a program;

       (5)  reporting on the manner of compliance with the terms
of a final order issued under this chapter;  and

       (6)  paying court costs.

    (c)  Liability under a back pay award may not accrue for a
date more than two years before the date a complaint is filed with
the commission.  Interim earnings, workers' compensation benefits,
and unemployment compensation benefits received operate to reduce
the back pay otherwise allowable.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


    Sec. 21.2585.  COMPENSATORY AND PUNITIVE DAMAGES.  (a)  On
finding that a respondent engaged in an unlawful intentional
employment practice as alleged in a complaint, a court may, as
provided by this section, award:

       (1)  compensatory damages;  and

       (2)  punitive damages.

    (b)  A complainant may recover punitive damages against a
respondent, other than a respondent that is a governmental entity,
if the complainant demonstrates that the respondent engaged in a
discriminatory practice with malice or with reckless indifference
to the state-protected rights of an aggrieved individual.

    (c)  Compensatory damages awarded under this section may not
include:

       (1)  back pay;

       (2)  interest on back pay;  or

       (3)  other relief authorized under Section 21.258(b).

    (d)  The sum of the amount of compensatory damages awarded
under this section for future pecuniary losses, emotional pain,
suffering, inconvenience, mental anguish, loss of enjoyment of
life, and other nonpecuniary losses and the amount of punitive
damages awarded under this section may not exceed, for each
complainant:

(1)  $50,000 in the case of a respondent that has fewer than 101 employees;

(2)  $100,000 in the case of a respondent that has more than 100 and fewer than 201 employees;

(3)  $200,000 in the case of a respondent that has more than 200 and fewer than 501 employees;  and

(4)  $300,000 in the case of a respondent that has more than 500 employees.

(e)  For the purposes of Subsection (d), in determining the number of employees of a respondent, the requisite number of employees must be employed by the respondent for each of 20 or more calendar weeks in the current or preceding calendar year.

Added by Acts 1995, 74th Leg., ch. 76, Sec. 9.07(b), eff. Sept. 1, 1995.  Amended by Acts 1999, 76th Leg., ch. 872, Sec. 13, eff. Sept. 1, 1999.


Sec. 21.259.  ATTORNEY'S FEES;  COSTS.  (a)  In a proceeding under this chapter, a court may allow the prevailing party, other than the commission, a reasonable attorney's fee as part of the costs.

(b)  The state, a state agency, or a political subdivision is liable for costs, including attorney's fees, to the same extent as a private person.

(c)  In awarding costs and attorney's fees in an action or a proceeding under this chapter, the court, in its discretion, may include reasonable expert fees.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1995, 74th Leg., ch. 76, Sec. 9.07(c), eff. Sept. 1, 1995.


Sec. 21.260.  RELIEF FOR DISABLED EMPLOYEE OR APPLICANT.  If the affected employee or applicant for employment has a disability, a court shall consider the undue hardship defense, including the reasonableness of the cost of necessary workplace accommodation and the availability of alternatives or other appropriate relief.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.261.  COMPELLED COMPLIANCE.  If an employer, employment agency, or labor organization fails to comply with a court order issued under this subchapter, a party to the action or the commission, on the written request of a person aggrieved by the failure, may commence proceedings to compel compliance with the order.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.262.  TRIAL DE NOVO.  (a)  A judicial proceeding under this chapter is by trial de novo.

(b)  A commission finding, recommendation, determination, or other action is not binding on a court.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


SUBCHAPTER G. RECORDS

Sec. 21.301.  RECORDKEEPING;  REPORTS.  A person under investigation in connection with a charge filed under this chapter and who is subject to this chapter shall:

(1)  make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed;

(2)  preserve the records for the period required by commission rule or court order;  and

(3)  make reports from the records as prescribed by commission rule or court order as reasonable, necessary, or appropriate for the enforcement of this chapter or a rule or order issued under this chapter.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


Sec. 21.302.  RECORDS;  TRAINING PROGRAM.  The commission by rule shall require that a person subject to this chapter who

controls an apprenticeship, on-the-job training, or other training or retraining program:

        (1)  keep all records reasonably necessary to carry out the purposes of this chapter, including a list of applicants for participation in the program and a record of the chronological order in which applications for the program were received;  and

        (2)  furnish to the commission on request a detailed description of the manner in which individuals are selected to participate in the program.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


    Sec. 21.303.  CONFORMITY TO FEDERAL LAW.  A report or record required by the commission under this subchapter must conform to a similar record or report required under 42 U.S.C. Section 2000e-8(c).

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


    Sec. 21.304.  CONFIDENTIALITY OF RECORDS.  An officer or employee of the commission may not disclose to the public information obtained by the commission under Section 21.204 except in compliance with Section 21.305 and as necessary to the conduct of a proceeding under this chapter.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.
Amended by:
    Acts 2011, 82nd Leg., R.S., Ch. 1012 (H.B. 2463), Sec. 1, eff. September 1, 2011.


    Sec. 21.305.  ACCESS TO COMMISSION RECORDS.  (a)  Except as provided by Subsection (c), the commission shall adopt rules allowing a party to a complaint filed under Section 21.201 reasonable access to commission records relating to the complaint.
    (b)  Except as provided by Subsection (c), unless the complaint is resolved through a voluntary settlement or conciliation, on the written request of a party the executive

director shall allow the party access to the commission records:

        (1)  after the final action of the commission; or

        (2)  if a civil action relating to the complaint is filed in federal court alleging a violation of federal law.

    (c)  Notwithstanding Section 552.023, Government Code, the following information is not considered public information for the purposes of Chapter 552, Government Code, and may not be disclosed to a party to a complaint filed under Section 21.201:

        (1)  identifying information of persons other than the parties and witnesses to the complaint;

        (2)  identifying information about confidential witnesses, including any confidential statement given by the witness;

        (3)  sensitive medical information about the charging party or a witness to the complaint that is:

            (A)  provided by a person other than the person requesting the information; and

            (B)  not relevant to issues raised in the complaint, including information that identifies injuries, impairments, pregnancies, disabilities, or other medical conditions that are not obviously apparent or visible;

        (4)  identifying information about a person other than the charging party that is found in sensitive medical information regardless of whether the information is relevant to the complaint;

        (5)  nonsensitive medical information that is relevant to the complaint if the disclosure would result in an invasion of personal privacy, unless the information is generally known or has been previously reported to the public;

        (6)  identifying information about other respondents or employers not a party to the complaint;

        (7)  information relating to settlement offers or conciliation agreements received from one party that was not conveyed to the other and information contained in a separate alternative dispute resolution file prepared for mediation purposes; and

        (8)  identifying information about a person on whose

behalf a complaint was filed if the person has requested that the person's identity as a complaining party remain confidential.

(d)  In this section, "identifying information" has the meaning assigned by Section 32.51, Penal Code.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993. Amended by:

Acts 2011, 82nd Leg., R.S., Ch. 1012 (H.B. 2463), Sec. 2, eff. September 1, 2011.


Sec. 21.306.  SUBPOENA OF RECORD OR REPORT.  (a)  If a person fails to permit access, examination, photographing, or copying or fails to make, keep, or preserve a record or make a report in accordance with this subchapter, the commission may issue a subpoena requiring compliance.

(b)  On a failure to comply with a subpoena of the commission, the commission shall apply for an order directing compliance to the district court of the county in which the person is found, resides, or transacts business.

Acts 1993, 73rd Leg., ch. 269, Sec. 1, eff. Sept. 1, 1993.


SUBCHAPTER H. DISCRIMINATORY USE OF GENETIC INFORMATION

Sec. 21.401.  DEFINITIONS.  In this subchapter:
(1)  "DNA" means deoxyribonucleic acid.
(2)  "Family health history" means a history taken by a physician or genetic professional to ascertain genetic or medical information about an individual's family.
(3)  "Genetic characteristic" means a scientifically or medically identifiable genetic or chromosomal variation, composition, or alteration that:
(A)  is scientifically or medically believed to:
(i)  predispose an individual to a disease, disorder, or syndrome;  or
(ii)  be associated with a statistically significant increased risk of developing a disease, disorder, or

syndrome;  and

(B)  may or may not be associated with any symptom of an ongoing disease, disorder, or syndrome affecting an individual on the date the genetic information is obtained regarding the individual.

(4)  "Genetic information" means information that is:

(A)  obtained from or based on a scientific or medical determination of the presence or absence in an individual of a genetic characteristic;  or

(B)  derived from the results of a genetic test performed on, or a family health history obtained from, an individual.

(5)  "Genetic test" means a presymptomatic laboratory test of an individual's genes, gene products, or chromosomes that:

(A)  analyzes the individual's DNA, RNA, proteins, or chromosomes;  and

(B)  is performed to identify any genetic variation, composition, or alteration that is associated with the individual's having a statistically increased risk of:

(i)  developing a clinically recognized disease, disorder, or syndrome;  or

(ii)  being a carrier of a clinically recognized disease, disorder, or syndrome.

The term does not include a blood test, cholesterol test, urine test, or other physical test used for a purpose other than determining a genetic or chromosomal variation, composition, or alteration in a specific individual.

(6)  "RNA" means ribonucleic acid.

Added by Acts 1997, 75th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 1997.  Amended by Acts 2001, 77th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 1276, Sec. 11.001(a), eff. Sept. 1, 2003.

Sec. 21.402.  DISCRIMINATORY USE OF GENETIC INFORMATION PROHIBITED.  (a)  An employer commits an unlawful employment

practice if the employer fails or refuses to hire, discharges, or otherwise discriminates against an individual with respect to compensation or the terms, conditions, or privileges of employment:

       (1)  on the basis of genetic information concerning the individual;  or

       (2)  because of the refusal of the individual to submit to a genetic test.

   (b)  A labor organization commits an unlawful employment practice if the labor organization excludes or expels from membership or otherwise discriminates against an individual:

       (1)  on the basis of genetic information concerning the individual;  or

       (2)  because of the refusal of the individual to submit to a genetic test.

   (c)  An employment agency commits an unlawful employment practice if the employment agency classifies or refers for employment, fails or refuses to refer for employment, or otherwise discriminates against an individual:

       (1)  on the basis of genetic information concerning the individual;  or

       (2)  because of the refusal of the individual to submit to a genetic test.

   (d)  An employer, labor organization, or employment agency commits an unlawful employment practice if the employer, labor organization, or employment agency limits, segregates, or classifies an employee, member, or applicant for employment or membership in a way that would deprive or tend to deprive the employee, member, or applicant of employment opportunities or otherwise adversely affect the status of the employee, member, or applicant:

       (1)  on the basis of genetic information concerning the employee, member, or applicant;  or

       (2)  because of the refusal of the employee, member, or applicant to submit to a genetic test.

Added by Acts 1997, 75th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 1997.

Sec. 21.403.  CONFIDENTIALITY OF GENETIC INFORMATION.  (a) Except as provided by Section 21.4031, genetic information is confidential and privileged regardless of the source of the information.

(b)  A person who holds genetic information about an individual may not disclose or be compelled to disclose, by subpoena or otherwise, that information unless the disclosure is specifically authorized as provided by Section 21.4032.

(c)  This section applies to a redisclosure of genetic information by a secondary recipient of the information after disclosure of the information by an initial recipient.

(d)  Redesignated as V.T.C.A., Labor Code Sec. 21.4031 by Acts 2003, 78th Leg., ch. 1276, Sec. 11.001(d).

(e)  A person who discloses genetic information in violation of this section is liable for a civil penalty of not more than $10,000. The attorney general may bring an action in the name of the state to recover the penalty, plus reasonable attorney's fees and court costs.

Added by Acts 1997, 75th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 1997.  Amended by Acts 2003, 78th Leg., ch. 965, Sec. 1, eff. June 20, 2003;  Acts 2003, 78th Leg., ch. 1276, Sec. 11.001(b) to (e), eff. Sept. 1, 2003.


Sec. 21.4031.  EXCEPTIONS TO CONFIDENTIALITY.  (a)  Subject to Subchapter G, Chapter 411, Government Code, genetic information may be disclosed without an authorization required under Section 21.4032 if the disclosure is:

(1)  authorized under a state or federal criminal law relating to:

(A)  the identification of individuals;  or

(B)  a criminal or juvenile proceeding, an inquest, or a child fatality review by a multidisciplinary child-abuse team;

(2)  required under a specific order of a state or federal court;

(3)  for the purpose of establishing paternity as

authorized under a state or federal law;

        (4)  made to provide genetic information relating to a decedent and the disclosure is made to the blood relatives of the decedent for medical diagnosis;  or

        (5)  made to identify a decedent.

   (b)  Genetic information may be disclosed without an authorization under Section 21.4032 if:

        (1)  the disclosure is for information from a research study in which the procedure for obtaining informed written consent and the use of the information is governed by national standards for protecting participants involved in research projects, including guidelines issued under 21 C.F.R. Part 50 and 45 C.F.R. Part 46;

        (2)  the information does not identify a specific individual;  and

        (3)  the information is provided to the Texas Department of Health to comply with Chapter 87, Health and Safety Code.

Added by Acts 1997, 75th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 1997.  Redesignated from Labor Code Sec. 21.403(c), (d) and amended by Acts 2003, 78th Leg., ch. 1276, Sec. 11.001(d), eff. Sept. 1, 2003.


    Sec. 21.4032.  AUTHORIZED DISCLOSURE.  An individual or the legal representative of an individual may authorize disclosure of genetic information relating to the individual by a written authorization that includes:

        (1)  a description of the information to be disclosed;

        (2)  the name of the person to whom the disclosure is made;  and

        (3)  the purpose for the disclosure.

Added by Acts 1997, 75th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 1997.  Redesignated from Labor Code Sec. 21.403(b) and amended by Acts 2003, 78th Leg., ch. 1276, Sec. 11.001(e), eff. Sept. 1, 2003.


    Sec. 21.404.  DISCLOSURE OF TEST RESULTS TO INDIVIDUAL

TESTED.  An individual who submits to a genetic test has the right to know the results of the test.  On the written request by the individual, the entity that performed the test shall disclose the test results to:

       (1)  the individual;  or

       (2)  a physician designated by the individual.

Added by Acts 1997, 75th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 1997.  Amended by Acts 2003, 78th Leg., ch. 1276, Sec. 11.001(f), eff. Sept. 1, 2003.


     Sec. 21.405.  DESTRUCTION OF SAMPLE MATERIAL;  EXCEPTIONS.  A sample of genetic material obtained from an individual for a genetic test shall be destroyed promptly after the purpose for which the sample was obtained is accomplished unless:

       (1)  the sample is retained under a court order;

       (2)  the individual authorizes retention of the sample for medical treatment or scientific research;

       (3)  the sample was obtained for research that is cleared by an institutional review board and retention of the sample is:

         (A)  under a requirement the institutional review board imposes on a specific research project;  or

         (B)  authorized by the research participant with institutional review board approval under federal law;  or

       (4)  the sample was obtained for a screening test established by the Texas Department of Health under Section 33.011, Health and Safety Code, and performed by that department or a laboratory approved by that department.

Added by Acts 1997, 75th Leg., ch. 1215, Sec. 1, eff. Sept. 1, 1997.  Amended by Acts 2003, 78th Leg., ch. 1276, Sec. 11.001(g), eff. Sept. 1, 2003.


        SUBCHAPTER I. PERSONNEL POLICIES AND PROCEDURES

     Sec. 21.451.  DEFINITION.  In this subchapter, "state agency" does not include a public junior college as defined by Section

61.003, Education Code.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


Sec. 21.452.  DEVELOPMENT AND IMPLEMENTATION OF PERSONNEL POLICIES AND PROCEDURES.  Each state agency shall develop and implement personnel policies and procedures that comply with this chapter, including personnel selection procedures that incorporate a workforce diversity program.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


Sec. 21.453.  REVIEW.  (a)  The commission shall review the personnel policies and procedures of each state agency on a six-year cycle to determine whether the policies and procedures comply with this chapter.
          (b)  The commission by rule shall establish a system to stagger the reviews of state agency personnel policies and procedures required under this section.
          (c)  If the commission determines that the personnel policies and procedures of a state agency do not comply with this chapter, the commission shall recommend appropriate revisions to the personnel policies and procedures.
          (d)  The state agency shall take these recommendations into consideration and determine whether to revise the personnel policies and procedures.
          (e)  The review of a state agency's personnel policies and procedures shall be completed within one year.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


Sec. 21.454.  COMPLIANCE REPORT.  Not later than 60 days after the commission completes the review of a state agency's personnel policies and procedures as required by Section 21.453 and provides its review and any recommendations to the agency, the agency shall submit to the commission, the governor, the legislature, and the Legislative Budget Board a report detailing:

    (1) whether the agency implemented the recommendations of the commission; and

    (2) if the agency did not implement all of the commission's recommendations, the reasons for rejecting those recommendations.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


  Sec. 21.455. REIMBURSEMENT; AUDIT. (a) A state agency shall reimburse the commission through interagency contract for the reasonable and necessary expenses incurred by the commission in conducting a review under Section 21.453.

  (b) The commission shall maintain a record of the time expended and the actual costs and travel expenses incurred by the commission in conducting a review under Section 21.453.

  (c) The amount of reimbursement paid by a state agency under Subsection (a) and the record maintained by the commission under Subsection (b) is subject to audit by the state auditor in accordance with Chapter 321, Government Code.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999. Amended by Acts 2003, 78th Leg., ch. 785, Sec. 61, eff. Sept. 1, 2003.


  Sec. 21.456. FAILURE TO COMPLY WITH SUBCHAPTER; ADMINISTRATIVE PENALTY. (a) If the commission determines that a state agency has failed to comply with this subchapter, the commission shall certify that determination to the comptroller.

  (b) On receipt of a certification by the commission under Subsection (a), the comptroller shall notify the state agency that is the subject of the certification that funds appropriated to the agency are subject to a reduction in the amount of $5,000 as provided by this section unless, not later than the 30th day after the date the agency receives notice from the comptroller under this subsection, the agency submits to the comptroller proof that the agency has complied with this subchapter. If the agency fails to submit to the comptroller the proof required by this subsection,

the comptroller shall:

      (1)  if the state agency failed to develop or implement personnel policies and procedures as required by Section 21.452:

         (A)  reduce the funds appropriated to the agency for the fiscal year in which the agency fails to comply with this subchapter by the amount of $5,000;  or

         (B)  if all funds appropriated to the agency for the fiscal year in which the agency fails to comply with this subchapter have been distributed to the agency, reduce the funds appropriated to the agency during the next fiscal year by the amount of $5,000;  or

      (2)  if the state agency failed to reimburse the commission as required by Section 21.455:

         (A)  transfer the amount of the reimbursement from the agency to the commission's appropriations and reduce the funds appropriated to the agency for the fiscal year in which the agency fails to comply with this subchapter by an amount that equals the difference between the amount of the reimbursement and $5,000;  or

         (B)  if all funds appropriated to the agency for the fiscal year in which the agency fails to comply with this subchapter have been distributed to the agency:

           (i)  during the next fiscal year, transfer the amount of the reimbursement from the funds appropriated to the agency for that fiscal year to the commission's appropriations;  and

           (ii)  reduce the funds appropriated to the agency during the next fiscal year by an amount that equals the difference between the amount of the reimbursement and $5,000.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


SUBCHAPTER J. HIRING PRACTICES

Sec. 21.501.  WORKFORCE ANALYSIS.  Each state fiscal biennium, each state agency shall analyze its current workforce and compare the number of African Americans, Hispanic Americans, and females employed by the agency in each job category to the available African Americans, Hispanic Americans, and females in the statewide

civilian workforce to determine the percentage of exclusion or underutilization by each job category.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


Sec. 21.502.  RECRUITMENT PLAN.  Based upon a workforce availability analysis under Section 21.501 that demonstrates the exclusion or underutilization of African Americans, Hispanic Americans, and females, or court-ordered remedies, or supervised conciliations or settlement agreements, each state agency, other than a public junior college as defined by Section 61.003, Education Code, shall develop and implement a plan to recruit qualified African Americans, Hispanic Americans, and females.  The plan must comply with this chapter.  The commission shall monitor state agencies to determine compliance with this section.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


Sec. 21.503.  EFFECT ON REMEDIES UNDER OTHER LAWS.  This subchapter does not affect a remedy, agreement, settlement, or affirmative action plan that has been ordered or approved by a court or that has been adopted in accordance with other law.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


Sec. 21.504.  ANNUAL REPORT.  Not later than November 1 of each calendar year, each state agency shall report to the commission the total number of African Americans, Hispanic Americans, females, and other persons hired for each job category by the agency during the preceding state fiscal year.  The commission shall compile this information and submit a report based on the information to the governor and the Legislative Budget Board not later than January 1 of the subsequent calendar year.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


SUBCHAPTER K. EQUAL EMPLOYMENT OPPORTUNITY REPORTS

Sec. 21.551.  DEFINITION.  In this subchapter, "racial and ethnic group" means Caucasian American, African American, or Hispanic American.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


Sec. 21.552.  EQUAL EMPLOYMENT OPPORTUNITY REPORT REQUIRED. (a)  Not later than November 1 of each year, each state agency shall report equal employment opportunity information for the preceding fiscal year to the commission as required by this subchapter.  The report must be made in the form prescribed by the commission and include information compiled on a monthly basis.

    (b)  Each year the commission shall compile equal employment opportunity information reported to the commission by a state agency.  The information must include:

        (1)  the total number of employees of the agency and the total number of new employees hired since the date of the last report made by the agency;

        (2)  the total number of employees of the agency listed by racial and ethnic group and the percentage of the total number of agency employees for each racial and ethnic group, including a distinction for those categories between the total number of employees and the total number of employees hired since the date of the last report made by the agency;

        (3)  the total number of male employees and the total number of female employees of the agency, including a distinction for those categories between the total number of employees and the total number of employees hired since the date of the last report made by the agency;

        (4)  the total number of male employees and the total number of female employees of the agency for each racial and ethnic group, including a distinction for those categories between the total number of employees and the total number of employees hired since the date of the last report made by the agency; and

        (5)   the total number of employees of the agency listed by job classification and the total number of employees for each

sex and racial and ethnic group listed by job classification, including a distinction for those categories between the total number of employees and the total number of employees hired since the date of the last report made by the agency.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 1301 (H.B. 2716), Sec. 2, eff. June 18, 2005.

Acts 2013, 83rd Leg., R.S., Ch. 1312 (S.B. 59), Sec. 78, eff. September 1, 2013.


Sec. 21.553.  COOPERATION WITH COMPTROLLER AND UNIFORM STATEWIDE ACCOUNTING SYSTEM; REPORT.  (a)  The commission shall compile the information reported to the commission under this subchapter with the assistance of the comptroller and the uniform statewide accounting system.

(b)  The commission shall conduct an analysis of the information reported to the commission under this subchapter and report the results of that analysis to the legislature, the Legislative Budget Board, and the governor not later than January 1 of each odd-numbered year.  The report required under this subsection must be written in plain language.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999. Amended by:

Acts 2013, 83rd Leg., R.S., Ch. 1312 (S.B. 59), Sec. 79, eff. September 1, 2013.

Acts 2013, 83rd Leg., R.S., Ch. 1312 (S.B. 59), Sec. 80, eff. September 1, 2013.


Sec. 21.554.  FORM.  Not later than December 15 of each year, the commission shall notify each state agency of the form to be used to make a report under this subchapter for the following year.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.

    Sec. 21.555.  FAILURE TO FILE REQUIRED REPORT;  ADMINISTRATIVE PENALTY.  (a)  If the commission determines that a state agency has failed to file a report required under this subchapter, the commission shall certify that determination to the comptroller.

    (b)  On receipt of a certification by the commission under Subsection (a), the comptroller shall notify the state agency that is the subject of the certification that funds appropriated to the agency are subject to a reduction in the amount of $2,000 as provided by this section unless, not later than the 30th day after the date the agency receives notice from the comptroller under this subsection, the agency submits to the comptroller proof that the agency filed the report required under this subchapter.  If the agency fails to submit to the comptroller the proof required by this subsection, the comptroller shall:

        (1)  reduce the funds appropriated to the agency for the fiscal year in which the agency fails to file the report required under this subchapter by the amount of $2,000;  or

        (2)  if all funds appropriated to the agency for the fiscal year in which the agency fails to file the report required under this subchapter have been distributed to the agency, reduce the funds appropriated to the agency during the next fiscal year by the amount of $2,000.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999.


    Sec. 21.556.  REQUIRED COMPLIANCE TRAINING FOR STATE AGENCIES.  (a)  A state agency that receives three or more complaints of employment discrimination in a fiscal year, other than complaints determined to be without merit, shall provide a comprehensive equal employment opportunity training program to appropriate supervisory and managerial employees.

    (b)  The training may be provided by the commission or by another entity or person approved by the commission, including a state agency.

    (c)  The state agency shall provide documentation of the training to the commission if the training is not conducted by the

commission. The documentation shall include the dates the training was provided, the names of the persons attending the training, an agenda for the training program, and the name of the entity or person providing the training.

(d) The commission by rule shall adopt minimum standards for a training program described by Subsection (a) and shall approve an entity or person to provide a training program if the program complies with the minimum standards adopted by the commission under this subsection.

(e) An agency required to participate in a program under this section shall pay the cost of attending the program or shall reimburse the commission or state agency providing the program through interagency contract. The cost of providing the program shall be determined and approved by the commission or state agency. The state auditor may audit the commission's expenditure of fees collected under this section based on a risk assessment performed by the state auditor and subject to the approval by the legislative audit committee of including the audit in the audit plan under Section 321.013, Government Code.

Added by Acts 1999, 76th Leg., ch. 872, Sec. 15, eff. Sept. 1, 1999. Amended by Acts 2003, 78th Leg., ch. 785, Sec. 62, eff. Sept. 1, 2003.

**Appendix**

**Tab 3**



## Alamo Heights Junior School

7607 N. New Braunfels   San Antonio, Texas  78209
Phone 210-824-3231  FAX: 210-832-5825

June 23, 2009

Dr. Kevin Brown
Superintendent of Schools
Alamo Heights Independent School District
7101 Broadway
San Antonio, Texas 78209

RE:   Catherine Clark

Dear Dr. Brown:

Catherine Clark is employed as a teacher/coach on the Alamo Heights ISD Junior School Campus.   Six other teacher coaches work with Ms. Clark, conducting P.E. classes and/or coaching sport teams.  On May 15, 2008, Ms. Clark informed me for the first time of complaints she held against members of her coaching staff (see Exhibit A).  Thereafter, I conducted a series of interviews, investigating her 52 separate charges.  On May 23, 2008 I issued the attached letter of determination regarding her complaints, generally finding little to no evidence to support Ms. Clark's contentions.  (See Exhibit B).

That list of charges addressed matters alleged to have occurred as early as September 20, 2007. Subsequent to my May 23, 2008 determination letter, Ms. Clark continued to forward similar complaints to me.  As you know, our grievance policy requires work place complaints to be filed within 15 working days of their inception, but Ms. Clark had not utilized the District's grievance policy to lodge any of her complaints.  Explaining the purpose of the District grievance system, on October 29, 2008, I placed Ms. Clark on a growth plan as a Teacher In Need of Assistance, directing her to improve peer communication, and to first communicate employment concerns directly to Michelle Boyer, her Campus Coaching Coordinator, and thereafter if needed, through the District's grievance Policy.  (See Exhibit C).

A copy of Board Policy DGBA (Local), describing the 15-day filing requirement and the grievance process, was first placed in Ms. Clark's private mailbox on May 23, 2008.  She was provided with another copy of the Policy, along with a memorandum dated September 17, 2008. A copy of the Policy was again handed to Ms. Clark in our meeting on October 29, 2008.

(Note: Additionally, a copy of the Policy was handed to Ms. Clark in our meeting of January 29, 2009, and yet another at our meeting of April 8, 2009.)

On January 23, 2009 Ms. Clark issued to me a second series of complaints, again outside the grievance Policy.  This time her complaints included allegations that:

- Her cell phone had twice been removed from her desk and hidden in the trash can by other coaches.

## EXHIBIT D-7

- Her keys had been removed from her desk twice, and hidden under the trash can by other coaches.
- She had "reported" the removal of her keys from her desk by other coaches.
- She was intentionally "hit" by Coach Annie Monterrubio as she carried a box out of the supply room.
- That I "blindsided" her when I directed her to attend a meeting where we discussed two grievances filed against her by her fellow coaches, as well as missing student athletic funds for which she had responsibilities because I did not inform her that the Campus Athletic Director and Assistant Principal would also attend such meeting.
- That it is my responsibility to pre-inform her of my agenda whenever she is asked to attend a meeting with me.
- That there were witnesses to a verbal attack on her by Coaches Michelle Boyer and Christi Gonzales.
- That all coaches were "snapping" at her, and she was being "bullied" by them.
- She had been "yelled" at and "treated terribly by three co-workers in a row."
- That Michelle Boyer brings breakfast tacos in the morning for all coaches except her.
- That Michelle Boyer holds coaches meetings that exclude her.
- That the "other coaches" had locked her out of the coaching office on three specified dates.
- That Michelle Boyer, should be required to report her [Coach Boyer's] whereabouts to her [Ms. Clark], and that it is "shocking ..." to her that I "don't agree that the head of a department should let her employees know where she is and when she'll be out."
- That she "had to ask for the District grievance form seven times."
- That on five separate occasions, print jobs which she had prepared were "wadded up" and thrown away by others.
- That she does not need to improve her communication skills, it's the others who are at fault.
- That all the above was in "retaliation" for her having previously filed a sexual harassment charge.

Many of the above complaints were also the subject of e-mail reprimands Ms. Clark had forwarded directly to colleagues. Once again, I investigated such charges, but was unable to find support for her claims.

On February 6, 2009 Ms. Clark forwarded to me a third set of complaints, again not using DGBA (Local). This time, among her claims she alleged:

- That Michelle Boyer has asked her to put away "balls and Frisbees" that were not hers.
- That all coaches were ignoring her request for coaching assistance.
- That none of the coaches would speak to her.

130

- That Michelle Boyer was playing loud music and refused to turn it down when she requested.
- That "last minute" venue changes had intentionally not been communicated to her.
- That Coach Monterubbio was "staring" at her "bottom."
- That her desk had been ransacked and two clipboards taken.
- That Coach Gonzales blocked her way at the door one morning.
- That coaches were talking about missing student activity monies in front of her.
- That all of the above was in "retaliation" for her having previously filed a sexual harassment charge.

Ms. Clark had again sent e-mail messages regarding the above to colleagues. I also investigated these claims and was, once more, unable to find support for her allegations.

On April 15, 2009, Ms. Clark used the grievance Policy to file a grievance against Coach Monterubbio for assault. She alleged that Coach Monterubbio intentionally shoved her from behind when they were both supervising students during an exercise run. Coach Monterubbio admitted to having shoved her [Ms. Clark], stating that she thought Ms. Clark was one of the students who she was ushering into the building at the end of a run. She said she apologized on the spot. Ms. Clark acknowledged the apology, insisting that the incident was an intentional assault and was intended to intimidate" her. She claimed that the act was in retaliation for her having previously reported that she had been sexually harassed by the Coach. The grievance resolution she sought was either her transfer or the transfer of Coach Monterubbio to another campus.

On April 21, 2009, in an attempt to better understand her grievance charge of intentional assault, I posed a set of inquires to Ms. Clark. (See Exhibit E attached). On April 22, 2009, Ms. Clark responded to my inquiries by describing an additional set of complaints (see Exhibit F attached), which are summarized as follows:

1.  Coach Monterubbio has a "… history of her unpredictable and crass behavior."
2.  Coach Monterubbio "… has bullied … [her] … for 18 months."
3.  Coach Monterubbio told her "… that she has harmed others in the past who tattled on her."
4.  Ms. Clark is "… constantly feeling ill and [is] so nervous every morning when … [she] … comes to work."
5.  She has "…an extreme amount of stress and ill health because … [she is] … frightened of …" Coach Monterubbio.
6.  Coach Monterubbio "… scowls and grunts when walking past …" her.
7.  "Within earshot of students, parents, substitute teachers, and staff, … [Coach Monterubbio] … continues to cuss and threaten."
8.  Coach Monterubbio "… makes fun of not just [her] … , but students, parents, and teachers on a daily basis."
9.  Coach Monterubbio "… bad mouths others and has no concern for discretion."
10. Coach Monterubbio "… exhibits unprofessional behavior during class, at games, and during practices."

11. In the athletic office, ... [Coach Monterubbio] ... is hostile on a daily basis by saying derogatory things about ... [her] ... to others which are meant for ... [her] ... to hear."

12. Coach Monterubbio is "... known to habitually snap at ... [her]... , other coaches, students, and parents."

13. Coach Monterubbio teases "... students and staff... , causing trouble."

14. Coach Monterubbio "... shouts at students and fellow coaches."

15. Coach Monterubbio uses "... profanity and/or talks about barhopping and having sexual relations the previous night" in the presence of students.

16. She feels "... that her [Coach Monterubbio's]... aggressive and unpredictable nature is a concern regarding our students."

17. Coach Monterubbio "... exhibits inappropriate language and gestures ... showing the children of this community that it is okay to bully, talk dirty, and to be outspokenly negative."

18. Coach Monterrubio "... talks about sex and female body parts ... in the girls' locker room every day among our children."

19. The "... antennae *[sic]* was ripped off of ... [her] car the very evening that ... [she] reported to [me] that ... [Coach Monterubbio] ... pushed ... [her] ... in the back. And ... [she is] ... fearful that additional retaliation will occur."

20. Coach Monterubbio chased her in her car on an unspecified date at 1:35 P.M.

21. Pornography was "... displayed on ... [Coach Monterubbio's] ... cell phone to ... [her] ... and the other coaches on Valentine's Day 2008, and the dirty pictures and off-colored jokes ... were e-mailed from her [Coach Monterubbio's] District computer (that is, one District e-mail address to another District e-mail address) to ... [her] ... and to others and this is "... another example of her [Coach Monterubbio's] disturbing character."

22. Coach Monterubbio "... touched ... [her] ... (with her shoulder twice, with a box, and now with both hands when pushing ... [her] ... in the back). When walking past ... [her] ... in the office, Coach Monterrubio purposefully "brushes" ... [her] ... body."

23. Coach Monterubbio "... is no doubt retaliating against ... [her] ... and has become more aggressive because ... [she] ... tattled on the Coach for her sexual harassment last year when she could not stop herself from commenting about ... [her] body parts to ... [her] ... and other coaches."

24. Coach Monterubbio's"... behavior ... seems to be overlooked by both Michelle Boyer and by you [me]."

25. When "... parents and other campuses report ... [Coach Monterubbio's] ... unprofessional behavior to Michelle Boyer, it is not addressed."

26. "As athletic supervisor, Michelle Boyer does not treat the coaches equally."

27. Since reporting sexual harassment by Michelle Boyer against ... [her] ... , Coach Boyer "... has picked on ... [her] and treated ... [her] ... unprofessionally on a daily basis ..." and "... [Coach Boyer] ... slammed a drawer and a door that really hurt ... [her] ...ears and frightened ... [her]."

28. Michelle Boyer "... also made a verbal threat to" [her].

132

29.     Other unspecified "… incidents … occurred, and were reported to [me] … in … [her] … report [to me] last Spring (May 2008), [and] in letters e-mailed to … [me] … on several occasions."

On April 22, 2009, I prepared a communiqué to Ms. Clark regarding the disposition of these 29 additional complaints. (See Exhibit G). Ms. Clark added these allegations to her original grievance. (See Exhibit H).

Meanwhile, on April 29, 2009 Ms. Clark was monitoring TAKS testing as part of her teaching assignment. A cell phone rang during the test. As you know, it is a violation of TAKS protocol for a student to have a cell phone during the tests. A diligent search was made to determine the source of the phone ringer – it was not found. Then the phone was heard again, at least twice more. This time another teacher/monitor identified Ms. Clark's phone as the source of the ring. That same day Ms. Clark prepared a handwritten explanation of these events. (See attached Exhibit I). She subsequently attempted to clarify her earlier explanation through a typed report. (See Exhibit J).

In the weeks ensuing, the administration and I decided to transfer Coach Monterubbio to another campus, the remedy Ms. Clark requested to her grievances. I assumed, or hoped, that by this action – separating Ms. Clark from Coach Monterubbio – would have a calming effect on the Junior School coaching office – it did not.

Almost immediately following Coach Monterubbio's reassignment, Ms. Clark began a new campaign of complaining of Coaches Boyer and Gonzales. Among her allegations Ms. Clark claimed:

1.      That she was intentionally snubbed by Coach Boyer when she "turned her back" on her at a meeting in the coaches' office on April 28, 2009;

2.      That she was falsely accused of "lying" by Coach Boyer when she was questioned as to the location of Coach Boyer's missing keys, which Ms. Clark admittedly last possessed at a meeting in the coaching office on April 29, 2009 (which I also attended);

3.      That she was falsely accused of "lying" when Coach Boyer questioned her statement at that meeting that she was "the first person in the office (at work) every morning";

4.      And at that same meeting she had "… answered each of … [my] questions in a polite manner and acted professional … ."

On April 29, 2009, I presented Ms. Clark with a set of inquiries about these new complaints, as well as others previously lodged. (See Exhibit K attached). My communiqué recognized that where there are repeated differing descriptions of the same events, a determination of the dependability of one source over the other will often lie in judging, and comparing the credibility of the accuser to that of the accused. My communiqué also recognized that I had been present at certain events made subject of this latest list of Ms. Clark's complaints. By comparing Ms. Clark's recitations of the facts of those occasions to my recollection of the same events she depicted, I was able to

reach some general conclusions regarding Ms. Clark's credibility. I concluded that her depictions of these events were mostly not credible. Thus, as an immediate a solution to the tension that was the earmark of the coaching office at the Junior School this year, on May 1, 2009, Ms. Clark was placed on administrative leave, a status which she continues to occupy today. (See Exhibit L attached).

I then enlisted the aid of Dr. Dana Bashara to investigate and determine a response to the remainder of Ms. Clark's multiple grievance allegations. From May 12, 2009 to May 28, 2009 Dr. Bashara interviewed coaches, teachers and students, as well as Ms. Clark.

Despite Ms. Clark's grievance allegations, the investigation did not find evidence to conclude that she had been intentionally assaulted by Coach Monterrubio. Nor did the investigation yield support for the remainder of her claims. Nevertheless, we did not disturb our decision to transfer Coach Monterrubio to another campus setting as Ms. Clark had previously requested in her grievance. The Level I grievance decision granting the relief she had requested is attached as Exhibit M.

However, one of the teachers on my campus met with me to describe a conversation she had held with Ms. Clark on April 23, 2009. According to that teacher's (Janet Briggs') unsolicited statement, Ms. Clark made the following statements to her:

- Coach Monterubbio had been transferred to another campus and could now "no longer push people around";
- Junior School coaches are having sexual affairs with one another;
- Junior School girls' coaches are "lesbian dikes *[sic]*" who "get drunk and share men;"
- Certain named coaches were making "rude gestures" behind her back;
- Coach Monterubbio had cursed at a referee at a meet, and at another time "flipped off" a parent. These incidents had been reported to Coach Boyer, who "did nothing about it";
- Either or both Coach Boyer and Coach Monterubbio had vandalized her vehicle;
- She had attended a meeting with Dr. Bashara that she was directed to keep confidential; nevertheless she would answer questions about that meeting if the teacher she was addressing would only ask.

Other Dr. Bashara interviewees provided interview testimony regarding Ms. Clark's teacher/coaching performance, namely classroom and instructional management and coaching performance issues, almost all of which had not previously been brought to my attention. These included the following concerns:

- At the morning and afternoon practices Ms. Clark was often not on the field or in the gym assisting the head coaches, but was engaged with her laptop computer or the computer in the coaching office.
- Despite having been instructed by me to not have her daughter attend work, Ms. Clark had continued, on at least two occasions, to care for her daughter during working hours.

134

- Ms. Clark told at least two District employees that Coaches Monterubbio and Boyer were sexually involved.
- Ms. Clark frequently permits her students to not dress for P.E. classes.
- Ms. Clark complained of her treatment by other coaches to her students.
- Ms. Clark told her students that Coaches Boyer and Monterubbio had stolen and disposed of her keys.
- Ms. Clark told her students that Coaches Boyer and Monterrubio had stolen and disposed of her cell phone.
- Ms. Clark commonly shares her private life with her students.
- Ms. Clark has not followed lesson plans.
- Ms. Clark has not maintained daily grades for her students.
- Ms. Clark has not maintained reasonable orderliness in her section of the coaching office, or her desk and cabinets.

On May 28, 2009 Ms. Clark was interviewed by Dr. Bashara. I have carefully considered her interview responses, along with the interview responses and statements, and responses of other interviewees, as well as other investigation materials, and have reached the following significant findings concerning Ms. Clark:

- She stated to AHISD teacher Janet Biggs on April 23, 2009 and to Coach Debbie Cathey on another occasion, that she found it "...difficult to work in the coaches' office with lesbian dike *[sic]* coaches who get drunk and share men."
- She stated to teacher Janet Biggs on April 23, 2009, and to Coach Debbie Cathey on another occasion, that Coaches Monterubbio and Boyer are sexually involved.
- She also stated to teacher Janet Biggs on April 23, 2009 that Coaches Monterubbio and Boyer were "making rude gestures" behind … [her] … back.
- On April 29, 2009 her cell phone rang audibly during a TAKS examination. Ms. Clark was aware that exam officials and others were attempting to learn the location of the phone. She was also aware that test protocol does not permit students to possess a phone during testing. Her phone rang at least one more time during the testing period. She was aware of the fact that it had rung. She provided conflicting, and therefore false statements regarding this event.
- Ms. Clark has repeatedly claimed that Coach Boyer has ignored complaints received regarding Coach Monterubbio's conduct. There is no evidence to support these claims.
- Ms. Clark has repeatedly claimed to others, including her students, that Coaches Boyer and Monterubbio vandalized her automobile. There is no reason to believe this allegation of criminal wrongdoing.
- Ms. Clark has repeatedly claimed to others, including her students, that Coaches Boyer and Monterubbio stole her keys and cell phone. There is no reason to have asserted, or to believe these allegations of criminal wrongdoing.
- Ms. Clark is distrustful of Coaches Cathey and Elliot. She distrusts Coach Cathey because she believes that she [Coach Cathey] "hangs out in bars." She stated that she learned this from unidentified "students."

135

- She accused Coach Cathey of having "gone through" her "belongings" in the coaching office.
- She further does not "trust" Coach Cathey because she has seen the coach "texting during class."
- She claims that Coach Cathey "snickers" at her, and then "runs over to Coach Boyer with a smile on her face."
- In the morning and afternoon coaching sessions, she spends a significant amount of time in the coaches' office on the computer or sitting on the bench with her laptop computer, when she was to be actively assisting the head coaches.
- She claims she had been designated as the "paperwork person," spending time in front of the computer in the coaches' office, or with her laptop computer because she was the "white coach," and was also instructed to do so. Coaches Gonzales and Boyer disagree with both contentions, and I find their explanation of these matters to be the credible versions.
- I directed her to not have her daughter with her on campus during working hours. On at least two separate occasions thereafter, she disobeyed my directive.
- She has not consistently required her students to dress in gym clothes for P.E. activities. In one of her classes, four students are regularly permitted to not dress in required gym clothing.

My conclusion is that Ms. Clark's conduct has been the primary cause of extreme disruption to the workplace, and an unacceptable disturbance to the educational goals of the Junior School coaching office and campus. I also find that her teaching/coaching performance has been severely substandard. I find that she has not been truthful in the course of this investigation. We have tried hard but have been unable to resolve these matters over the course of this instructional year. In my opinion, Ms. Clark's conduct is irremediable. I am proposing the termination of her teaching/coaching contract for good cause.

Sincerely,

*Stephanie Kershner*

Stephanie Kershner
Principal

**Appendix**

**Tab 4**



## Alamo Heights Independent School District
7101 Broadway • San Antonio, Texas 78209 • Phone 210-824-2483

July 14, 2009

Ms. Catherine Clark

███████████████████

San Antonio, Texas 78209

Re:    Alamo Heights Independent School District

Dear Ms. Clark:

This letter will notify you that the Alamo Heights Independent School District Board of Trustees met on June 25, 2009, at a duly noticed meeting, and received and accepted the Superintendent's recommendation to propose the termination of your employment contract for good cause, as authorized by Texas Education Code, Chapter 21, and as supported by Board Policies DF (Legal),   DFD (Local), DH (Legal), DH (Local), DH (Exhibit), DFD (Legal), DFD (Local), DFCA (Legal),   DCC (Legal), DCC (Local), DFCA (Legal),   DGBA (Legal), and DGBA (Local) (Policies attached).

The proposal to terminate your employment is made for the following specific reasons, individually and collectively:

1.      Repeated failures to work cooperatively with your teacher colleagues.

2.      Repeated failures to maintain effective working relationships and good rapport with colleagues.

3.      Causing disruptions to the work place and teaching environment.

4.      Diminished effectiveness as a teacher.

5.      Repeated unprofessional and inappropriate conduct, and conduct breaching the Texas Educator Code of Ethics.

6.      Repeated failure in the performance of duties.

7.      Insubordination.

8.      Failure to complete the requirements of your October 29, 2008 Intervention Plan for Teacher in need of Assistance.

9.      False reporting in an official District investigation.

10.     Repeated and continuing failure to comply with Board Policies, administrative regulations, procedures and directives.

## EXHIBIT D-9

11.  Your deficiencies pointed out in observation reports, appraisals or evaluations, write-ups, directives, memoranda, or other communications.

12.  Examples of conduct illustrating one or more of items 1-11 above, include but are not limited to:

- voicing complaints about your teaching colleagues to students;
- informing students and faculty that colleagues were engaged in sexual relationships;
- informing students and faculty that your teaching colleagues were stealing your personal property;
- informing students and faculty that your teaching colleagues were vandalizing your motor vehicle;
- failure to prepare lesson plans;
- failure to maintain daily grades;
- failure to consistently apply dressing rules for your P.E. classes;
- failure to complete special education documentation regarding classroom modifications;
- ineffective classroom management;
- failure to comply with your Principal's directive of September 17, 2008 regarding the presence of your child(ren) in the workplace;
- false reporting in an official District investigation;
- failure to complete the requirements of your October 29, 2008 Intervention Plan for Teacher in Need of Assistance;
- failure to comply with the no-cell-phone prohibition for monitors of TAKS examinations in Spring semester, 2009;
- failure to attend weekly new teacher brunch meetings as directed;
- failure to comply with campus sign-out procedures in Fall semester, 2008;
- failure to return a signed copy of a September 17, 2008 letter as directed;
- failure to meet Teacher Choice Day deadlines;
- failure to cooperate in a District investigation;
- failure to meet Code of Ethics Standards 1.7, 2.1 and 2.3. Board Policy DH (Exhibit).

If you desire to contest this proposed action, you must notify the Board of Trustees and the Commissioner of Education in writing pursuant to Education Code §§21.159(a) and 21.253. Notice to the Board of Trustees, and all further communications in this matter, should be directed through our attorney, Robert Schulman, at 517 Soledad Street, San Antonio, Texas 78205.

If you do not contest the Board action, the Board shall proceed on the proposed termination and take the action it deems appropriate. Education Code §21.159(c).

July 14, 2009
Page 3


Yours truly,

Craig Clayton
President, Board of Trustees

Enclosures:
Board Policies DF (Legal), DFD (Local), DH (Legal), DH (Local), DH (Exhibit), DFD (Legal), DFD (Local), DFCA (Legal), DCC (Legal), DCC (Local), DFCA (Legal), DGBA (Legal), and DGBA (Local)

140

| | Note: | For a detailed treatment of termination and nonrenewal of educator contracts, see policies DFAA and DFAB (Probationary Contracts), DFBA and DFBB (Term Contracts), and DFCA (Continuing Contracts). |

**WITHHOLDING INFORMATION**

An attempt by any District employee to encourage or coerce a child to withhold information from the child's parent is grounds for discharge or suspension under Education Code 21.104 (probationary contracts), 21.156 (continuing contracts), and 21.211 (term contracts). *Education Code 26.008(b)*

**DISCHARGE OF CONVICTED EMPLOYEES**

The District shall discharge an employee if the District obtains information through a criminal history record information (CHRI) review that:

1. The employee has been convicted of:

   a. A felony under Penal Code Title 5;

   b. An offense requiring registration as a sex offender under Code of Criminal Procedure Chapter 62; or

   c. An offense under the laws of another state or federal law that is equivalent to an offense under paragraphs a or b; and

2. At the time the offense occurred, the victim of the offense was under 18 years of age or was enrolled in a public school.

**EXCEPTION**

However, the District is not required to discharge an employee if the person committed an offense under Title 5, Penal Code, and:

1. The date of the offense is more than 30 years before June 15, 2007; and

2. The employee satisfied all terms of the court order entered on conviction.

**CERTIFICATION TO SBEC**

Each school year, the Superintendent shall certify to the Commissioner that the District has complied with the above provisions.

**SANCTIONS**

The State Board for Educator Certification (SBEC) may impose a sanction on an educator who does not discharge an employee if the educator knows or should have known, through a criminal history record information review, that the employee has been convicted of an offense described above.

**OPTIONAL TERMINATION**

The District may discharge an employee if the District obtains information of the employee's conviction of a felony or of a misdemeanor involving moral turpitude that the employee did not disclose to SBEC or the District. An employee so discharged is

considered to have been discharged for misconduct for purposes of Labor Code 207.044 (unemployment compensation).

*Education Code 22.085* [See DBAA]

**CERTAIN OFFENSES AGAINST CHILDREN**

A district that receives notice under Education Code 21.058(b) of the revocation of a certificate issued under Chapter 21, Subchapter B, shall:

1. Immediately remove the person whose certificate has been revoked from campus or from an administrative office, as applicable, to prevent the person from having any contact with a student [see DK]; and

2. As soon as practicable, terminate the employment of the person in accordance with the person's contract and with Education Code Chapter 21, Subchapter B.

These removal and termination requirements apply only to a conviction of a felony under Penal Code Title 5 or an offense for which the person must register as a sex offender, and only if the victim of the offense is under 18 years of age.

*Education Code 21.058*

**FAILURE OF CERTIFICATION**

An employee's probationary, term, or continuing contract under Education Code Chapter 21 is void if the employee:

1. Does not hold a certificate or permit issued by SBEC; or

2. Fails to fulfill the requirements necessary to extend the employee's temporary or emergency certificate or permit.

**DISTRICT'S OPTIONS**

After an employee receives notice that the employee's contract is void the District may:

1. Terminate the employee;

2. Suspend the employee with or without pay; or

3. Retain the employee for the remainder of the school year on an at-will employment basis in a position other than classroom teacher at the employee's existing rate of pay or at a reduced rate.

An employee whose contract is void is not entitled to the minimum salary prescribed by Education Code 21.402.

**NO APPEAL OR CHAPTER 21 HEARING**

The District's decision under Education Code 21.0031(b) is not subject to appeal under Education Code Chapter 21, and the notice and hearing requirements of that chapter do not apply to the decision.

*Education Code 21.0031*

TERMINATION OF EMPLOYMENT

APPLICABILITY

These void contract provisions do not affect the rights and remedies of a party in an at-will employment relationship and do not apply to a certified teacher assigned to teach a subject for which the teacher is not certified. *Education Code 21.0031; Nunez v. Simms, 341 F.3d 385 (5th Cir. 2003)*

REPORT TO SBEC

In addition to the reporting requirement under Family Code 261.101 [see FFG], the Superintendent shall promptly notify SBEC in writing by filing a report within seven calendar days of the date the Superintendent first obtains or has knowledge of information indicating that:

CRIMINAL HISTORY

1. An applicant for or holder of a certificate issued by SBEC has a reported criminal history;

ASSESSMENT INSTRUMENT

2. The certificate holder engaged in conduct that violated the assessment instrument security procedures established under Education Code 39.0301; or

RESIGNATION

3. The certificate holder resigned and reasonable evidence supports a recommendation by the Superintendent to terminate the educator based on a determination that the educator engaged in misconduct described in 4(a)–(f), below [see DFE];

TERMINATION

4. A certificate holder's employment at the District was terminated based on a determination that the certificate holder:

   a. Sexually or physically abused or otherwise committed an unlawful act with a student or minor;

   b. Possessed, transferred, sold, or distributed a controlled substance, as defined by Health and Safety Code Chapter 481 or by 21 U.S.C. Section 801 et seq.;

   c. Illegally transferred, appropriated, or expended funds or other property of the District;

   d. Attempted by fraudulent or unauthorized means to obtain or alter a professional certificate or permit for the purpose of promotion or additional compensation;

   e. Committed a criminal offense or any part of a criminal offense on school property or at a school-sponsored event; or

   f. Solicited or engaged in sexual conduct or a romantic relationship with a student or minor.

DEFINITIONS

"Abuse" has the meaning assigned by Family Code 261.001 and includes any sexual conduct involving an educator and a student or minor.

"Solicitation of a romantic relationship" means deliberate or repeated acts that can be reasonably interpreted as soliciting a relationship characterized by an ardent emotional attachment or pattern of exclusivity. Acts that constitute the solicitation of a romantic relationship include:

1. Behavior, gestures, expressions, communications, or a pattern of communication with a student that is unrelated to the educator's job duties and that may reasonably be interpreted as encouraging the student to form an ardent or exclusive emotional attachment to the educator, including statements of love, affection, or attraction. When evaluating whether communications constitute the solicitation of a romantic relationship, the following may be considered:

    a. The nature of the communications;

    b. The timing of the communications;

    c. The extent of the communications;

    d. Whether the communications were made openly or secretly;

    e. The extent to which the educator attempted to conceal the communications;

    f. If the educator claims to be counseling a student, TEA staff may consider whether the educator's job duties included counseling, whether the educator reported the subject of the counseling to the student's guardians or to the appropriate school personnel, or, in the case of alleged abuse or neglect, whether the educator reported the abuse or neglect to the appropriate law enforcement agencies; and

    g. Any other communications tending to show that the educator solicited a romantic relationship with a student.

2. Making inappropriate comments about a student's body.

3. Making sexually demeaning comments to a student.

4. Making comments about a student's potential sexual performance.

5. Requesting details of a student's sexual history.

6. Requesting a date.

7. Engaging in conversations regarding the sexual problems, preferences, or fantasies of either party.

8.  Inappropriate hugging, kissing, or excessive touching.

9.  Suggestions that a romantic relationship is desired after the student graduates, including post-graduation plans for dating or marriage.

10. Any other acts tending to show that the educator solicited a romantic relationship with the student, including providing the student with drugs or alcohol.

REPORTS

A superintendent who is required to file a report, but fails to timely do so, is subject to sanctions.

The Superintendent shall notify the Board of the District and the educator of the filing of the report.

IMMUNITY

A superintendent who in good faith and while acting in an official capacity files a report with SBEC is immune from civil or criminal liability that might otherwise be incurred or imposed.

*Education Code 21.006; 19 TAC 249.14*

TERMINATION OF EMPLOYMENT                                    DFD
HEARINGS BEFORE HEARING EXAMINER                          (LOCAL)

TIME LIMITS FOR        The Board shall consider the hearing examiner's record and rec-
ORAL ARGUMENT         ommendation at the first Board meeting for which notice can be
                      posted in compliance with the open meetings laws.

                      The Board shall allow ten minutes per party for oral argument.
                      Administration shall be offered the opportunity to present argument
                      first and may use a portion of the designated time for rebuttal after
                      the other party has presented argument.

                      The Board reserves the right to grant additional time in equal
                      amount to both parties, depending on the complexity of the issues
                      and solely at the Board's discretion.

EDUCATOR ETHICS

Educators shall comply with standard practices and ethical conduct toward students, professional colleagues, school officials, parents, and members of the community and shall safeguard academic freedom.

The State Board for Educator Certification (SBEC) shall provide for the adoption, amendment, and enforcement of an educator's code of ethics [see DH(EXHIBIT)]. SBEC is solely responsible for enforcing the ethics code for purposes related to certification disciplinary proceedings.

*Education Code 21.041(8); 19 TAC 247.1, 247.2*

REPORT TO SBEC OF EDUCATOR MISCONDUCT

The Superintendent shall promptly notify SBEC in writing by filing a report with SBEC not later than the seventh day after the Superintendent first learns about a criminal record or an alleged incident of misconduct, as described at DF, involving a certified educator.

The Superintendent shall include the name of a student or minor who is the victim of abuse or unlawful conduct by an educator, but the name of the student or minor is not public information under Government Code, Chapter 552 [see GBAA].

*Education Code 21.006; 19 TAC 249.14*

PUBLIC SERVANTS

All District employees are "public servants" and therefore subject to Title VIII of the Penal Code, regarding offenses against public administration, including restrictions on the acceptance of illegal gifts, honoraria and expenses, and abuse of office. *Penal Code 1.07(a)(41), Title VIII* [See DBD and BBFA]

TOBACCO USE PROHIBITED

The Board shall prohibit smoking or using tobacco products at a school-related or school-sanctioned activity on or off school property.

ENFORCEMENT

The Board shall ensure that District personnel enforce the policies on school property.

*Education Code 38.006(1)(3)* [See also FNCD and GKA]

DRUG AND ALCOHOL ABUSE PROGRAM

The Board shall prohibit the use of alcoholic beverages at school-related or school-sanctioned activities on or off school property. *Education Code 38.007(a)*

A district that receives a federal grant must agree to provide a drug-free workplace by:

1. Publishing a statement notifying employees of the requirements of the federal Drug-Free Workplace Act (DFWA) and requiring that each employee be given a copy of the statement [see DI(EXHIBIT)];

2. Establishing a drug-free awareness program for employees pursuant to the DFWA;

3. Notifying the granting agency within ten days after receiving notice that an employee has been convicted under a criminal drug statute;

4. Imposing a sanction on an employee who is convicted of such a violation; and

5. Making a good faith effort to continue to maintain a drug-free workplace.

*41 U.S.C. 702(a)(1); 49 CFR Part 32*

A district that has 15 or more employees shall adopt a policy for elimination of drug abuse and must provide their employees with a copy of the policy on or before the first day of employment. Districts that comply with the DFWA must amend their policies to include alcoholic beverages. *28 TAC 169.1, 169.2*

**DIETARY SUPPLEMENTS**

Except as provided at Education Code 38.011(b), a District employee may not:

1. Knowingly sell, market, or distribute a dietary supplement that contains performance-enhancing compounds to a primary or secondary education student with whom the employee has contact as part of the employee's duties; or

2. Knowingly endorse or suggest the ingestion, intranasal application, or inhalation of a dietary supplement that contains performance-enhancing compounds by a primary or secondary student with whom the employee has contact as part of the employee's duties.

An employee who violates items 1 or 2, above, commits a Class C misdemeanor offense.

*Education Code 38.011*

EMPLOYEE STANDARDS OF CONDUCT

All District employees shall perform their duties in accordance with state and federal law, District policy, and ethical standards. [See DH(EXHIBIT)]

All District employees shall recognize and respect the rights of students, parents, other employees, and members of the community and shall work cooperatively with others to serve the best interests of the District.

Employees wishing to express concern, complaints, or criticism shall do so through appropriate channels. [See DGBA]

**VIOLATIONS OF STANDARDS OF CONDUCT**

Employees shall comply with the standards of conduct set out in this policy and with any other policies, regulations, and guidelines that impose duties, requirements, or standards attendant to their status as District employees. Violation of any policies, regulations, or guidelines may result in disciplinary action, including termination of employment. [See DCD and DF series]

**SAFETY REQUIREMENTS**

All employees shall adhere to District safety rules and regulations and shall report unsafe conditions or practices to the appropriate supervisor.

**HARASSMENT OR ABUSE**

Employees shall not engage in prohibited harassment, including sexual harassment, of:

1. Other employees. [See DIA]

2. Students. [See FFH; see FFG regarding child abuse and neglect]

While acting in the course of their employment, employees shall not engage in prohibited harassment, including sexual harassment, of other persons, including Board members, vendors, contractors, volunteers, or parents.

**RELATIONSHIPS WITH STUDENTS**

Employees shall not form romantic or other inappropriate social relationships with students. Any sexual relationship between a student and a District employee is always prohibited, even if consensual. [See FFH]

**TOBACCO USE**

Employees shall not use tobacco products on District premises, in District vehicles, or at school or school-related activities. [See also GKA]

**ALCOHOL AND DRUGS**

Employees shall not manufacture, distribute, dispense, possess, use, or be under the influence of any of the following substances during working hours while at school or at school-related activities during or outside of usual working hours:

EMPLOYEE STANDARDS OF CONDUCT

1. Any controlled substance or dangerous drug as defined by law, including but not limited to marijuana, any narcotic drug, hallucinogen, stimulant, depressant, amphetamine, or barbiturate.

2. Alcohol or any alcoholic beverage.

3. Any abusable glue, aerosol paint, or any other chemical substance for inhalation.

4. Any other intoxicant, or mood-changing, mind-altering, or behavior-altering drugs.

An employee need not be legally intoxicated to be considered "under the influence" of a controlled substance.

**EXCEPTIONS**

An employee who manufactures, possesses, or dispenses a substance listed above as part of the employee's job responsibilities, or who uses a drug authorized by a licensed physician prescribed for the employee's personal use shall not be considered to have violated this policy.

**NOTICE**

Each employee shall be given a copy of the District's notice regarding drug-free schools. [See DI(EXHIBIT)]

A copy of this policy, a purpose of which is to eliminate drug abuse from the workplace, shall be provided to each employee at the beginning of each year or upon employment.

**ARRESTS AND CONVICTIONS**

An employee who is arrested for any felony or any offense involving moral turpitude shall report the arrest to the principal or immediate supervisor within three calendar days of the arrest. An employee who is convicted of or receives deferred adjudication for such an offense shall also report that event to the principal or immediate supervisor within three calendar days of the event.

**ARRESTS, INDICTMENTS, CONVICTIONS, AND OTHER ADJUDICATIONS**

An employee shall notify his or her principal or immediate supervisor within three calendar days of any arrest, indictment, conviction, no contest or guilty plea, or other adjudication of the employee for any felony, any offense involving moral turpitude, and any of the other offenses as indicated below:

1. Crimes involving school property or funds;

2. Crimes involving attempt by fraudulent or unauthorized means to obtain or alter any certificate or permit that would entitle any person to hold or obtain a position as an educator; or

3. Crimes that occur wholly or in part on school property or at a school-sponsored activity.

EMPLOYEE STANDARDS OF CONDUCT

MORAL TURPITUDE

Moral turpitude includes but is not limited to dishonesty; fraud; deceit; theft; misrepresentation; deliberate violence; base, vile, or depraved acts that are intended to arouse or gratify sexual desire of the actor; drug- or alcohol-related offenses; or acts constituting abuse under the Texas Family Code.

Examples, but not by way of limitation, of offenses that involve moral turpitude are:

1. Arson

2. Forgery

3. Public lewdness

4. Prostitution

5. Theft (in excess of $500 in value)

6. Sexual offense (various)

7. Swindling

LANGUAGE

Educators shall observe appropriate standards of language in the presence of students.

DRESS AND GROOMING

The dress and grooming of District employees shall be clean, neat, in a manner appropriate for their assignments, and in accordance with any additional standards established by their supervisors and approved by the Superintendent.

ADOPTED:

EMPLOYEE STANDARDS OF CONDUCT

DH
(EXHIBIT)

## CODE OF ETHICS AND STANDARD PRACTICES
## FOR TEXAS EDUCATORS

The Texas educator shall comply with standard practices and ethical conduct toward students, professional colleagues, school officials, parents, and members of the community and shall safeguard academic freedom. The Texas educator, in maintaining the dignity of the profession, shall respect and obey the law, demonstrate personal integrity, and exemplify honesty. The Texas educator, in exemplifying ethical relations with colleagues, shall extend just and equitable treatment to all members of the profession. The Texas educator, in accepting a position of public trust, shall measure success by the progress of each student toward realization of his or her potential as an effective citizen. The Texas educator, in fulfilling responsibilities in the community, shall cooperate with parents and others to improve the public schools of the community.

1. Professional Ethical Conduct, Practices, and Performance.

Standard 1.1. The educator shall not knowingly engage in deceptive practices regarding official policies of the school district or educational institution.

Standard 1.2. The educator shall not knowingly misappropriate, divert, or use monies, personnel, property, or equipment committed to his or her charge for personal gain or advantage.

Standard 1.3. The educator shall not submit fraudulent requests for reimbursement, expenses, or pay.

Standard 1.4. The educator shall not use institutional or professional privileges for personal or partisan advantage.

Standard 1.5. The educator shall neither accept nor offer gratuities, gifts, or favors that impair professional judgment or to obtain special advantage. This standard shall not restrict the acceptance of gifts or tokens offered and accepted openly from students, parents, or other persons or organizations in recognition or appreciation of service.

Standard 1.6. The educator shall not falsify records, or direct or coerce others to do so.

Standard 1.7. The educator shall comply with state regulations, written local school board policies, and other applicable state and federal laws.

Standard 1.8. The educator shall apply for, accept, offer, or assign a position or a responsibility on the basis of professional qualifications.

2. Ethical Conduct Toward Professional Colleagues.

Standard 2.1. The educator shall not reveal confidential health or personnel information concerning colleagues unless disclosure serves lawful professional purposes or is required by law.

Standard 2.2. The educator shall not harm others by knowingly making false statements about a colleague or the school system.

152

Standard 2.3. The educator shall adhere to written local school board policies and state and federal laws regarding the hiring, evaluation, and dismissal of personnel.

Standard 2.4. The educator shall not interfere with a colleague's exercise of political, professional, or citizenship rights and responsibilities.

Standard 2.5. The educator shall not discriminate against or coerce a colleague on the basis of race, color, religion, national origin, age, sex, disability, or family status.

Standard 2.6. The educator shall not use coercive means or promise of special treatment in order to influence professional decisions or colleagues.

Standard 2.7. The educator shall not retaliate against any individual who has filed a complaint with the SBEC under this chapter.

3.  Ethical Conduct Toward Students.

Standard 3.1. The educator shall not reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law.

Standard 3.2. The educator shall not knowingly treat a student in a manner that adversely affects the student's learning, physical health, mental health, or safety.

Standard 3.3. The educator shall not deliberately or knowingly misrepresent facts regarding a student.

Standard 3.4. The educator shall not exclude a student from participation in a program, deny benefits to a student, or grant an advantage to a student on the basis of race, color, sex, disability, national origin, religion, or family status.

Standard 3.5. The educator shall not engage in physical mistreatment of a student.

Standard 3.6. The educator shall not solicit or engage in sexual conduct or a romantic relationship with a student.

Standard 3.7. The educator shall not furnish alcohol or illegal/unauthorized drugs to any student or knowingly allow any student to consume alcohol or illegal/unauthorized drugs in the presence of the educator.

*19 TAC 247.2*

APPLICABILITY                 This hearing process applies only if an employee requests a hear-
                              ing after receiving notice of a proposed decision to:

                              1.   Terminate a continuing contract at any time;

                              2.   Terminate a probationary or term contract before the end of
                                   the contract period; or

                              3.   Suspend without pay.

                              It does not apply to a decision to:

                              1.   Terminate a probationary contract at the end of the contract
                                   term; or

                              2.   Not renew a term contract, unless the Board has adopted this
                                   process for nonrenewals.

                              *Education Code 21.251*

REQUEST FOR                   Not later than the 15th day after the date the employee receives
HEARING                       notice of one of the proposed contract actions listed above, the
                              employee must file a written request with the Commissioner for a
                              hearing before a hearing examiner. The employee must provide
                              the District with a copy of the request and must provide the Com-
                              missioner with a copy of the notice. The parties may agree in writ-
                              ing to extend by not more than ten days the deadline for requesting
                              a hearing. *Education Code 21.253*

ASSIGNMENT OF                 The parties may agree to select a hearing examiner from the list
HEARING EXAMINER              maintained by the Commissioner or a person who is not certified to
BY AGREEMENT                  serve as a hearing examiner, provided that person is licensed to
                              practice law in Texas. If the parties agree on a hearing examiner
                              the parties shall, before the date the Commissioner is permitted to
                              assign a hearing examiner, notify the Commissioner in writing of
                              the agreement, including the name of the hearing examiner se-
                              lected.

BY APPOINTMENT                If the parties do not select a hearing examiner by agreement, the
                              Commissioner shall assign the hearing examiner not earlier than
                              the sixth business day and not later than the tenth business day
                              after the date on which the Commissioner receives the request for
                              a hearing. When a hearing examiner has been assigned, the
                              Commissioner shall notify the parties immediately.

REJECTION                     The parties may agree to reject a hearing examiner for any reason
                              and either party is entitled to reject an assigned hearing examiner
                              for cause. A rejection must be in writing and filed with the Com-
                              missioner not later than the third day after the date of notification of
                              the hearing examiner's assignment. If the parties agree to reject
                              the hearing examiner or if the Commissioner determines that one

party has good cause for the rejection, the Commissioner shall assign another hearing examiner.

**FINALITY OF DECISION**

After the employee receives notice of the proposed contract action, the parties may agree in writing that the hearing examiner's decision be final and nonappealable on all or some issues.

*Education Code 21.254*

**POWERS OF HEARING EXAMINER**

The hearing examiner may issue subpoenas, administer oaths, rule on motions and the admissibility of evidence, maintain decorum, schedule and recess the proceedings, allow the parties to take depositions or use other means of discovery, and make any other orders as provided by Commissioner rule.

**CONDUCT OF HEARING**

The hearing and any depositions must be held within the geographical boundaries of the District or at the regional education service center that serves the District.

*Education Code 21.255*

**SCHEDULE RESTRICTION**

A hearing before a hearing examiner may not be held on a Saturday, Sunday, or a state or federal holiday, unless all parties agree. *Education Code 21.257(c)*

**PRIVATE**

A hearing before a hearing examiner shall be private unless the employee makes a written request for a public hearing.

**EXCEPTION**

If necessary to maintain decorum, the hearing examiner may close a hearing that an employee has requested be public.

**PROTECTION OF WITNESSES**

To protect the privacy of a witness who is a child, the hearing examiner may close the hearing to receive the testimony or order that the testimony be presented by procedures in Article 38.071, Code of Criminal Procedure.

**EMPLOYEE RIGHTS**

At the hearing, the employee has the right to:

1. Be represented by a representative of the employee's choice;

2. Hear the evidence on which the charges are based;

3. Cross-examine each adverse witness; and

4. Present evidence.

The hearing is not subject to the Administrative Procedure Act.

The hearing shall be conducted in the same manner as a trial without a jury in state district court. A certified shorthand reporter shall record the hearing.

EVIDENCE

The Texas Rules of Civil Evidence shall apply at the hearing. An evaluation or appraisal of the teacher is presumed to be admissible at the hearing. The hearing examiner's findings of fact and conclusions of law shall be presumed to be based only on admissible evidence.

BURDEN OF PROOF

The District has the burden of proof by a preponderance of the evidence at the hearing.

*Education Code 21.256*

COSTS

The District shall bear the cost of the services of the hearing examiner and certified shorthand reporter and the production of any original hearing transcript. Each party shall bear its costs of discovery, if any, and its attorney's fees. *Education Code 21.255(e)*

RECOMMENDATION

Not later than the 60th day after the date on which the Commissioner receives a request for a hearing before a hearing examiner, the hearing examiner shall complete the hearing and make a written recommendation. The recommendation must include findings of fact and conclusions of law. The recommendation may include a proposal for granting relief, including reinstatement, back pay, or employment benefits. The proposal for relief may not include attorney's fees or other costs associated with the hearing or appeals from the hearing. The hearing examiner shall send a copy of the recommendation to each party, the Board President, and the Commissioner.

WAIVER OF
DEADLINE

The parties may agree in writing to extend by not more than 45 days the right to a recommendation by the date specified above.

*Education Code 21.257*

CONSIDERATION

The Board or a designated subcommittee shall consider the hearing examiner's record and recommendation at the first Board meeting for which notice can be posted in compliance with the open meetings laws. The meeting must be held not later than the 20th day after the date that the Board President receives the hearing examiner's recommendation and record.

ORAL ARGUMENT AND
RECORDING

At the meeting, the Board or subcommittee shall allow each party to present an oral argument to the Board or subcommittee. The Board may, by written policy, limit the amount of time for oral argument, provided equal time is allotted each party. A certified shorthand reporter shall record any such oral argument.

LEGAL ADVICE

The Board or subcommittee may obtain advice from an attorney who has not been involved in the proceedings.

*Education Code 21.258, 21.260*

DECISION

Not later than the tenth day after the date on which the meeting to consider the hearing examiner's recommendation is held, the Board or subcommittee shall announce its decision, which must include findings of fact and conclusions of law, and may include a grant of relief.

The Board or subcommittee may adopt, reject, or change the hearing examiner's conclusions of law or proposal for granting relief. The Board may reject or change a finding of fact made by the hearing examiner:

1. Only after reviewing the record of the proceedings; and

2. Only if the finding of fact is not supported by substantial evidence.

The Board or subcommittee shall state in writing the reason for and legal basis for a change or rejection.

RECORDING

A certified shorthand reporter shall record the announcement of the decision. The District shall bear the cost of the reporter's services.

*Education Code 21.259, 21.260*

RECORD OF
PROCEEDINGS

The Commissioner shall consider the appeal solely on the basis of the local record and may not consider any additional evidence or issue. *Education Code 21.301(c)*

The record of the proceedings before the independent hearing examiner shall include:

1. The transcripts of proceedings at the local level;

2. All evidence admitted;

3. All offers of proof;

4. All written pleadings, motions, and intermediate rulings;

5. A description of matters officially noticed;

6. If applicable, the recommendation of the independent hearing examiner;

7. The transcript of the oral argument before the Board or Board subcommittee;

8. The decision of the Board or Board subcommittee; and

9. If applicable, the Board or Board subcommittee's written reasons for changing the recommendation of the independent hearing examiner.

*19 TAC 157.1072(e)*

TERMINATION OF EMPLOYMENT                                                    DFD
HEARINGS BEFORE HEARING EXAMINER                                     (LOCAL)

TIME LIMITS FOR          The Board shall consider the hearing examiner's record and rec-
ORAL ARGUMENT            ommendation at the first Board meeting for which notice can be
                         posted in compliance with the open meetings laws.

                         The Board shall allow ten minutes per party for oral argument.
                         Administration shall be offered the opportunity to present argument
                         first and may use a portion of the designated time for rebuttal after
                         the other party has presented argument.

                         The Board reserves the right to grant additional time in equal
                         amount to both parties, depending on the complexity of the issues
                         and solely at the Board's discretion.

DISCHARGE

A teacher employed under a continuing contract may be discharged at any time for good cause as determined by the Board. "Good cause" is the failure to meet the accepted standards of conduct for the profession as generally recognized and applied in similarly situated school districts in this state.

SUSPENSION

The District may suspend a teacher without pay and for a period not to extend beyond the end of the current school year in lieu of discharge, for good cause as defined above.

*Education Code 21.156*

REDUCTION IN FORCE

Continuing contract employees may be released from employment by the District at the end of a school year because of necessary reduction of personnel.

Necessary reduction of personnel shall be made in the reverse order of seniority in the specific teaching fields.

*Education Code 21.157*

NOTICE

Before any employee under a continuing contract is discharged, suspended without pay in lieu of discharge, or released because of a necessary reduction in personnel, the employee shall be notified in writing by the Board of the proposed action and the grounds for the action. *Education Code 21.158(a)*

An employee who is discharged or suspended without pay for actions related to the inability or failure of the employee to perform assigned duties is entitled, as a matter of right, to a copy of each evaluation report or any other written memorandum that concerns the fitness or conduct of the employee, by requesting in writing a copy of these documents. *Education Code 21.158(b)*

HEARING

If, upon written notification of the proposed action, the employee desires to contest the same, the employee shall notify the Board in writing not later than the tenth day after the date of receipt of the official notice and must provide the Commissioner with a copy of the notice. A timely request for a hearing entitles the employee to a hearing before a hearing examiner.

The parties may agree in writing to extend by not more than ten days the deadline for requesting a hearing.

*Education Code 21.251(a)(1), 21.253, 21.159* [See DFD]

HEARING NOT
REQUESTED

If the employee fails to request a hearing not later than the tenth day after receiving notice of the proposed action, the Board shall take the appropriate action and notify the employee in writing of the action not later than the 30th day after the date the Board sent the notice of the proposed action. *Education Code 21.159(c)*

CONTINUING CONTRACTS
SUSPENSION/TERMINATION

DFCA
(LEGAL)

*Note:*  See DF regarding circumstances under which a certified employee's termination during the year shall be reported to the State Board for Educator Certification (SBEC).

Alamo Heights ISD
015901

EMPLOYMENT PRACTICES
CONTINUING CONTRACTS

DCC
(LEGAL)

CONTINUING
CONTRACTS

An employee of the District who completes the required probationary period [see DCA(LEGAL)] and who is elected to employment under a continuing contract by the Board for the succeeding year, shall be notified in writing of election to continuing contract status, and such employee shall, not later than the 30th day after such notification, file with the Superintendent written notification of acceptance of the continuing contract. Failure of the employee to accept the contract within such 30-day period shall be considered a refusal on the part of the employee to accept the contract. *Education Code 21.153*

FORMER
ADMINISTRATORS

The Board may grant to a person who has served as a principal or in another administrative position for which certification is required, at the completion of service in such capacity, a continuing contract, if the person qualifies for that position under criteria adopted by the Board. The period of service in an administrative capacity shall be construed as contract service as an employee. *Education Code 21.155*

STATUS UNDER
CONTINUING
CONTRACT

Each employee with whom a continuing contract has been made shall be entitled to continue in the employee's position or a position with the District for future school years without the necessity for annual nomination or reappointment, until such time as the person:

1.  Resigns [see DFE], or retires under the Teacher Retirement System;

2.  Is released from employment by the District at the end of a school year because of necessary reduction of personnel [see DFCA];

3.  Is discharged for good cause, as defined in Section 21.156 of the Education Code [see DFCA] and in accordance with the procedures provided [see DF and DFD];

4.  Is discharged for a reason stated in the teacher's contract that existed on or before September 1, 1995 and pursuant to the procedures provided [see DFD]; or

5.  Is returned to probationary status, as authorized in Section 21.106 of the Education Code [see DNB].

*Education Code 21.154*

EMPLOYMENT PRACTICES                                        DCC
CONTINUING CONTRACTS                                      (LOCAL)

ELIGIBLE POSITIONS      Continuing contracts governed by Chapter 21 of the Education
                        Code shall be provided to teachers and librarians.

CONTINUING CONTRACTS
SUSPENSION/TERMINATION

DFCA
(LEGAL)

DISCHARGE

A teacher employed under a continuing contract may be discharged at any time for good cause as determined by the Board. "Good cause" is the failure to meet the accepted standards of conduct for the profession as generally recognized and applied in similarly situated school districts in this state.

SUSPENSION

The District may suspend a teacher without pay and for a period not to extend beyond the end of the current school year in lieu of discharge, for good cause as defined above.

*Education Code 21.156*

REDUCTION IN FORCE

Continuing contract employees may be released from employment by the District at the end of a school year because of necessary reduction of personnel.

Necessary reduction of personnel shall be made in the reverse order of seniority in the specific teaching fields.

*Education Code 21.157*

NOTICE

Before any employee under a continuing contract is discharged, suspended without pay in lieu of discharge, or released because of a necessary reduction in personnel, the employee shall be notified in writing by the Board of the proposed action and the grounds for the action. *Education Code 21.158(a)*

An employee who is discharged or suspended without pay for actions related to the inability or failure of the employee to perform assigned duties is entitled, as a matter of right, to a copy of each evaluation report or any other written memorandum that concerns the fitness or conduct of the employee, by requesting in writing a copy of these documents. *Education Code 21.158(b)*

HEARING

If, upon written notification of the proposed action, the employee desires to contest the same, the employee shall notify the Board in writing not later than the tenth day after the date of receipt of the official notice and must provide the Commissioner with a copy of the notice. A timely request for a hearing entitles the employee to a hearing before a hearing examiner.

The parties may agree in writing to extend by not more than ten days the deadline for requesting a hearing.

*Education Code 21.251(a)(1), 21.253, 21.159* [See DFD]

HEARING NOT
REQUESTED

If the employee fails to request a hearing not later than the tenth day after receiving notice of the proposed action, the Board shall take the appropriate action and notify the employee in writing of the action not later than the 30th day after the date the Board sent the notice of the proposed action. *Education Code 21.159(c)*

163

Alamo Heights ISD
015901

CONTINUING CONTRACTS
SUSPENSION/TERMINATION

DFCA
(LEGAL)

*Note:* See DF regarding circumstances under which a certified employee's termination during the year shall be reported to the State Board for Educator Certification (SBEC).

UNITED STATES
CONSTITUTION

The District shall take no action abridging the freedom of speech or the right of the people to petition the Board for redress of grievances. *U.S. Const. Amend. I, XIV*

The Board may confine its meetings to specified subject matter and may hold nonpublic sessions to transact business. But when the Board sits in public meetings to conduct public business and hear the views of citizens, it may not discriminate between speakers on the basis of the content of their speech or the message it conveys. *Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 828 (1995); City of Madison v. Wis. Emp. Rel. Comm'n, 429 U.S. 167, 174 (1976); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)* [See DG]

TEXAS CONSTITUTION

Employees shall have the right, in a peaceable manner, to assemble together for their common good and to apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address, or remonstrance. *Tex. Const. Art. I, Sec. 27*

There is no requirement that the Board negotiate or even respond to complaints. However, the Board must stop, look, and listen and must consider the petition, address, or remonstrance. *Prof'l Ass'n of College Educators v. El Paso County Cmty. [College] District, 678 S.W.2d 94 (Tex. App.—El Paso 1984, writ ref'd n.r.e.)*

FEDERAL LAWS

SECTION 504

A district that receives federal financial assistance, directly or indirectly, and that employs 15 or more persons shall adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by Section 504 of the Rehabilitation Act of 1973. *34 CFR 104.7(b), 104.11*

AMERICANS WITH
DISABILITIES ACT

A district that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by the Code of Federal Regulations, Title 28, Part 35 (Americans with Disabilities Act regulations). *28 CFR 35.107, 35.140*

TITLE IX

A district that receives federal financial assistance, directly or indirectly, shall adopt and publish grievance procedures providing for prompt and equitable resolution of employee complaints alleging any action prohibited by Title IX of the Education Amendments of 1972. *34 CFR 106.8(b); North Haven Board of Education v. Bell, 456 U.S. 512 (1982)*

PERSONNEL-MANAGEMENT RELATIONS                                    DGBA
EMPLOYEE COMPLAINTS/GRIEVANCES                                 (LEGAL)

STATE LAWS

WAGES, HOURS, CONDITIONS OF WORK

The prohibition against collective bargaining and strikes [see DGA] does not impair the right of employees to present grievances concerning their wages, hours of employment, or conditions of work, either individually or through a representative that does not claim the right to strike. *Gov't Code 617.005*

The term "conditions of work" should be construed broadly to include any area of wages, hours or conditions of employment, and any other matter that is appropriate for communications from employees to employer concerning an aspect of their relationship. *Atty. Gen. Op. JM-177 (1984); Corpus Christi Fed. of Teachers v. Corpus Christi ISD, 572 S.W.2d 663 (Tex. 1978)*

The statute protects grievances presented individually or individual grievances presented collectively. *Lubbock Prof'l Firefighters v. City of Lubbock, 742 S.W.2d 413 (Tex. App.—Amarillo 1987, writ ref'd n.r.e.)*

The District cannot deny an employee's representative, including an attorney, the right to represent the employee at any stage of the grievance procedure, so long as the employee designates the representative and the representative does not claim the right to strike. *Lubbock Prof'l Firefighters v. City of Lubbock, 742 S.W.2d 413 (Tex. App.—Amarillo 1987, writ ref'd n.r.e.); Sayre v. Mullins, 681 S.W.2d 25 (Tex. 1984)*

The District should meet with employees or their designated representatives at reasonable times and places to hear grievances concerning wages, hours of work, and conditions of work. The right to present grievances is satisfied if employees have access to those in a position of authority to air their grievances. However, that authority is under no legal compulsion to take action to rectify the matter. *Atty. Gen. Op. H-422 (1974); Corpus Christi ISD v. Padilla, 709 S.W.2d 700 (Tex. App.—Corpus Christi, 1986, no writ)*

EMPLOYMENT POLICY

The District's employment policy must provide each employee with the right to present grievances to the Board.

The policy may not restrict the ability of an employee to communicate directly with a member of the Board regarding a matter relating to the operation of the District, except that the policy may prohibit ex parte communication relating to:

1.    A hearing under Education Code Chapter 21, Subchapter E (Term Contracts) or F (Hearing Examiners); and

2.    Another appeal or hearing in which ex parte communication would be inappropriate pending a final decision by the Board.

*Education Code 11.1513*

Alamo Heights ISD
015901

PERSONNEL-MANAGEMENT RELATIONS
EMPLOYEE COMPLAINTS/GRIEVANCES

DGBA
(LEGAL)

GRIEVANCE POLICY

The District's grievance policy must permit an employee to report a grievance against a supervisor to a different supervisor if the employee alleges that the supervisor:

1. Violated the law in the workplace; or

2. Unlawfully harassed the employee.

*Education Code 11.171*

FINALITY OF GRADES

An examination or course grade issued by a classroom teacher is final and may not be changed unless the grade is arbitrary, erroneous, or not consistent with the District's grading policy applicable to the grade, as determined by the board of the district in which the teacher is employed.

The Board's determination is not subject to appeal.

*Education Code 28.0214*

OPEN MEETINGS ACT

The Board is not required to conduct an open meeting to hear a complaint or charge against an employee. However, the Board may not conduct a closed meeting if the employee who is the subject of the hearing requests a public hearing. *Gov't Code 551.074* [See BEC]

CLOSED MEETING

The Board may conduct a closed meeting on an employee complaint to the extent required or provided by law. [See BEC]

RECORD OF PROCEEDINGS

An appeal of the Board's decision to the Commissioner of Education shall be decided based on a review of the record developed at the District level. "Record" includes, at a minimum, an audible electronic recording or written transcript of all oral testimony or argument. *Education Code 7.057(c), (f)*

It is the District's responsibility to make and preserve the records of the proceedings before the Board. If the District fails to create and preserve the record without good cause, all substantial evidence issues that require missing portions of the record for resolution shall be deemed against the District. The record shall include:

1. A tape recording or a transcript of the hearing at the local level. If a tape recording is used:

   a. The tape recording must be complete, audible, and clear; and

   b. Each speaker must be clearly identified.

2. All evidence admitted;

3. All offers of proof;

4.    All written pleadings, motions, and intermediate rulings;

5.    A description of matters officially noticed;

6.    If applicable, the decision of the hearing examiner;

7.    A tape recording or transcript of the oral argument before the Board; and

8.    The decision of the Board.

*19 TAC 157.1073(d)*

**WHISTLEBLOWER COMPLAINTS**

Before bringing suit, an employee who seeks relief under Government Code Chapter 554 (whistleblowers) must initiate action under the District's grievance or appeal procedures relating to suspension or termination of employment or adverse personnel action. *Gov't Code 554.005* [See DG]

GUIDING PRINCIPLES

INFORMAL
PROCESS

The Board encourages employees to discuss their concerns and complaints through informal conferences with their supervisor, principal, or other appropriate administrator.

Concerns should be expressed as soon as possible to allow early resolution at the lowest possible administrative level.

DIRECT
COMMUNICATION
WITH BOARD
MEMBERS

Employees shall not be prohibited from communicating with a member of the Board regarding District operations except when communication between an employee and a Board member would be inappropriate because of a pending hearing or appeal related to the employee.

FORMAL PROCESS

If an informal conference regarding a complaint fails to reach the outcome requested by the employee, he or she may initiate the formal process described below by timely filing a written complaint form.

Even after initiating the formal complaint process, employees are encouraged to seek informal resolution of their concerns. An employee whose concerns are resolved may withdraw a formal complaint at any time.

The process described in this policy shall not be construed to create new or additional rights beyond those granted by law or Board policy, nor to require a full evidentiary hearing or "mini-trial" at any level.

NOTICE TO
EMPLOYEES

The District shall inform employees of this policy.

FREEDOM FROM
RETALIATION

Neither the Board nor any District employee shall unlawfully retaliate against an employee for bringing a concern or complaint.

WHISTLEBLOWER
COMPLAINTS

Whistleblower complaints shall be filed within the time specified by law and may be made to the Superintendent or designee beginning at Level Two. Time lines for the employee and the District set out in this policy may be shortened to allow the Board to make a final decision within 60 calendar days of the initiation of the complaint. [See DG]

COMPLAINTS
AGAINST
SUPERVISORS

Complaints alleging a violation of law by a supervisor may be made to the Superintendent or designee. Complaints alleging a violation of law by the Superintendent may be made directly to the Board or designee.

COMPLAINTS

In this policy, the terms "complaint" and "grievance" shall have the same meaning. This policy shall apply to all employee complaints, except as provided below.

DATE ISSUED: 6/2/2008                                        1 of 6
UPDATE 83
DGBA(LOCAL)-A

EXCEPTIONS

This policy shall not apply to:

1. Complaints alleging discrimination, including violations of Title IX (gender), Title VII (sex, race, color, religion, national origin), ADEA (age), or Section 504 (disability). [See DIA]

2. Complaints alleging certain forms of harassment, including harassment by a supervisor and violations of Title VII. [See DIA]

3. Complaints concerning retaliation relating to discrimination and harassment. [See DIA]

4. Complaints concerning instructional materials. [See EFA]

5. Complaints concerning a commissioned peace officer who is an employee of the District. [See CKE]

6. Complaints arising from the proposed nonrenewal of a term contract issued under Chapter 21 of the Education Code. [See DFBB]

7. Complaints arising from the proposed termination or suspension without pay of an employee on a probationary, term, or continuing contract issued under Chapter 21 of the Education Code during the contract term. [See DFAA, DFBA, or DFCA, respectively]

GENERAL
PROVISIONS

FILING

Complaint forms and appeal notices may be filed by hand-delivery, fax, or U.S. Mail. Hand-delivered filings shall be timely filed if received by the appropriate administrator or designee by the close of business on the deadline. Fax filings shall be timely filed if they are received on or before the deadline, as indicated by the date/time shown on the fax copy. Mail filings shall be timely filed if they are postmarked by U.S. Mail on or before the deadline and received by the appropriate administrator or designated representative no more than three days after the deadline.

RESPONSE

At Levels One and Two, "response" shall mean a written communication to the employee from the appropriate administrator. Responses may be hand-delivered or sent by U.S. Mail to the employee's mailing address of record. Mailed responses shall be timely if they are postmarked by U.S. Mail on or before the deadline.

DAYS

"Days" shall mean District business days, unless otherwise noted. In calculating time lines under this policy, the day a document is filed is "day zero." The following business day is "day one."

REPRESENTATIVE        "Representative" shall mean any person who or an organization that does not claim the right to strike and is designated by the employee to represent him or her in the complaint process.

The employee may designate a representative through written notice to the District at any level of this process. If the employee designates a representative with fewer than three days' notice to the District before a scheduled conference or hearing, the District may reschedule the conference or hearing to a later date, if desired, in order to include the District's counsel. The District may be represented by counsel at any level of the process.

CONSOLIDATING        Complaints arising out of an event or a series of related events
COMPLAINTS           shall be addressed in one complaint. Employees shall not bring separate or serial complaints arising from any event or series of events that have been or could have been addressed in a previous complaint.

When two or more complaints are sufficiently similar in nature and remedy sought to permit their resolution through one proceeding, the District may consolidate the complaints.

UNTIMELY FILINGS     All time limits shall be strictly followed unless modified by mutual written consent.

If a complaint form or appeal notice is not timely filed, the complaint may be dismissed, on written notice to the employee, at any point during the complaint process. The employee may appeal the dismissal by seeking review in writing within ten days from the date of the written dismissal notice, starting at the level at which the complaint was dismissed. Such appeal shall be limited to the issue of timeliness.

COSTS INCURRED       Each party shall pay its own costs incurred in the course of the complaint.

COMPLAINT FORM       Complaints under this policy shall be submitted in writing on a form provided by the District.

Copies of any documents that support the complaint should be attached to the complaint form. If the employee does not have copies of these documents, they may be presented at the Level One conference. After the Level One conference, no new documents may be submitted by the employee unless the employee did not know the documents existed before the Level One conference.

A complaint form that is incomplete in any material aspect may be dismissed, but may be refiled with all the required information if the refiling is within the designated time for filing a complaint.

PERSONNEL-MANAGEMENT RELATIONS
EMPLOYEE COMPLAINTS/GRIEVANCES

DGBA
(LOCAL)

LEVEL ONE

Complaint forms must be filed:

1. Within 15 days of the date the employee first knew, or with reasonable diligence should have known, of the decision or action giving rise to the complaint or grievance; and

2. With the lowest level administrator who has the authority to remedy the alleged problem.

In most circumstances, employees on a school campus shall file Level One complaints with the campus principal; other District employees shall file Level One complaints with their immediate supervisor.

If the only administrator who has authority to remedy the alleged problem is the Superintendent or designee, the complaint may begin at Level Two following the procedure, including deadlines, for filing the complaint form at Level One.

If the complaint is not filed with the appropriate administrator, the receiving administrator must note the date and time the complaint form was received and immediately forward the complaint form to the appropriate administrator.

The appropriate administrator shall investigate as necessary and hold a conference with the employee within ten days after receipt of the written complaint. The administrator may set reasonable time limits for the conference.

The administrator shall provide the employee a written response within ten days following the conference. The written response shall set forth the basis of the decision. In reaching a decision, the administrator may consider information provided at the Level One conference and any other relevant documents or information the administrator believes will help resolve the complaint.

LEVEL TWO

If the employee did not receive the relief requested at Level One or if the time for a response has expired, the employee may request a conference with the Superintendent or designee to appeal the Level One decision.

The appeal notice must be filed in writing, on a form provided by the District, within ten days of the date of the written Level One response or, if no response was received, within ten days of the Level One response deadline.

After receiving notice of the appeal, the Level One administrator shall prepare and forward a record of the Level One complaint to the Level Two administrator. The employee may request a copy of the Level One record.

PERSONNEL-MANAGEMENT RELATIONS
EMPLOYEE COMPLAINTS/GRIEVANCES

DGBA
(LOCAL)

The Level One record shall include:

1. The original complaint form and any attachments.

2. All other documents submitted by the employee at Level One.

3. The written response issued at Level One and any attachments.

4. All other documents relied upon by the Level One administrator in reaching the Level One decision.

The Superintendent or designee shall hold a conference within ten days after the appeal notice is filed. The conference shall be limited to the issues presented by the employee at Level One and identified in the Level Two appeal notice. At the conference, the employee may provide information concerning any documents or information relied upon by the administration for the Level One decision. The Superintendent or designee may set reasonable time limits for the conference.

The Superintendent or designee shall provide the employee a written response within ten days following the conference. The written response shall set forth the basis of the decision. In reaching a decision, the Superintendent or designee may consider the Level One record, information provided at the Level Two conference, and any other relevant documents or information the Superintendent or designee believes will help resolve the complaint.

Recordings of the Level One and Level Two conferences, if any, shall be maintained with the Level One and Level Two records.

**LEVEL THREE**

If the employee did not receive the relief requested at Level Two or if the time for a response has expired, the employee may appeal the decision to the Board.

The appeal notice must be filed in writing, on a form provided by the District, within ten days of the date of the written Level Two response or, if no response was received, within ten days of the Level Two response deadline.

The Superintendent or designee shall inform the employee of the date, time, and place of the Board meeting at which the complaint will be on the agenda for presentation to the Board.

The Superintendent or designee shall provide the Board the record of the Level Two complaint. The employee may request a copy of the Level Two record.

The Level Two record shall include:

1. The Level One record.

2. The written response issued at Level Two and any attachments.

3. All other documents relied upon by the administration in reaching the Level Two decision.

If at the Level Three hearing the administration intends to rely on evidence not included in the Level Two record, the administration shall provide the employee notice of the nature of the evidence at least three days before the hearing.

The District shall determine whether the complaint will be presented in open or closed meeting in accordance with the Texas Open Meetings Act and other applicable law. [See BE]

The presiding officer may set reasonable time limits and guidelines for the presentation including an opportunity for the employee and administration to each make a presentation and provide rebuttal and an opportunity for questioning by the Board. The Board shall hear the complaint and may request that the administration provide an explanation for the decisions at the preceding levels.

In addition to any other record of the Board meeting required by law, the Board shall prepare a separate record of the Level Three presentation. The Level Three presentation, including the presentation by the employee or the employee's representative, any presentation from the administration, and questions from the Board with responses, shall be recorded by audio recording, video/audio recording, or court reporter.

The Board shall then consider the complaint. It may give notice of its decision orally or in writing at any time up to and including the next regularly scheduled Board meeting. If the Board does not make a decision regarding the complaint by the end of the next regularly scheduled meeting, the lack of a response by the Board upholds the administrative decision at Level Two.

**Appendix**

**Tab 5**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-50391
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

December 30, 2014

Lyle W. Cayce
Clerk

RODOLFO MARTINEZ,

> Plaintiff - Appellant

v.

TEXAS WORKFORCE COMMISSION - CIVIL RIGHTS DIVISION,

> Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before KING, JOLLY, and HAYNES, Circuit Judges.

PER CURIAM:

Rodolfo Martinez appeals the district court's order granting summary judgment in favor of the Texas Workforce Commission-Civil Rights Division ("TWC") on Martinez's claims of national origin discrimination under Title VII, 42 U.S.C. § 2000e-2(a).[1] Martinez, a Mexican-American, argues that the TWC discriminated against him when it appointed Janet Quesnel, a white woman,

---

[1] We note that Martinez was represented by counsel at various points below, but he proceeds with this appeal *pro se*. As such, we review his brief and other filings liberally. *See Abdul-Alim Amin v. Universal Life Ins. Co. of Memphis, Tenn.*, 706 F.2d 638, 640 n.1 (5th Cir. 1983).

No. 14-50391

to a management position over him in May 2011.  The TWC counters that it promoted Quesnel because she was more qualified and performed better during the interview process than Martinez.  A magistrate judge issued a Report and Recommendation ("R&R") recommending that the district court grant summary judgment in favor of the TWC because Martinez failed to show that the TWC's reasons for promoting Martinez were a pretext for unlawful discrimination; the district court agreed.  For the following reasons, we agree with the district court and AFFIRM the grant of summary judgment.

I.

We review the district court's grant of summary judgment de novo and apply the same standard as the district court.  *Day v. Wells Fargo Bank Nat'l Ass'n*, 768 F.3d 435, 435 (5th Cir. 2014).  The district court is entitled to grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At the summary judgment stage, we "review the facts in the light most favorable to the non-movant."  *Price v. Fed. Express Corp.*, 283 F.3d 715, 719 (5th Cir. 2002).

As Martinez presents a Title VII claim based on circumstantial evidence, we review the case in accordance with the traditional burden-shifting framework for such claims.  *See Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  The plaintiff must first present a prima facie case of discrimination, and if the plaintiff does so, the defendant must respond by offering a legitimate, non-discriminatory reason behind its decision.  *Id.*  If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is a pretext for discrimination.  *Id.*

2

No. 14-50391

II.

The parties do not dispute that Martinez made out a prima facie case of national origin discrimination based on a failure to promote theory. *See Haynes v. Pennzoil Co.*, 207 F.3d 296, 300 (5th Cir. 2000) (identifying the prima facie elements of a failure to promote claim). The TWC then proffered a non-discriminatory reason for failing to promote Martinez—Quesnel was more qualified than Martinez. Specifically, the TWC pointed to Quesnel's extensive experience within the TWC and in state government—she had over thirty years of state government experience, she had worked for the TWC continuously for over seventeen years, and she was already employed in a managerial capacity at the time of her promotion. Additionally, Quesnel out-scored Martinez during the interview process. We must decide whether Martinez produced sufficient evidence to suggest that TWC's reasons were pretext for discrimination.

Martinez argues that he has shown pretext because "the evidence in the record establishes that he was substantially more qualified for the position of Manager in May 2011 than [Quesnel]." We have held that a plaintiff may establish pretext by demonstrating that he was "clearly better qualified" such that "the qualifications are so widely disparate that no reasonable employer would have made the same decision." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010) (internal quotation marks omitted). Martinez does not cite the record on appeal, nor does he identify such qualifications in his brief.

For guidance, we turn to the R&R, in which the magistrate judge noted that Martinez claimed he had four superior qualifications: (1) he had more supervisory experience; (2) he had higher-level experience; (3) he had spent more years as an investigator; and (4) he had more education. We agree with the magistrate judge that these factors do not suggest that Martinez was clearly more qualified than Quesnel. Even accepting that Martinez had more

3

supervisory experience and higher-level experience generally, an employer may discount both years of service and general experience in favor of specific qualifications. *Moss*, 610 F.3d at 923–24. As the magistrate judge noted, Martinez's supervisory experience came from 1990 through 1997, whereas Quesnel was currently working in a supervisory role at the TWC when she was promoted. Indeed, it is clear from the record that the TWC valued Quesnel's strong record of service within the TWC, which included regular promotions from investigatory to supervisory roles. *See Nichols v. Lewis Grocer*, 138 F.3d 563, 567–69 (5th Cir. 1998) (finding that an employee was not clearly more qualified than another in part because the employee selected had experience in the department of the available position).

We also reject the notion that the magistrate judge weighed the evidence in reaching his conclusion. Instead, our precedents recognize that *employers* are generally free to weigh the qualifications of prospective employees, so long as they are not motivated by race. Indeed, an employee's "better education, work experience, and longer tenure with the company do not establish that he is clearly better qualified." *Price*, 283 F.3d at 723. Here, Quesnel had the longer tenure at the TWC, a strong service record at the TWC, a supervisory position at the TWC, and a stronger performance than Martinez in her interview. We cannot say that Martinez's other qualifications make him clearly more qualified than Quesnel. *See id.* (concluding that the employer was entitled to summary judgment when it valued a candidate's military experience and other skills over the plaintiff's college degree, greater management experience, and other qualifications).

Second, Martinez argues that the TWC improperly relied on the results of a "subjective" interview score to select Quesnel over him. An employer may rely on subjective reasons to select one candidate over another, however, "such as a subjective assessment of the candidate's performance in an interview."

4

No. 14-50391

*Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007).  Here, the TWC asked the candidates an identical set of questions and scored them based on the similarity of their answers to a model answer.  *Cf. id.* at 617 (finding that there was no evidence as to how the interviewers arrived at their scores).  Because the TWC has provided some evidence demonstrating how it scored the applicants in the interview process, we conclude that the subjective assessment may serve as a legitimate, non-discriminatory reason for its decision, and the use of the subjective assessment does not serve as evidence of pretext.

Finally, Martinez claims that the TWC "misrepresented the bases for the selection of [Quesnel], rather than truthfully stating that the only basis for promotion of [Quesnel] was . . . the subjective scoring during the interview."  We see no evidence of a misrepresentation.  Instead, the TWC consistently stated that it selected Quesnel based both on her qualifications, namely her record at the TWC, and her performance in the interview.[2]

### III.

In sum, Martinez has failed to show that he was clearly better qualified for the manager position or that the TWC's bases for its decision were otherwise affected by his national origin.  Accordingly, the district court properly adopted the magistrate's R&R granting summary judgment in favor of the TWC.

AFFIRMED.

---

[2] We note that the magistrate judge also considered and rejected a number of additional arguments in his R&R.  Although Martinez has not raised those issues here, we have nonetheless reviewed the R&R and the record evidence and have found no error.